HAYES P. HYDE (SBN 308031)
*HHyde@goodwinlaw.com*
**GOODWIN PROCTER** LLP
Three Embarcadero Center, 28TH Floor
San Francisco, CA 94111
Phone: +1 415 733 6000

JORDAN F. BOCK (SBN 321477)
*jbock@goodwinlaw.com*
**GOODWIN PROCTER** LLP
100 Northern Avenue
Boston, MA 02210
Phone: +1 617 570 1000

Attorneys for Plaintiffs
ASSOCIATION OF AMERICAN RAILROADS and
AMERICAN SHORT LINE AND REGIONAL
RAILROAD ASSOCIATION

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS and AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board; JOHN EISENHUNT, SUSAN SHAHEEN, JOHN R. BALMES, DIANE TAKVORIAN, BILL QUIRK, DEAN FLOREZ, HECTOR DE LA TORRE, DAVINA HURT, V. MANUAL PEREZ, ERIC GUERRA, NORA VARGAS, TANIA PACHECO-WERNER, GIDEON KRACOV, HENRY STERN, and EDUARDO GARCIA, in their official capacities as members of the California Air Resources Board; STEVEN S. CLIFF, in his official capacity as Executive Officer of the California Air Resources Board; and ROB BONTA, in his official capacity as Attorney General of the State of California <br><br> Defendants. | Case No. TBD <br><br> **COMPLAINT** <br><br> Date:       TBD <br> Time:       TBD <br> Courtroom: TBD <br> Judge:     Hon. |

1    Plaintiffs Association of American Railroads ("AAR") and American Short Line and

2    Regional Railroad Association ("ASLRRA") respectfully state the following claims for

3    declaratory and injunctive relief against Defendants Liane M. Randolph, Chair of the California

4    Air Resources Board ("CARB"); John Eisenhunt, Susan Shaheen, John R. Balmes, Diane

5    Takvorian, Bill Quirk, Dean Florez, Hector De La Torre, Davina Hurt, V. Manual Perez, Eric

6    Guerra, Nora Vargas, Tania Pacheco-Werner, Gideon Kracov, Henry Stern, and Eduardo Garcia,

7    members of CARB; Steven S. Cliff, Executive Officer of CARB; and Rob Bonta, Attorney

8    General of the State of California.

9                          **PRELIMINARY STATEMENT**

10       1.    This is a civil action for declaratory and injunctive relief under the Commerce and

11   Supremacy Clauses of the U.S. Constitution and this Court's inherent equitable authority to

12   enjoin actions by state officers that are contrary to federal law.  This action challenges the "In-

13   Use Locomotive Regulation" ("the Regulation"), adopted by CARB on April 27, 2023.  *See*

14   Declaration of Hayes P. Hyde in Support of Plaintiffs' Complaint, Ex. 10.[1]  The Regulation is

15   unlawful and its implementation and enforcement should be enjoined because it (i) is preempted

16   by federal law, including by the Interstate Commerce Commission Termination Act, the Clean

17   Air Act, and the Locomotive Inspection Act; and (ii) violates the Dormant Commerce Clause by

18   imposing a clear and substantial burden on interstate transportation.  Absent relief from this

19   Court, which has jurisdiction pursuant to 28 U.S.C. § 1331, Plaintiffs' members will suffer

20   irreparable harm.

21       2.    Rail transportation plays a vital role in the U.S. economy.  Freight rail accounts for

22   approximately 40% of long-distance ton-miles—more than any other mode of transportation.[2]

23   *See* U.S. Freight Railroads, AAR – Congress Fact Sheet (March 23, 2023), *available at*

24   https://bit.ly/3UT4FF3.  Freight rail's contribution to the U.S. economy comes not from a series

---

[1]  All cited exhibits are attached to the accompanying Declaration of Hayes P. Hyde in Support of Plaintiffs' Complaint, filed herewith.

[2]  A ton-mile is defined as one ton of freight shipped one mile.  Because it reflects both the volume shipped (tons) and the distance shipped (miles), it provides the "best single measure of the physical volume of freight transportation services."  *See* Bureau of Transp. Statistics (Sept. 10, 2012), U.S. Dep't of Transp., *available at* https://bit.ly/3ozVJII.

COMPLAINT                                                    Case No.

of separate state systems, but from a single interconnected system of nearly 140,000 miles of track crisscrossing the country.  Railroad operators do not switch locomotives when they cross state borders; rather, they frequently maintain the same locomotives over extensive distances. This means that a locomotive owned by one railroad may be operated by another railroad altogether.

3.     Despite its significance to the U.S. economy, freight rail accounts for just 1.7% of transportation-related greenhouse gas emissions.  *Id.*  While already energy efficient, railroads have continued to explore and invest in emissions-reducing initiatives.  Based on updated emissions data, California rail yard emissions of diesel particulate matter dropped more than 70% from 2005 to 2017 (in the railyards analyzed), and the railroads are moving aggressively to pursue lower- and zero-emissions locomotive technologies.  *See* Ex. 1 at 4.  BNSF Railway, for example, has invested heavily in the "next generation" of zero and near-zero emission technologies, including conducting initial testing of this technology.  Union Pacific Railroad has similarly initiated efforts to study and implement measures designed to further reduce criteria pollutant and greenhouse gas emissions.  For example, Union Pacific systematically renewed its environmental protection infrastructure and positioned itself to achieve sustainability goals consistent with the Paris Climate Agreement.  Likewise, both BNSF and Union Pacific have worked continuously to bring more energy-efficient locomotives into their fleets.  Similarly, Sierra Northern Railway has been working to upgrade its locomotive fleet to reduce its environmental footprint.

4.     Plaintiffs AAR and ASLRRA are non-profit, voluntary associations representing both freight and passenger railroads in California and across North America.  Many AAR and ASLRRA members operate in California.  For decades, AAR and ASLRRA members have worked collaboratively with state and local regulators, including CARB, to meet environmental objectives in a manner that is both practical and effective.  But it has long been understood that state and local regulators like CARB lack authority to directly regulate railroad operations and locomotive emissions.

1     5.     Given the importance of the interstate nature of rail transportation (which operates

2   by linking intrastate and interstate networks), Congress has repeatedly directed that railroads are

3   to be regulated solely at the federal level.  Thus, under the Interstate Commerce Commission

4   Termination Act ("the ICCTA"), 49 U.S.C. § 10101, *et seq.*, state and local regulators are

5   categorically precluded from enacting rules that have the effect of managing or governing rail

6   transportation; they are limited to enacting generally applicable laws that do not single out

7   railroads but have at most a remote or incidental effect on rail transportation, without overly

8   burdening railroad operations.  The Clean Air Act, 42 U.S.C. § 7401, *et seq.*, likewise provides

9   exclusive authority to the federal government to set emission standards for new locomotives,

10  expressly precluding state and local regulators from adopting or attempting to enforce such

11  standards on their own.  And the Locomotive Inspection Act, 49 U.S.C. § 20701, *et seq.*, reserves

12  the field of regulating locomotive equipment to the federal government.

13    6.     Until April 2023, CARB had never issued rules directly regulating aspects of

14  railroad operations or locomotive emissions.  Indeed, CARB specifically acknowledged in 2005

15  that state regulations "designed to reduce emissions from railroad locomotives" or "affect how the

16  railroads are permitted to use and operate [their] locomotives" were likely preempted. Ex. 4 at

17  16.  Subsequent events confirmed the agency's legal analysis, as the Ninth Circuit held

18  regulations passed by a different California regulator imposing reporting obligations on railroads

19  and restricting the idling time of locomotives were preempted.  *See Ass'n of Am. R.R. v. S. Coast*

20  *Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010).

21    7.     CARB has now chosen to target railroads and locomotive emissions in a

22  regulation.  Specifically, CARB seeks to "achieve emission reductions from Locomotives

23  Operating in California."  Ex. 8 at 1.  The In-Use Locomotive Regulation would manage railroad

24  operations in several respects.  The Regulation's "Spending Account" provision effectively

25  charges railroads for the privilege of operating in the State, compelling operators to set aside

26  *billions* of dollars according to a formula based on locomotive emissions, and then prescribing the

27  locomotives and related infrastructure the railroads may buy with their own money.  The

28  Regulation's "In-Use Operational Requirements" ban federally approved locomotives from

COMPLAINT                                                                    Case No.

continuing to operate in California based on CARB's own assessment of a locomotive's "useful life," which directly conflicts with federal law.  The Regulation also seeks to regulate train idling and imposes onerous record-keeping and reporting requirements—the same types of rules the Ninth Circuit has already held are preempted.

8.      Reflecting CARB's lack of experience with and understanding of the railroad industry, the Regulation's dictates are unworkable and counterproductive.  While Plaintiffs and their members are committed to sustainable freight transportation and further reductions in emissions, fulfilling that commitment requires realistic solutions accounting for the actual state of technological development.  CARB's regulation instead imposes mandates premised on unrealistic technology forecasts, which would undermine the effectiveness of rail transportation and likely force some operators into bankruptcy.

9.      The Regulation is unlawful.  The Regulation is preempted in full under the ICCTA, and central aspects of the Regulation are preempted under the Clean Air Act and the Locomotive Inspection Act.  In addition, the Regulation is a CARB attempt to dictate railroad policy for the nation in violation of the Dormant Commerce Clause.

10.      The Regulation is also infeasible.  Given the inherently interstate nature of railroad operations, it is not practicable for locomotive operators with networks spanning several states to adopt California-specific solutions to CARB's sweeping mandates in California alone.  CARB's analysis expressly assumes railroad operators will be forced to make changes to their *national* locomotive fleets in response to the Regulation.  But if California can impose its policy choices on the railroads, so too can any other state, leading to an entirely unworkable patchwork of state regulatory schemes that undermines the efficiency of an interconnected, interstate transportation network.

11.      AAR and ASLRRA ("Plaintiffs") accordingly seek relief from this Court to declare that the Regulation is invalid and to enjoin Defendants from implementing and/or enforcing the Regulation.

COMPLAINT                                                                 Case No.

# THE PARTIES

12.     Plaintiff AAR is a non-profit, voluntary association representing both freight and passenger railroads.  AAR works with its members to enhance the economy, safety, and efficiency of rail service by promoting sound transportation policy and facilitating the exchange of information among railroads, their customers, and the public at large.

13.     AAR regularly represents its member railroads in proceedings before Congress, the courts, and federal and state administrative agencies in matters of common interest to its members, such as the issues that are the subject this litigation.  As part of this role, AAR participated in the proceedings that led to the adoption of the Regulation, including by submitting written comments and oral testimony in response to CARB's notice of public hearing and proposal.

14.     AAR's freight members operate 83% of the line haul mileage, employ 95% of the workers, and account for 97% of the freight revenue of all railroads in the United States.  AAR's passenger railroads operate intercity passenger trains and provide commuter rail service.

15.     AAR's members include the largest (Class I) and some of the smallest (Class III) railroads in the country.[3]  Union Pacific, for example, is a Class I railroad with over 32,452 miles of track in 23 states and over 33,000 employees.  BNSF is also a Class I railroad with 32,500 miles of track in 28 states and over 33,000 employees.  Both have thousands of miles of track and thousands of employees in California.

16.     As these descriptions reflect, AAR's members own (or lease) and operate locomotives that are part of the national freight and passenger rail network, including within the State of California.  As a result, AAR's members are immediately and directly harmed by the Regulation, which interferes with their ability to effectively manage their locomotive networks.

17.     Plaintiff ASLRRA represents the interests of approximately 600 Class II and Class III railroads operating in nearly every U.S. state.  These "short line" railroads play a vital role in the nation's hub-and-spoke transportation network, often providing the necessary first-mile/last-

---

[3] Class I, Class II, and Class III refer to designations assigned by the Surface Transportation Board ("STB") based on railroads' annual revenue.

mile connection between farmers and manufacturers and the ultimate consumer.  Together, short lines operate nearly 50,000 miles of track, or about 30% of the national railroad network.  ASLRRA participated in the proceedings that led to adoption of the Regulation, including by submitting written comments.

18.     Like AAR's members, ASLRRA's members own (or lease) and operate locomotives within California, and are thus immediately and directly harmed by the Regulation.  Approximately 25 short line railroads operate in California.  Sierra Northern Railway, for example, is a Class III railroad that owns and leases over 130 miles of track in California, with more than 80 California employees.  Mendocino Railway is similarly a Class III railroad with over 75 employees and more than 70 miles of track in California, over which it operates freight locomotives, passenger locomotives, and historic locomotives.  Short line railroads are not limited to a single state:  Arizona & California Railroad Company, for example, is a 205-mile Class III railroad that operates in California and Arizona, with 91 miles of track and 26 employees in California.  It transports agricultural products, petroleum products, minerals and stone, chemicals and plastics, and lumber and forest products.

19.     Defendant Steven S. Cliff is the Executive Officer of CARB.  Defendant Cliff ("the Executive Officer") is responsible for the promulgation, implementation, and, in substantial part, enforcement of the Regulation.  Defendant Cliff is sued in his official capacity only.

20.     Defendant Liane M. Randolph is the Chair of CARB.  Defendant Randolph is sued in her official capacity only.

21.     Defendants John Eisenhut, Susan Shaheen, John R. Balmes, Diane Takvorian, Bill Quirk, Dean Florez, Hector De La Torre, Davina Hurt, V. Manuel Perez, Eric Guerra, Nora Vargas, Tania Pacheco-Werner, Gideon Kracov, Henry Stern, and Eduardo Garcia are members of CARB, and are sued in their official capacities only.

22.     Defendant Rob Bonta is the Attorney General of the State of California.  Defendant Bonta ("Attorney General") is responsible for the enforcement of the Regulation and is sued in his official capacity only.

COMPLAINT                                                        Case No.

6

**JURISDICTION AND VENUE**

23.     Plaintiffs' causes of action arise under 42 U.S.C. § 1983 and/or the United States Constitution.  The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

24.     The Court has authority to enjoin enforcement of the Regulation under 42 U.S.C. § 1983 and/or its inherent equitable authority to enjoin state officials who are violating, or plan to violate, federal law, *see Ex parte Young*, 209 U.S. 123 (1908), and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

25.     Plaintiffs bring this suit on behalf of their members, one or more of whom possess standing to sue in their own right.  *See Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 n.7 (9th Cir. 2021).  In particular, the Regulation forces Plaintiffs' members to make substantial changes to their operations—including, among other harms, installing unwanted and unnecessary technology on their locomotives, changing the composition of their fleets, and otherwise diverting capital to comply with the Regulation.  These harms are directly caused by the Regulation and would, in turn, be redressed by a favorable decision, as enjoining the implementation and enforcement of the Regulation would necessarily eliminate the increased burdens the Regulation causes.

26.     AAR and ASLRRA also satisfy the additional requirements for associational standing.  The interests at stake in this litigation are precisely the interests that AAR and ASLRRA exist to protect.  Both organizations are dedicated to ensuring that their members can operate safe, efficient, and cost-effective freight transportation, and they seek to advance those interests by engaging with policymakers, including by participating in rulemakings and, where necessary, pursuing litigation.  There is also no reason Plaintiffs' members need to individually participate in this suit.  Both AAR and ASLRRA are fully able to represent their members' interests, as evidenced by the fact that both have provided declarations from individual members describing the effects of these Regulations on the members' operations.

27.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b), as Defendants' offices are in Sacramento, California (in this judicial district), the Board sits in

COMPLAINT                                                                                      Case No.

Sacramento, California, and the Board held meetings regarding the Regulation in Sacramento, California, including the final vote approving the Regulation.

## BACKGROUND

### I.    Railroads Are Subject To Exclusive Federal Regulation

28.    The U.S. railroad system is foundational to the efficient transportation of freight and passengers across the nation.  Currently, freight railroads haul around 1.7 billion tons of raw materials and finished goods in a typical year.  Freight rail accounts for around 40% of long-distance ton-miles, more than any other mode of transportation.  *See* U.S. Freight Railroads, AAR – Congress Fact Sheet (March 23, 2023), *available at* https://bit.ly/3UT4FF3.

29.    The freight rail industry in the United States is not a combination of discrete, disconnected railroads, but rather a single interconnected system of six Class I railroads and hundreds of short line (Class II or Class III) railroads that together own and maintain nearly 140,000 route-miles of track through every continental state.

30.    At any given time, approximately 5 to 10% of the line-haul locomotives operated by the six Class I railroads are owned or leased by another railroad.[4]  This practice, known as "locomotive run-through interoperability," allows the railroads to maximize the efficiency of locomotive use in moving freight trains across the country and reduces transportation time by eliminating the need to exchange locomotives when moving from one railroad's line to another's. It thus reduces the idling and switching time for locomotives.

---

[4] A "line-haul locomotive" is a locomotive that is "powered by an engine with a maximum rated power (or a combination of engines having a total rated power)" of greater than 2,300 horsepower.  *See* 40 C.F.R. § 1033.901 (defining a "line-haul locomotive" as a "a locomotive that does not meet the definition of switch locomotive").

COMPLAINT                                                        Case No.

31.     As shown in the diagram below, in a 60-day window a single Class I train can travel across the country, crossing in and out of many different states.



32.     Given the interconnected nature of the U.S. rail system, "the Federal Government has determined that a uniform regulatory scheme is necessary to the operation of the national rail system." *United Transp. Union v. Long Island R.R.*, 455 U.S. 678, 688 (1982); *see also City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1029 (9th Cir. 1998) ("Congress and the courts long have recognized a need to regulate railroad operations at the federal level.").  As the Surface Transportation Board ("STB")—which has exclusive jurisdiction over rail transportation—has explained, "[a]llowing states and localities to create a variety of complex regulations governing how an instrument of interstate commerce is operated, equipped, or kept track of … would directly conflict with the goal of uniform national regulation of rail transportation." *U.S. Env't Prot. Agency*, FD 35803, 2014 WL 7392860, at *9 (STB Dec. 29, 2014).  Several federal laws thus preclude state and local regulation over this "intrinsically interstate form of transportation." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 804 (5th Cir. 2011).

33.     Three federal statutes are at issue here:  the ICCTA, the Clean Air Act, and the Locomotive Inspection Act.

## The ICCTA

34.     The ICCTA grants the STB, a federal agency, exclusive jurisdiction over "transportation by rail carriers, and the remedies provided … with respect to rates, classifications, rules … practices, routes, services, and facilities of such carriers."  49 U.S.C. § 10501(b).  This provision expressly "preempt[s] the remedies provided under Federal or State law."  *Id.*

35.     Under the ICCTA, "transportation" refers to "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail," and "services related to that movement."  49 U.S.C. §§ 10102(9)(A), (B).  The ICCTA preempts state laws in two distinct ways.

a.   First, the ICCTA categorically preempts regulations that "have the effect of 'managing' or 'governing' rail transportation*." Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 19 (D.C. Cir. 2017).  Categorical preemption applies as a matter of law "regardless of [a regulation's] practical effect because 'the focus is the act of regulation itself, not the effect of the state regulation in a specific factual situation.'"  *Id.* (quoting *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 644 (2d Cir. 2005)).  Under this approach, the ICCTA preempts state laws that impose rules on railroads unless "they are laws of general applicability that do not unreasonably interfere with interstate commerce."  *AAR*, 622 F.3d at 1097; *see also Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010) (state regulation cannot "discriminate against rail carriers"); *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007) ("[F]or a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry.").

b.   Second, a state statute or regulation is "impermissible if, as applied, [it] would have the effect of unreasonably burdening or interfering with rail transportation."  *Delaware*, 859 F.3d at 19.

36.     Applying these standards, the Ninth Circuit has held that the ICCTA "plainly" preempts local environmental regulations targeting railroads, such as rules imposing reporting requirements related to emissions and restricting the idling time allowed for locomotives. *AAR*, 622 F.3d at 1098.  The Court held that the rules were preempted because they applied "exclusively and directly to railroad activity, requiring the railroads to reduce emissions and to provide, under threat of penalties, specific reports on their emissions and inventory." *Id.*

**The Clean Air Act**

37.     Congress granted the U.S. Environmental Protection Agency ("EPA") exclusive authority to regulate emissions from new locomotives under the Clean Air Act.  Specifically, the Clean Air Act requires EPA to "promulgate regulations containing standards applicable to emissions from new locomotives and new engines used in locomotives."  42 U.S.C. § 7547(a)(5).

38.     EPA has promulgated comprehensive standards and other regulations governing locomotive emissions.  See 40 C.F.R. pt. 1033, subpart B.  These regulations employ a tier system for locomotives ranging from Tier 0 to Tier 4, with emission requirements tied to the year of original manufacture of a locomotive.  *See id.* § 1033.101.  The emission standards and requirements apply to "new" locomotives during their "useful life," which is a period generally specified by the manufacturer in both years (a minimum of 10 years) and megawatt-hours—the useful-life period ends when either of the two specified values (the years or megawatt-hours) is exceeded or the locomotive is remanufactured.  *Id.* § 1033.101(g).  EPA has interpreted the term "new" with respect to locomotives and locomotive engines to include "remanufactured or refurbished" ones.  *Id.* § 1033.901.  Thus, a locomotive that has been remanufactured (or has a remanufactured engine) is subject to EPA's emissions regulations during an additional useful life period.  *Id.* § 1033.101(g)(3)-(4).

39.     Consistent with the statute's comprehensive federal regulatory scheme, § 209(e)(1) of the Clean Air Act provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from … [n]ew locomotives or new engines used in locomotives."  42 U.S.C. § 7543(e)(1).  As with the

federal emission regulations, for preemption purposes "new" locomotives or engines include "remanufactured or refurbished" ones. *See* 40 C.F.R. §§ 1074.5, 1033.901.

40.     Section 209(e)(2) also requires that a state first receive an express waiver from EPA before adopting or attempting to enforce "standards and other requirements relating to the control of emissions" from nonroad vehicles or engines, including non-new locomotives or engines operating beyond their useful life. See 42 U.S.C. § 7543(e)(2); 40 C.F.R. §§ 1074.101; Final Rule, *Emission Standards for Locomotives and Locomotive Engines*, 63 Fed. Reg. 18978, 18994 (Apr. 16, 1998) ("all state requirements relating to the control of emissions from in-use locomotives and locomotive engines … are subject to section 209(e)(2)'s waiver requirement").

### The Locomotive Inspection Act

41.     The Locomotive Inspection Act governs the regulation of locomotive equipment. Specifically, the Locomotive Inspection Act provides that "[a] railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—(1) are in proper condition and safe to operate without unnecessary danger of personal injury; (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and (3) can withstand every test prescribed by the Secretary under this chapter." 49 U.S.C. § 20701.

42.     "It has long been settled that Congress intended federal law to occupy the field of locomotive equipment and safety." *Law v. Gen. Motors Corp.*, 114 F.3d 908, 910 (9th Cir. 1997); *see also Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 631 (2012) (holding that Congress "occup[ied] the entire field of regulating locomotive equipment"—a field that "extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances") (quoting *Napier v. Atl. Coast Line R.R. Co.*, 272 U.S. 605, 611 (1926)).

**II.     The Regulation Targets Railroads By Setting Standards and Other Requirements for Locomotive Emissions and Managing Railroad Operations**.

43.     The Regulation consists of 17 separate sections, all prescribing requirements that apply exclusively to railroads. The Regulation imposes a series of obligations on railroads, including (among other requirements) compelling railroads to deposit significant amounts of

money every year in a dedicated "Spending Account" that can be spent only on certain technology; directing railroads to report extensive quantities of geographically based data that railroads are largely not equipped to collect; and restricting the locomotives permitted to operate in the State.  The central provisions of the Regulation include the following:

**The Spending Account And Administrative Payment Requirements**

44.     The Spending Account provision (§ 2478.4) requires the railroads to "establish a Spending Account" in which they make substantial annual deposits of funds that "are to be solely dedicated to compliance with the Spending Account requirements."

45.     As part of this provision, the "Annual Deposit Obligation" or "Funding Requirement" requires the locomotive operators to make annual deposits that are calculated based upon the operator's emissions in the previous year.  § 2478.4(b), (g).  Locomotive operators must "begin tracking California locomotive activity in each air district" and then deposit funds in the spending account using a formula based upon "their locomotives' cumulative diesel emissions," as measured by the megawatt hours "their locomotives operated in each California air district over the previous year."[5]  Ex. 2 at 49; *id.* at 98 (Operators must "calculate the Spending Account funding requirement for each of their locomotives that operated in California annually based on the emissions discharged by the locomotives in the state"); *see also* Ex. 11 at 32.

46.     BNSF Railway and Union Pacific Railroad estimate $700-$800 million will need to be deposited annually by each railroad to comply with the Spending Account requirements.  Annual deposits of up to $5 million may be required of the short line railroads—a huge sum given their much smaller operating budgets.

47.     The railroads must make their first annual deposit into the Spending Account "[o]n or before July 1, 2024."  § 2478.4(b).  But to comply with this obligation, the railroads must begin tracking emissions immediately, as the initial deposit is calculated based on emissions

---

[5] "'California Air District' means one of the local air pollution control districts or air quality management districts established under Health and Safety Code sections 40000 et seq." § 2478.3(a).  There are 35 in California.  *See AAR*, 622 F.3d at 1096  (explaining that California "divides its geographic territory into 35 air quality management districts").

produced "from the effective date of this Locomotive Regulation through December 31, of the same year as the effective date." § 2478.4(g).

48.     Those deposited funds can only be used to acquire certain narrow categories of locomotives and locomotive equipment.  Until January 1, 2030, the Spending Account funds may be spent only on (1) "Cleaner Locomotive(s), or for the Remanufacture or Repower to a Cleaner Locomotive(s)," or (2) specific locomotives and accompanying infrastructure that are either "zero emission" ("ZE") or capable of operating in a ZE configuration.  Beginning on January 1, 2030, Spending Account funds may only be spent on locomotives that are ZE or ZE Capable.

49.     The Regulation defines "Cleaner Locomotive" as a locomotive "with exhaust emission levels that are equal to or less than Tier 4," § 2478.3(a), where "Tier 4" refers to the cleanest possible locomotives currently available on the market.  *See* ¶ 38, *supra*.  Locomotive Operators purchasing new Tier 4 locomotives will still be required to allocate additional funds to a Spending Account based on that new locomotive's emissions.  This feature of the Regulation thus creates a strong disincentive against Tier 4 purchases, as railroads would continue to see their operations taxed despite investing to use the best technology available on the market.

50.     The Regulation defines a "Zero Emission (ZE) Locomotive" as "a Locomotive that never emits any criteria pollutant, toxic pollutant, or greenhouse gas from any onboard source of power at any power setting when Operated in a ZE Configuration, including any propulsion power that is connected to and moves with the Locomotive when it is in motion." § 2478.3(a).  A "Zero Emission (ZE) Configuration" is "a Locomotive configuration that operates in a zero emission capacity," as just defined.  *Id.*  To qualify as "ZE Capable," the locomotive operator must show "that the Locomotive was only Operated in a ZE Configuration when Operating in California during that Calendar Year."  *Id.*  "A ZE Capable Locomotive that has been Operated outside of a ZE Configuration within California at any point during a Calendar Year shall not qualify as a ZE Capable Locomotive for that Calendar Year and shall be treated as an emitting Locomotive based on the U.S. EPA Tier of its engine for the purposes of this Locomotive Regulation."  *Id.*

51.     The Administrative Payment Provision authorizes CARB to collect an annual payment of $175 per locomotive, with limited exceptions for defined categories of "Historic Locomotives"[6] and "ZE" locomotives, as defined above. § 2478.12. "The fees listed in this section 2478.12 are not refundable." *Id.* The Administrative Payment provision is due with the railroads' submission of their annual report. §§ 24278.11(a)(6), 2478.12.

### The In-Use Operational Requirements

52.     The In-Use Operational Requirements (§ 2478.5) ban certain federally certified locomotives from continuing to operate in California.

53.     Subsection (a) dictates that, beginning in 2030, no locomotive that is "23 years or older"—as determined by its "Original Engine Build Date"—may operate in California, unless the locomotive has not exceeded a specified quantity of energy usage over its lifetime or it exclusively operates in ZE Configuration within California. § 2478.5(a).

54.     In contravention of federal law, this ban generally applies to locomotives that have a fully remanufactured engine. § 2478.3(a) ("'Original Engine Build Date' means the date of final assembly of the Locomotive Engine, prior to any Remanufacture of the Locomotive Engine."). By contrast, federal law expressly defines a "remanufactured" locomotive as "new." 40 C.F.R. § 1033.901. Moreover, federal law specifically accounts for a locomotive's "useful life," which ends either when the locomotive reaches a certain number of years or MWh, or when the locomotive is remanufactured. 40 C.F.R. § 1033.101(g); *see* ¶ 38, *supra*.

55.     Subsection (b) likewise dictates that, beginning in 2030, "any Switch, Industrial, or Passenger Locomotive" built in 2030 or later (as determined by its "Original Engine Build Date") must operate in a ZE configuration "at all times while in California." § 2478.5(b).[7]

---

[6] The Regulation defines "Historic Locomotive" as "a Locomotive that is owned or Operated by a Historic Railroad and meets all the following requirements: (1) Does not haul freight; (2) Is used solely for education, preservation, or historical experience; and (3) The use of the Locomotive in its original configuration is key to the educational, preservation, or historical experience." § 2478.3(a).

[7] An Industrial Locomotive is operated by "a Locomotive Operator that Operates Locomotives to move their company products but doesn't provide rail services to other companies or to passengers." § 2478.3(a). A Passenger Locomotive is, as its name suggests, "a Locomotive designed and constructed for the primary purpose of propelling passenger Trains and providing power to the passenger Railcars of the Train for such functions as heating, lighting, and air conditioning." *Id.* A Switch Locomotive (also referred to as a "Switcher") is a locomotive that

56.     Subsection (c) dictates that, beginning in 2035, any "Freight Line Haul Locomotive Engine" built in 2035 or later (as judged by its "Original Engine Build Date") must operate in a ZE configuration "at all times while in California." § 2478.5(c).

57.     Section 2478.6 allows for temporary "Compliance Extensions" of the In-Use Operational Requirements, but only in a narrow set of circumstances:  to remove a locomotive from California; for maintenance; or in the case of delayed or unavailable equipment. § 2478.6(a)-(b).  To qualify for such an extension, locomotives must submit an application to the Executive Officer explaining, in particular, the justification for the extension and the length of time the railroad will need to operate the out-of-compliance locomotive in California.  *Id.*  The Executive Officer then has discretion whether to grant the request.  *Id.*  Even this limited relief is unavailable for the Spending Account requirements, such that emissions from an out-of-compliance locomotive would continue to trigger Spending Account deposit obligations despite an extension.

**The Idling Requirements**

58.     The Idling Requirements (§ 2748.9) limit the length of time a railroad may remain stationary without turning off its engine.  The Regulation requires that any locomotive with an "automatic engine stop/start" ("AESS") device must be "shut off no more than 30 minutes after the Locomotive becomes stationary," except for locomotives operating in ZE configuration or that satisfy a few other narrow exceptions.  §§ 2478.9(a), (e); *see also* § 2478.3(a) ("'Automatic Engine Stop/Start (AESS)' means the automatic engine shut down/start up system that controls the engine by stopping or starting it without Operator action described in Code of Federal Regulations, title 40, section 1033.15(g).").

59.     The Idling Requirements also require that railroads maintain their AESS capabilities.  Specifically, the provision dictates that a "properly functioning AESS shall not be removed, tampered with, or disabled unless for maintenance," and further directs that a

---

"does not meet the definition of Industrial or Passenger Locomotive" and "is powered by an engine with a maximum Rated Power (or a combination of engines having a total Rated Power) of 2,300 hp or less." *Id.*

"Locomotive Operator with an AESS equipped Locomotive shall ensure the AESS is functional at all times during the Locomotive's Operation."  *Id.* § 2478.9(b), (c).

60.     While federal regulations also include a 30-minute idling requirement, the federal requirements apply to the original equipment manufacturer or remanufacturer—not to the railroad operator.  40 C.F.R. § 1033.115(g).  Thus, the Regulation imposes an entirely new requirement on railroad operators that does not exist under federal law.  *See* Ex. 11 at 40 (acknowledging that "[t]he purpose" of the Regulation "is to clarify what is expected of locomotive *operators*," whereas "the U.S. EPA rule … is directed at manufacturers").

### Reporting and Recordkeeping Requirements

61.     A locomotive operator must register each locomotive that operates in California and provide extensive information about the locomotive.  § 2478.10.  Locomotives are required to have properly functioning MWh meters at all times, unless the locomotive is operated exclusively in California during a given calendar year.  § 2478.10(d).

62.     The Regulation imposes extensive Reporting and Recordkeeping Requirements (§ 2478.11), which are designed to collect the emissions information that is then used to calculate railroads' required Spending Account deposits.  To satisfy the Reporting and Recordkeeping Requirements, Plaintiffs' members will need to develop and install extensive new technology. The relevant provisions require all locomotive operators in the State to submit annual reports with emissions information for non-ZE locomotives, § 2478.11(b); an itemized list of the description and location of each item purchased with the Spending Account, along with the claimed credits that can be put toward the Spending Account, § 2478.11(c); and particularized power usage data for each locomotive operated in California, § 2478.11(d).

63.     The railroads must collect extensive data on the use and location of each locomotive operating in California to comply with these requirements.  And while the data collection formally begins as of the Regulation's anticipated effective date (October 1, 2023), it will not be possible for Plaintiffs' members to comply with Regulation's obligations unless they commit significant resources to technological adaptation well in advance of that date.  Because many locomotive operators in the United States are not currently able to collect the data necessary

to compile these reports, they will need to purchase, install, and implement new technology to collect and interpret the data from the locomotives.  *See* ¶¶ 84-87*, infra*.

### **Alternative Compliance Options**

64.     Finally, in lieu of "direct compliance" with the Spending Account and In-Use Requirements, the Regulation provides two theoretical alternatives: the Alternative Compliance Plan ("ACP") and the Alternative Fleet Milestone Option ("AFMO").  §§  2478.4(a), 2478.5(d). These alternative options do not relieve railroad operations from the obligations imposed under other subsections of the Regulation, including both the Idling Requirements and the Reporting and Recordkeeping Requirements.

65.     The ACP requires locomotive operators to achieve reductions in emissions that are "equivalent to or greater than the reductions that would have been achieved" through direct compliance with the regulations, according to a set of complicated assumptions.  § 2478.7(b), (c).

66.     To replace the Spending Account requirement (§ 2478.4) through an ACP, a locomotive operator must reduce emissions "in amounts equivalent to or greater than the reductions that would have been achieved during the Five-Year Verification Period," assuming that "(A) all Spending Account funds would have been used to purchase, at Fair Market Value, Tier 4 Locomotives until December 31, 2028, and ZE Locomotives from January 1, 2029, onward"; "(B) The Tier 4 or ZE Locomotives that would have been purchased using Spending Account funds would have been introduced into use in California within one year of the sufficient accumulation of funds to purchase a Tier 4 or ZE Locomotive;" and "(C) Tier 4 Locomotives would Operate for 23 years prior to being removed from California service."  § 2478.7(b)(2).

67.     To replace the In-Use Operational Requirements (§ 2478.5) through an ACP, a locomotive operator must reduce emissions "in amounts equivalent to or greater than the reductions that would have been achieved during the Five-Year Verification Period," assuming that "(A) Beginning January 1, 2030, the Locomotive Operator's Locomotives with an Original Engine Build Date of 23 years and older would no longer be Operated in California as specified in subsection 2478.5(a)"; "(B) Beginning January 1, 2030, any Switch, Industrial, or Passenger Locomotive Operating in California with an Original Engine Build Date of 2030 or newer would

always be Operated in a ZE Configuration in California as specified in subsection 2478.5(b)"; and "(C) Beginning January 1, 2035, any Freight Line Haul Locomotive Operating in California with an Original Engine Build Date of 2035 or newer would always be Operated in a ZE Configuration in California as specified in subsection 2478.5(b)."

68.     The AFMO, in turn, requires locomotive operators to dramatically transform their existing fleet in roughly five-year stages.  By 2030, a railroad that has been approved for the AFMO must have transitioned fully half of its fleet to either "Cleaner" (Tier 4) or ZE locomotives.  § 2478.8(b).  That number increases to 100% of a railroad's fleet by 2035, at which point the option to use Tier 4 locomotives begins to phase out.  *Id.*  By 2042, half of a railroad's fleet must consist of ZE locomotives, and that number culminates in a fully ZE fleet by 2047.  *Id.* As the railroads have explained, it is not possible to overhaul their fleets on CARB's proposed timeline because, among other reasons, ZE locomotives will not be available on this timeframe; rather, even the most optimistic timelines provided by locomotive manufacturers show no path for zero-emission line-haul locomotives in the coming decades.  Railroads do not have an ability to opt-out of an approved AFMO if they later determine it is unworkable, as the AFMO "is valid in perpetuity and binds the Locomotive Operator to follow" it.  § 2478.8(i).

69.     CARB expects the AFMO option will be used only by passenger rail, expressly recognizing that it is not a feasible option for freight operators like Plaintiffs' members.  *See* Ex. 3 at 7.

70.     Both the ACP and the AFMO have extensive application processes.  For the ACP, railroads must submit their applications to CARB "at least six months prior to the requested start date of the ACP" and provide a slew of information justifying their use of the ACP—including a "detailed explanation of the calculations, assumptions, and information used to demonstrate" that the railroad's emissions will satisfy the ACP's requirements.  § 2478.7(d).  The AFMO requires a similarly detailed application that includes, among other information, a "detailed list" of the railroad's full fleet of locomotives, and a "detailed description of any plans for expansion of Locomotive Operations in California with details on how the Operator will increase service (e.g., with new Locomotives or by increasing use of current Locomotive fleet)."  § 2478.8(e).  Both

COMPLAINT                                                                      Case No.

1  options are subject to CARB's discretionary approval, and the ACP is available only if the

2  railroad pays a substantial, nonrefundable fee.  §§ 2478.7(g), 2478.8(g), 2478.12.

3  **III.    CARB Issues the Regulation in Defiance of Comments and Its Own Previous Legal**

**Analysis Recognizing the Agency's Lack of Authority to Regulate Railroad**

4  **Operations and Locomotive Emissions.**

5          71.    AAR, ASLRRA, and their members have consistently demonstrated their

6  commitment to partnering with federal and state regulators in improving air quality.  For decades,

7  railroads have undertaken initiatives to address air quality in California—both on their own and

8  through collaborations with CARB and various Air Districts.  In 1998 and 2005, CARB entered

9  into voluntary agreements with several railroads operating in California (among them BNSF and

10  Union Pacific) to control emissions from locomotives—agreements that CARB acknowledges the

11  railroads have fully honored.  *See* Ex. 1 at 3-4.  Union Pacific and BNSF have likewise worked

12  with CARB and two Air Districts to bring "Tier 4" locomotives into their fleets, *i.e.*, locomotives

13  with the lowest emission levels currently available on the market.

14          72.    As these initiatives suggest, CARB has never before attempted to directly regulate

15  locomotive emissions or railroad operations.  To the contrary, it recognized that federal law

16  places significant limits on the agency's authority in this area, which is why CARB has

17  previously worked cooperatively with the railroads to achieve meaningful emissions reductions in

18  a pragmatic manner.  In 2005, CARB's attorneys defended this approach by explaining that "the

19  ICCTA basically protects the railroads from any regulation … that has a potential economic

20  impact on railroad operations" and would likely preempt state regulations "specifically designed

21  to reduce emissions from railroad locomotives" that "affect how the railroads are permitted to use

22  and operate those locomotives."  *See* Ex. 4 at 16, 21, 27.  CARB further explained that "Congress

23  intended ICCTA preemption to be broadly construed," and that states were likely "prohibited

24  from applying direct, discriminatorily applied regulations"—precisely the issue here.  *Id.* at 14.

25          73.    CARB changed course with the In-Use Locomotive Regulation, which first took

26  shape in fall 2020 following Governor Gavin Newsom's issuance of Executive Order N-79-20.

27  That order directed CARB, "to the extent consistent with State and federal law," to propose

28  strategies "to achieve 100 percent zero-emission from off-road vehicles and equipment operations

COMPLAINT                                                          Case No.

in the State by 2035."  E.O. N-79-20 (Sept. 23, 2020) (Cal.), https://bit.ly/41tEhEg; *see* Ex. 9 at 110-11 (describing this background to the Regulation).  In response, CARB decided to disregard previously recognized limits on its regulatory authority and proposed comprehensive regulations of railroad operations and locomotive emissions in California.

74.     On September 20, 2022, CARB issued a formal Notice of Public Hearing with an Initial Statement of Reasons and Proposed Regulation Order.  Both AAR and ASLRRA submitted comments in response to the Notice.  In those comments, Plaintiffs explained in detail that the Regulation would be preempted by the ICCTA, the Clean Air Act, and the Locomotive Inspection Act, in addition to violating the Commerce Clause of the U.S. Constitution.  *See* Ex. 1 at 9-29; Ex. 5 at 2, Attachment 2 at 5-21.

75.     Plaintiffs also explained that CARB's assumptions about the future availability of ZE technologies are unrealistic.  *See* Ex. 1 at 33-35; Ex. 5, Attachment 2 at 19-20.  While CARB conducted a "technology feasibility analysis," the analysis merely showed that ZE technology is technically possible in some contexts—not that it is in fact safe, reliable, maintainable, or operable on the North American rail network.  As Plaintiffs detailed, CARB has no meaningful evidence to suggest that highly uncertain technological projections (*e.g.*, proposed battery-electric or zero-emission hydrogen locomotives) will result in technology that is sufficiently safe and reliable to use at commercial scale on the timescales contemplated by the Regulation.  *See* Ex. 1 at 33-35.  Rather than rely on meaningful testing data or input from the railroads, CARB turned instead to a literature search and interviews with people in the field (but notably excluding the railroads themselves).  *Id.* at 33.  The railroads, by contrast, typically test new technology for significant periods of time to ensure that it is safe and able to be used on a commercial scale as part of their interstate rail networks.  *Id.* at 34 & n.93.

76.     ASLRRA likewise documented the potentially crippling threat the Regulation will have on its members.  In particular, it explained that the Regulation "would significantly destabilize the state's short line railroad industry," as that industry "already operates on relatively small profit margins."  Ex. 5 at 8.  While CARB suggested that short line railroads might be able to stave off extinction by "pass[ing] on the costs" of the Regulation to its customers, ASLRRA

explained why that purported solution is infeasible.  *Id.* at 9.  Because short line railroads lack pricing power and "compete directly and aggressively with trucks for freight transportation and are also subject to product and geographic competition … regulatory costs cannot reliably be passed on to the customer."  *Id.*

77.    CARB did not materially change its regulatory proposal in response to comments from Plaintiffs and others.  Its most significant modification was merely to add a second alternative compliance option (the AFMO), which CARB recognized is not a viable option for freight railroads.

78.    CARB has conceded that its regulatory proposal will have substantial impacts on railroad operations not only within California, but on a national level.  Recognizing the interoperability of locomotives in interstate rail networks, CARB "assume[d]" that operators would need to transform their "entire fleet" nationwide to comply with the Regulation.  Ex. 2 at 177 (emphasis added); *see also* Ex. 6 at 35 (noting that the agency "assumed that each operator's entire fleet would comply with the … Regulation, allowing all locomotives to operate as needed in California); *id.* at 88 (assuming that "Class I operators … would continue their current business practice of sending any available line haul locomotive from their fleets to California," and would therefore need "to make their entire line haul locomotive fleet compliant"); Ex. 7 at 12 ("For Class I railroads, 72 percent of the nationwide line haul locomotives visit California in any given year."); Ex. 11 at 67 ("Freight line haul operators operate the locomotives [that operate in California] throughout the entire national rail network and [CARB] staff did not assume changes to this way of operation.").  CARB also assumed that Class I operators like BNSF and Union Pacific "will be able to pass on costs of the [Regulation] across the nation."  Ex. 2 at 200.  CARB lacks authority, however, to impose economic regulations on railroad operators, as economic regulation of railroads and rate-setting is the exclusive responsibility of the STB.

79.    On April 27, 2023, CARB formally adopted the current version of the Regulation.  The regulation will be codified at 13 C.C.R. §§ 2478-2478.17.

80.    On June 9, 2023, CARB transmitted the Regulation to the Office of Administrative Law ("OAL") for review.  OAL reviews a regulation solely for compliance with state-law

1   obligations.  OAL does not have authority to review whether a regulation is consistent with

2   federal law, nor does OAL have authority to itself change the substance of a regulation in any

3   manner.  *See* Gov. Code § 11349.1.

4       81.     OAL is thus required to complete its review of the Regulation within 30 working

5   days from receipt—*i.e.*, no later than July 25, 2023.  *See* Gov. Code § 11349.3(a).  Unless OAL

6   identifies an error that requires returning the Regulation to CARB, OAL will transmit the

7   Regulation to the Secretary of State within that 30-day period.  *See id.*  If OAL fails to act within

8   those 30 days, the Regulation "shall be deemed to have been approved."  *Id.* § 11349.3(a).

9       82.     Under California law, a regulation becomes effective on one of four quarterly

10  dates based on when the final regulations are filed with the Secretary of State:  January 1, if filed

11  between September 1 and November 30; April 1, if filed between December 1 and February 29;

12  July 1, if filed between March 1 and May 31; and October 1, if filed between June 1 and August

13  31.  *See* About the Regular Rulemaking Process, California Office of Administrative Law,

14  *available at* https://bit.ly/43XxLXR.  Thus, under the mandatory timeline for OAL review, the

15  Regulation will become effective following OAL approval on October 1, 2023 (the "Effective

16  Date").  Consistent with that timeline, CARB itself states that the "Regulation is anticipated to go

17  into effect in the fall of 2023."  Ex. 11 at 20.

18      83.     On June 11, 2023, CARB posted on its website the agency's Final Statement of

19  Reasons for adopting the Regulation, which incorporates by reference the Initial Statement of

20  Reasons and responds to submissions by commenters.  *See generally* Ex. 11.  In the Final

21  Statement, CARB states that it "anticipates seeking … authorization from the U.S. EPA" for the

22  Regulation under Section 209(e)(2)(A) of the Clean Air Act "[t]o the extent that the [Regulation]

23  imposes standards or other requirements on non-new locomotives."  *Id.* at 21.  According to

24  CARB, under Section 209(e)(2)(A), "only U.S. EPA and California" supposedly "have authority

25  to promulgate these types of regulations," including the Reporting and Recordkeeping

26  Requirements that go immediately into force on the Effective Date.  *Id.* at 22, 35.  Upon

27  information and belief, CARB has not submitted any such application to the U.S. EPA, the U.S.

28  EPA has not provided notice for a public hearing regarding any such an application, and the U.S.

COMPLAINT                                               Case No.

1    EPA has not "authorize[d] California to adopt and enforce standards and other requirements"

2    established in the Regulation.  42 U.S.C. § 7543(e)(2)(A).

3    **IV.    The Regulation Imposes Immediate and Irreparable Harm on Plaintiffs, Who Must**

4    **Begin Undertaking Burdensome, Disruptive Investments Now In Order To Comply.**

5            84.     The Regulation imposes certain obligations that begin on the Effective Date.  Once

6    the Regulation becomes effective, Plaintiffs' members will immediately be obligated to collect

7    data to comply with the Reporting and Recordkeeping Requirements, with that data then used to

8    determine the amount each railroad must deposit into the Spending Account for the first year.

9    §§ 2478.4(b), 2478.11(a); *see also* Ex. 11 at 128-129 ("Recordkeeping and reporting

10   requirements begin on the effective date of the Proposed Regulation. . . . Locomotive activity and

11   location data are needed as soon as the Proposed Regulation goes into effect[.]").  Plaintiffs'

12   members will also be forced immediately to follow the Idling Requirements.  § 2478.9.

13           85.     Plaintiffs' members will not be able to comply with the Reporting and

14   Recordkeeping Requirements on the Effective Date of the Regulation unless they begin to

15   undertake substantial technology investments well in advance of the Effective Date.  Plaintiffs'

16   members will also need to divert funds from existing priorities before the Effective Date,

17   inhibiting members' ability to manage their railroads and interfering with their operations.

18           86.     First, the Reporting and Recordkeeping obligations place a certainly impending

19   and substantial burden on Plaintiffs' members.  For example, none of BNSF's locomotives

20   gather, correlate, and transmit the real-time data required under the Regulation to record the

21   "Total engine hours Operated in each California Air District." § 2478.11(b)(2), (3).  Hundreds of

22   BNSF's locomotives are missing the on-board technology needed for these measurements (MWh

23   meters and/or GPS units), and none of BNSF's systems are designed to apportion activity or

24   emissions to 35 individual Air Districts across California.  As a result, BNSF will be unable to

25   comply with the Regulation unless it installs new equipment on its locomotives and builds new

26   back-end infrastructure to properly analyze the data *before* the Regulation takes effect.  To

27   comply, BNSF will need to create and install sophisticated software that tracks to a high degree of

28   precision (1) how much electricity each locomotive generates while in each California Air

COMPLAINT                                                              Case No.

24

District (measured in MWh), and (2) how much time each locomotive spends operating while in each California Air District.  None of BNSF's locomotives are currently equipped with software of this type, meaning BNSF will need to begin installing the new technology and building this new back-end infrastructure in advance to be able to comply with the Regulation.

87.    Union Pacific likewise does not currently have the technology required to record the locational use information required by the Recordkeeping and Reporting Requirements. Many of Union Pacific's locomotives lack MWh meters, some lack GPS units, and some do not have technology to transmit the required data (including the required idling data) back to the company's centralized data system.  As a result, Union Pacific will not be able to comply with the Reporting and Recordkeeping requirements as of the Regulation's effective date unless it first installs new technology on many of its locomotives—at an estimated cost of $264 million.

88.    Likewise, the railroads must prepare *now* for the substantial deposits they will have to make in their Spending Accounts by July 1, 2024.  BNSF, for example, estimates that under the Regulation's formula, it will have to deposit around $800 million per year.  To set aside funds on that order of magnitude, BNSF will need to begin reallocating funds it would otherwise use for important infrastructure and maintenance across its nationwide network.  Likewise, Union Pacific must immediately divert capital it would spend on other critical priorities, including safety enhancements, track upgrades, and preparations to respond to catastrophic weather events.

89.    Other members of Plaintiffs are in the same untenable position, and several short line members will not be able to bear the substantial and immediate expenses imposed by the Regulation.  These short line operators face a serious prospect of bankruptcy.  CARB itself has conceded this significant risk, recognizing the possibility that some Class III locomotive operators in California "would be *eliminated*" due to "the costs of the Proposed Regulation."  Ex. 6 at 143 (emphasis added).

90.    For example, Mendocino Railway is a small Class III carrier with very narrow margins and no spare financial resources to install the necessary technology.  As a result, if the Regulation takes effect while this litigation proceeds, it could be forced into bankruptcy.  The short-term effects of the Spending Account provision are no less dire.  To be able to deposit the

1  approximately $312,268 necessary to comply with the Spending Account requirement,

2  Mendocino Railway must set aside funds that it was otherwise planning to spend on

3  improvements to its railroad line, potentially jeopardizing the safe operations of both its freight

4  and passenger trains.

5        91.    Sierra Northern has likewise explained that the Spending Account provision will

6  require it to deposit as much as $2 million annually, forcing it to cease making safety upgrades to

7  its railroad tracks and other infrastructure and also forcing the company to end investments in

8  upgrading its fleet to more environmentally friendly (and currently available) locomotives.

9        92.    Absent an injunction, Plaintiffs' members will accordingly experience extensive,

10 imminent, and irreparable harm.

11                          **CLAIMS FOR RELIEF**

12                         **FIRST CAUSE OF ACTION**

13        **(Declaratory/Injunctive Relief – Preemption By the ICCTA)**

14       93.    Plaintiffs reallege and incorporate by reference the preceding allegations as though

15 fully set out herein.

16       94.    The ICCTA preempts all state and local laws and regulations impacting railroad

17 operations "unless" they are (1) "rules of general applicability," *and* (2) "do not unreasonably

18 burden railroad activity." *AAR*, 622 F.3d at 1098. The Regulation fails both prongs of this test.

19       95.    First, the Regulation is preempted because it directly targets locomotives. As the

20 individual provisions reveal, the Regulation is not a "rule[] of general applicability," *AAR*, 622

21 F.3d at 1098, but rather focuses entirely—and exclusively—on locomotives. *See* § 2478.1(a)

22 (regulation governs "Locomotive Operator[s] that Operate[] a Locomotive in the State of

23 California"); *see also* Ex. 11 at 82 (describing the Spending Account as "a regulatory concept

24 developed to address the unique circumstances of the railroad industry"). The Regulation, both in

25 its individual provisions and taken as a whole, has the effect of managing or governing rail

26 transportation.

27       96.    The Spending Account provision requires railroads (and only railroads) to deposit

28 funds that can then only be used to purchase certain narrow categories of locomotives and

1    railroad equipment approved by CARB.  *See* § 2478.4.  The provision thus impermissibly dictates

2    to railroads what equipment they may purchase and more generally commandeers railroads'

3    decisionmaking on capital investments to comply with CARB's priorities and mandates.  *See U.S.*

4    *Env't Prot. Agency*, 2014 WL 7392860, at *9 (identifying as preempted state regulations that

5    "govern[]" how railroads are "operated [or] equipped").

6          97.     The In-Use Operational Requirement imposes an effective blanket ban on the

7    operation of federally certified locomotives that are 23 years or older, as measured from the date

8    of original manufacture, notwithstanding an average useful life of 40 years or more.  *See*

9    § 2478.5.  Locomotives that satisfy federal emission standards and that are within their "useful

10   life" under federal law will be prohibited from operating in California.  In addition, after specified

11   time points, the provision restricts the use of all new locomotives in the State to locomotives that

12   are capable of operating in ZE configuration.  § 2478.5(b), (c).  By prohibiting certain

13   locomotives from operating within the State and further dictating how locomotives must operate

14   in the State going forward, this provision directly interferes with railroad operations, with the

15   effect of managing and governing rail transportation.

16         98.     The Idling Requirements mandate that railroads shut off their locomotives (with

17   limited exceptions) within 30 minutes of the locomotive becoming stationary.  *See* § 2478.9.  This

18   requirement has the effect of managing or governing rail transportation.  *See AAR*, 622 F.3d at

19   1096, 1098 (holding that an environmental regulation that "limit[ed] the permissible amount of

20   emissions from idling trains" was preempted under ICTAA); *AAR v. S. Coast Air Quality Mgmt.*

21   *Dist*., 2007 WL 2439499, at *3 (C.D. Cal. Apr. 30, 2007) (explaining that the preempted

22   regulation at issue required "the Railroads to limit idling of unattended locomotives to 30 minutes

23   or less in certain circumstances); *see also Delaware*, 859 F.3d at 18 ("[B]y limiting times and

24   places for idling, and providing exceptions, [the state statute] directly regulates the rail

25   transportation of passengers or property by limiting permissible idling time[s] …").

26         99.     The Reporting and Recordkeeping Requirements mandate that railroads collect

27   extensive operational data and report it to CARB for purposes of calculating the deposit

28   obligations for the Spending Account.  § 2478.11.  These provisions apply only to railroad

1  operators and they impose significant burdens on the railroad industry, which will need to make

2  significant technological adaptations to collect the necessary data.  This requirement has the

3  effect of managing or governing rail transportation.  *See AAR*, 622 F.3d at 1096 (holding that

4  reporting requirements related to locomotive emissions were preempted); *see also U.S. Env't*

5  *Prot. Agency*, 2014 WL 7392860, at *9 (recognizing that requiring "railroad employees to

6  comply with idling and recordkeeping rules for each jurisdiction … would likely result in an

7  unworkable variety of regulations").  Moreover, the Reporting and Recordkeeping Requirements

8  exist specifically to inform the Spending Account requirements, as they provide the necessary

9  emissions inputs into CARB's formula.  Because the Spending Account requirements are

10  themselves improper under the ICCTA, there is no valid basis for the Reporting and

11  Recordkeeping Requirements.

12      100.    The Administrative Payment provision applies only to railroad operators, imposing

13  a payment obligation on railroads for the purpose of funding CARB's regulatory scheme to

14  govern rail transportation.  § 2478.12.  Such a discriminatory payment that falls exclusively on

15  railroad operators is impermissible.  *See BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904

16  F.3d 755, 760 (9th Cir. 2018).

17      101.    Because the Regulation is not a generally applicable law but rather specifically

18  targets the railroad industry, it is categorically preempted without any need to inquire into the

19  practical effect of any of its provisions.  And because the impermissible targeting of the railroad

20  industry applies to the Regulation as a whole, none of its provisions can survive preemption.

21      102.    Second, the Regulation is also preempted because it has "the effect of

22  unreasonably burdening or interfering with rail transportation."  *Delaware*, 859 F.3d at 19.  In

23  particular, the Regulation displaces railroad spending priorities and forces railroads to make huge

24  outlays of capital for untested, unproven, commercially infeasible locomotives and accompanying

25  equipment.  The Regulation also interferes with railroad operations by dictating what locomotives

26  are permitted to operate in the State and setting strict, burdensome conditions for locomotive use

27  in the State, including restrictive idling rules, onerous recordkeeping and reporting obligations,

28  and targeted administrative fees.

COMPLAINT                                    Case No.

28

103.    CARB has recognized that the Regulation will compel railroads to make changes to their entire fleets, confirming the significance of the burden imposed by the Regulation.  The Regulation will thus unreasonably interfere with rail transportation by requiring railroads to replace their current fleets with locomotives mandated by CARB.

## SECOND CAUSE OF ACTION

## (Declaratory/Injunctive Relief – Preemption by the Clean Air Act)

104.    Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set out herein.

105.    The Spending Account and In-Use Operational Requirements are preempted by the Clean Air Act, which expressly preempts any state "standard or other requirement relating to the control of emissions from … [n]ew locomotives or new engines used in locomotives."  42 U.S.C. § 7543(e)(1).

106.    The In-Use Operational Requirements are preempted by the Clean Air Act.  These provisions bar the in-state operation of certain categories of locomotives that CARB believes produce unacceptable levels of emissions.  In particular, the In-Use Operational Requirements bar the in-state operation (beginning in 2030) of any locomotive older than 23 years, based on its Original Engine Build Date, unless it satisfies specified emissions-related criteria.  § 2478.5(a).  The In-Use Operational Requirements also bar the in-state operation of *all locomotives not operating in ZE Configuration—i.e.*, locomotives that produce any emissions—that are built no earlier than 2030 (for switch, industrial, and passenger locomotives) or 2035 (for freight line haul locomotives).  § 2478.5(b), (c).  These provisions seek to enforce a standard or other requirement relating to locomotive emissions control within the meaning of the statute.

107.    The In-Use Operational Requirements apply even to locomotives that are "new," because CARB counts from the original engine's assembly *without regard to any subsequent remanufacture*.  *See* § 2478.3(a) ("'Original Engine Build Date' means the date of final assembly of the Locomotive Engine, prior to any Remanufacture of the Locomotive Engine."); *id.* ("'Remanufacture' has the meaning set forth in Code of Federal Regulations, title 40, section 1033.901.").  Federal law, by contrast, expressly provides that "[a] locomotive or engine also

1   becomes new if it is remanufactured or refurbished (as defined in this section)." 40 C.F.R.

2   § 1033.901.

3   108. Even as applied to non-new locomotives or engines operating beyond their useful

4   life period under federal law, the In-Use Operational Requirements are preempted under Section

5   209(e)(2) of the Clean Air Act because the EPA has not granted any waiver authorizing

6   California to adopt or enforce these emission standards. *See* 42 U.S.C. § 7543(e)(2); *Pac.*

7   *Merchant Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1113 (9th Cir. 2008).

8   109. The Spending Account's Funding Requirement and the Purchase Restrictions

9   attached to those funds are also expressly preempted under Section 209(e).

10   110. The "Funding Requirement" is a "standard or other requirement" under Section

11   209(e) because it imposes specific mandates on locomotive operators. *See* § 2478.4(g)(2) ("the

12   Locomotive Operator shall use the following formula to calculate the Spending Account *funding*

13   *requirement* for each Locomotive…." (emphasis added)).

14   111. The Funding Requirement also "relat[es] to the control of emissions" from

15   locomotives, as "[t]he goal" of the Spending Account "is to increase uptake of cleaner diesel

16   locomotives and zero-emission locomotives." Ex. 9 at 111. Moreover, "[t]he amount deposited

17   in the account is calculated by using the locomotive's annual usage in megawatt hours (MWh)

18   and the locomotive's emission factors." Ex. 2 at 20; *see also* Ex. 11 at 32 (noting that "operators

19   with any locomotive that emits harmful pollutants in California must set aside funds in proportion

20   to the harm"). The Funding Requirement thus attaches "liability" for past emissions, which is "a

21   potent method of governing conduct and controlling policy." *Riegel v. Medtronic, Inc*., 552 U.S.

22   312, 324 (2008) (citation omitted).

23   112. The Purchase Restrictions in § 2478.4(d) likewise are preempted as an "attempt to

24   enforce" a "standard or other requirement relating to the control of emissions." 42 U.S.C.

25   § 7543(e). Section  2478.4(d) sets forth purchase restrictions for locomotives that are expressly

26   tied to emission levels. Those purchase restrictions are an "enforcement technique[]" within the

27   scope of Section 209 preemption. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,* 541

28   U.S. 246, 253-54 (2004).

COMPLAINT                                                    Case No.

113.    The Spending Account provisions (like the In-Use Operational Requirements) are thus preempted under section 209(e)(1) and/or section 209(e)(2).

## THIRD CAUSE OF ACTION

### (Declaratory/Injunctive Relief – Preemption by the Locomotive Inspection Act )

114.    Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set out herein.

115.    The Locomotive Inspection Act "occup[ies] the entire field of regulating locomotive equipment"—a field that "extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." *Kurns*, 565 U.S. at 631 (quoting *Napier*, 272 U.S. at 611).  It thus establishes a "sweeping preemption rule." *Forrester v. Am. Dieselelectric, Inc.*, 255 F.3d 1205, 1210 (9th Cir. 2001); *see also Union Pac.*, 346 F.3d at 869 (explaining that the Locomotive Inspection Act "occup[ies] the field of locomotive equipment" regulation).

116.    The Idling Requirements are preempted by the Locomotive Inspection Act because they purport to regulate the locomotive's equipment and maintenance.

117.    Specifically, § 2478.9(c) requires that a "Locomotive Operator with an AESS equipped Locomotive shall ensure the AESS is functional at all times during the Locomotive's Operation."  Similarly, § 2478.9(b) provides that "[a] properly functioning AESS shall not be removed, tampered with, or disabled unless for maintenance."  § 2478.9(b).  A railroad that owns a locomotive with an AESS is thus bound to keep that equipment, and further to ensure that the equipment remains in working order.

118.    As the Supreme Court has recognized, a state cannot properly "require railroads to equip their locomotives with parts meeting state-imposed specifications"—precisely what California seeks to do here. *Kurns*, 565 U.S. at 636.  Nor can a state dictate standards for "the repair and maintenance of locomotives," as this category is likewise "aimed at the equipment of locomotives." *Id.* at 635.  The Idling Requirement thus falls within the heartland of the field occupied by the Locomotive Inspection Act .

119.    The Registration Requirement also directs that any locomotive operated in California must "have a properly functioning Locomotive MWh meter at all times," unless the locomotive is operated exclusively in California during the calendar year.  § 2478.10(d).  The provision further directs that a "MWh meter shall not be removed, tampered with, disabled, or turned off except for maintenance."  *Id.*  These equipment and maintenance mandates also fall within the field occupied by the Locomotive Inspection Act .

**FOURTH CAUSE OF ACTION**

**(Declaratory/Injunctive Relief – Dormant Commerce Clause – 42 U.S.C. § 1983)**

120.    Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set out herein.

121.    The Dormant Commerce Clause is a "limitation on state power" arising from the negative implication of the Commerce Clause, which reserves the power to regulate interstate commerce to the federal government.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012).  Under this doctrine, "certain state regulations on instrumentalities of interstate transportation—trucks, trains, and the like"—are invalid.  *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1158 n.2 (2023).  Specifically, "when a lack of national uniformity would impede the flow of interstate goods … the Commerce Clause itself pre-empts [that] entire field from state regulation."  *Id.* (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978) (emphasis omitted)); *see also Nat'l Ass'n of Optometrists*, 682 F.3d at 1148 (a "classic example of this type of [invalid] regulation is one that imposes significant burdens on interstate transportation").

122.    The Regulation targets trains—a central instrumentality of interstate commerce.  *See* ¶ 2, *supra*.  Railroads' only options for complying with the Regulation are to change locomotives at the California border, or to replace their entire nationwide fleets.  Either possibility will substantially increase the costs and burdens on railroads, multiplying the likelihood of delays and shortages in the transport of goods due to inefficiencies arising from the need for a California-compliant fleet. The Regulation would thus substantially and

1    unconstitutionally impede the flow of interstate goods, imposing significant burdens on interstate

2    transportation.

3        123.    The burden on interstate commerce is compounded by the likelihood of imitation:

4    if California is permitted to enforce the Regulation, other states will surely follow suit with their

5    own regulations, creating a hugely disruptive "patch-work regulatory scheme." *Union Pac.*, 346

6    F.3d at 871.

7        124.    In addition, the burden imposed on interstate commerce by the Regulation, as

8    detailed above, "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce*

9    *Church, Inc.*, 397 U.S. 137, 142 (1970).  CARB asserts that the Regulation will achieve better air

10   quality and associated health benefits.  But these benefits depend on implausible technological

11   projections made by CARB of when ZE technology will be commercially available.  In fact, the

12   Regulations' mandates are counterproductive, because they will disrupt railroads' existing

13   investments in safety and the environment and because the compliance burdens imposed make the

14   industry less competitive in relation to other forms of freight and passenger transportation that

15   produce far greater levels of criteria, toxic, and climate pollutants, such as trucks.  *See* Ex. 1 at 7-

16   8 (discussing the effects of shifting freight transportation to trucks).

17       125.    The Administrative Payment provision also independently violates the Dormant

18   Commerce Clause.  That provision imposes an annual flat fee of $175 per locomotive operated in

19   California, with narrow exceptions for ZE locomotives and historic locomotives.  § 2478.12.  The

20   imposition of such a flat fee on transportation companies engaged in interstate commerce

21   penalizes interstate travel and imposes an impermissible burden on interstate commerce.  *See Am.*

22   *Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 285 (1987) (holding that such operational fees

23   violate the Dormant Commerce Clause because they "can obviously divide and disrupt the market

24   for interstate transportation services," including by provoking "retaliatory" fees imposed by other

25   states"); *id.* at 284 ("If each State imposed flat taxes for the privilege of making commercial

26   entrances into its territory, there is no conceivable doubt that commerce among the States would

27   be deterred.").

28

1

## PRAYER FOR RELIEF

2     A.     WHEREFORE, Plaintiffs prays for judgment against Defendants as follows:

3     B.     For a declaration that CARB's In-Use Locomotive Regulation, to be codified at 13

4  C.C.R. §§ 2478-2478.17, is invalid in its entirety, and that it is contrary to law for Defendants to

5  enforce the Regulation in any form.

6     C.     For a preliminary and permanent injunction requiring Defendants to conform their

7  conduct to such judicial declaration and barring them from implementing or enforcing the In-Use

8  Locomotive Regulation, to be codified at 13 C.C.R. §§ 2478-2478.17, in any way;

9     D.     For such costs and attorneys' fees to which Plaintiffs may be entitled by law; and

10    E.     For such other and further relief as the Court deems just and proper.

11
                                     Respectfully submitted,
12

13  Dated: June 16, 2023                     By:  /s/  Hayes P. Hyde
                                                  HAYES P. HYDE (SBN 308031)
14                                                *HHyde@goodwinlaw.com*
                                                  **GOODWIN PROCTER** LLP
15                                                Three Embarcadero Center, 28TH Floor
                                                  San Francisco, CA 94111
16                                                Phone: +1 415 733 6000

17                                                JORDAN F. BOCK (SBN 321477)
                                                  *JBock@goodwinlaw.com*
18                                                **GOODWIN PROCTER** LLP
                                                  100 Northern Avenue
19                                                Boston, MA 02210
                                                  Phone: +1 617 570 1000
20
                                                  Attorneys for Plaintiffs
21                                                ASSOCIATION OF AMERICAN RAILROADS and
                                                  AMERICAN SHORT LINE AND REGIONAL
22                                                RAILROAD ASSOCIATION

23

24

25

26

27

28

COMPLAINT                                          Case No.