1    HAYES P. HYDE (SBN 308031)                  BRIAN T. BURGESS (*pro hac vice* application
     HHyde@goodwinlaw.com                         pending)
2    **GOODWIN PROCTER LLP**                       BBurgess@goodwinlaw.com
     Three Embarcadero Center, 28TH Floor         **GOODWIN PROCTER LLP**
3    San Francisco, CA 94111                      1900 N Street NW
     Phone: +1 415 733 6000                       Washington, DC 20036
4                                                 Phone: +1 202 346 4000
     JORDAN F. BOCK (SBN 321477)
5    JESSE LEMPEL (*pro hac vice* application
     pending)
6    JBock@goodwinlaw.com
     JLempel@goodwinlaw.com
7    **GOODWIN PROCTER LLP**
     100 Northern Avenue
8    Boston, MA 02210
     Phone: +1 617 570 1000
9
     Attorneys for Plaintiffs
10   ASSOCIATION OF AMERICAN RAILROADS and
     AMERICAN SHORT LINE AND REGIONAL
11   RAILROAD ASSOCIATION

12                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF CALIFORNIA
13                     SACRAMENTO DIVISION

14

15   ASSOCIATION OF AMERICAN          Case No. 2:23-cv-01154-JAM-JDP
     RAILROADS and AMERICAN SHORT LINE
16   AND REGIONAL RAILROAD            **MEMORANDUM OF POINTS AND**
     ASSOCIATION,                     **AUTHORITIES IN SUPPORT OF**
                                      **PLAINTIFFS' MOTION FOR**
17                    Plaintiffs,     **PRELIMINARY INJUNCTION**

18        v.                          Date:        August 1, 2023
                                      Time:        1:30 p.m.
19   LIANE M. RANDOLPH, in her official   Courtroom: 6 (14th Floor)
     capacity as Chair of the California Air   Judge:       Hon. John A. Mendez
20   Resources Board; JOHN EISENHUT, SUSAN
     SHAHEEN, JOHN R. BALMES, DIANE
21   TAKVORIAN, BILL QUIRK, DEAN
     FLOREZ, HECTOR DE LA TORRE,
22   DAVINA HURT, V. MANUEL PEREZ, ERIC
     GUERRA, NORA VARGAS, TANIA
23   PACHECO-WERNER, GIDEON KRACOV,
     HENRY STERN, and EDUARDO GARCIA,
24   in their official capacities as members of the
     California Air Resources Board; STEVEN S.
25   CLIFF, in his official capacity as Executive
     Officer of the California Air Resources Board;
26   and ROB BONTA, in his official capacity as
     Attorney General of the State of California
27
                      Defendants.
28

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 4

I.     Railroad operations are subject to exclusive federal regulation........................... 4

II.    CARB departs from its historic practices to directly regulate railroad operations
       and locomotive emissions by adopting the Regulation....................................... 6

ARGUMENT ..................................................................................................................... 12

I.     Plaintiffs are likely to succeed on their claims that the Regulation is unlawful. .............. 12

       A.     The Regulation is preempted in full by the ICCTA ............................... 12

       B.     The Spending Account and In-Use Requirements are also preempted by the
              Clean Air Act ......................................................................................... 17

              1.     The In-Use Operational Requirements are preempted............................. 18

              2.     The Spending Account sets "standard[s] or other requirement[s]"
                     relating to the control of emissions from new locomotives ..................... 19

       C.     The Regulation violates the Dormant Commerce Clause .................................... 21

II.    Plaintiffs' members will suffer immediate, irreparable harm absent an injunction. ......... 22

III.   The balance of hardships and public interest favor injunctive relief ............................... 25

CONCLUSION .................................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021) (per curiam) ................................................................. 3

*Am. Auto. Mfrs. Ass'n v. Cahill,*
    152 F.3d 196 (2d Cir. 1998) ...................................................................... 21

*April in Paris v. Becerra,*
    494 F. Supp. 3d 756 (E.D. Cal. 2020) ................................................. 24, 25

*Arizona v. United States,*
    567 U.S. 387 (2012) ................................................................................. 16

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
    729 F.3d 937 (9th Cir. 2013) .................................................................... 21

*Ass'n for Accessible Medicines v. Bonta,*
    562 F. Supp. 3d 973 (E.D. Cal. 2021) ......................................... 23, 24, 25

*Ass'n of American Railroads v. S. Coast Air Quality Mgmt. Dist.,*
    622 F.3d 1094 (9th Cir. 2010) ........................................ 2, 7, 13, 16, 17
    2007 WL 2439499 (C.D. Cal. Apr. 30, 2007) ..................................... 7, 10

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Prot.,*
    208 F.3d 1 (1st Cir. 2000) ........................................................................ 21

*Blue Lake Rancheria v. Lanier,*
    106 F. Supp. 3d 1134 (E.D. Cal. 2015) (Mendez, J.) ............................... 23

*BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.,*
    904 F.3d 755 (9th Cir. 2018) ............................................................ 1, 5, 13

*Cal. Rest. Ass'n v. City of Berkeley,*
    65 F.4th 1045 (9th Cir. 2023) .................................................................. 18

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) .................................................................... 25

*Delaware v. STB,*
    859 F.3d 16 (D.C. Cir. 2017) .............................................................. 13, 17

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) .................................................................. 25

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ............................................................ 12, 23, 24

*EEOC v. BNSF Ry. Co.*,
  902 F.3d 916 (9th Cir. 2018) ............................................................................... 19

*Elam v. Kansas City S. Ry. Co.*,
  635 F.3d 796 (5th Cir. 2011) ............................................................................... 12

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
  541 U.S. 246 (2004) .................................................................................. 18, 20

*Engine Mfrs. Ass'n v. U.S. E.P.A.*,
  88 F.3d 1075 (D.C. Cir. 1996) ............................................................................. 6

*Fla. E. Coast Ry. v. City of W. Palm Beach*,
  266 F.3d 1324 (11th Cir. 2001) ........................................................................... 15

*Geo Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) (en banc) ............................................................... 12

*Green Mountain R.R. Corp. v. Vermont*,
  404 F.3d 638 (2d Cir. 2005) ................................................................................ 13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ............................................................................. 24

*Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*,
  644 F.3d 934 (9th Cir. 2011) ............................................................................... 20

*N.Y. Susquehanna v. W. Ry. v. Jackson*,
  500 F.3d 238 (3d Cir. 2007) ................................................................................ 13

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
  682 F.3d 1144 (9th Cir. 2012) ....................................................................... 21, 22

*Nat'l City of Indiana v. Boutris*,
  2003 WL 21536818 (E.D. Cal. July 2, 2003) ..................................................... 25

*Nat'l Pork Producers Council v. Ross*,
  143 S. Ct. 1142 (2023) ................................................................................... 21, 22

*Nat'l R.R. Passenger Corp. v. Su*,
  41 F.4th 1147 (9th Cir. 2022) ............................................................................... 4

*Norfolk S. Ry. v. City of Alexandria*,
  608 F.3d 150 (4th Cir. 2010) ............................................................................... 13

*Pac. Merch. Shipping Ass'n v. Goldstene*,
  517 F.3d 1108 (9th Cir. 2008) .................................................................. 6, 18, 19

*Raza v. Exec. Off. of Immigr. Rev.*,
   524 F. Supp. 3d 919 (N.D. Cal. 2021) ................................................................. 24

*Riegel v. Medtronic, Inc.*,
   552 U.S. 312 (2008) .................................................................................................. 20

*Rocky Mountain Farmers Union v. Corey*,
   913 F.3d 940 (9th Cir. 2019) ................................................................................... 23

*S. Pac. Co. v. Ariz. ex rel. Sullivan*,
   325 U.S. 761 (1945) ........................................................................................... 15, 22

*Se. Pa. Transp. Authority v. Pa. Public Utility Comm'n*,
   210 F. Supp. 2d 689 (E.D. Pa. 2002) ..................................................................... 24

*Small v. Avanti Health Sys., LLC*,
   661 F.3d 1180 (9th Cir. 2011) ................................................................................. 25

*S. Pac. Co. v. Arizona ex rel. Sullivan*,
   352 U.S. 761 (1945) .................................................................................................. 21

*United States Env't Prot. Agency Petition for Declaratory Ord.*,
   2014 WL 7392860 (STB Dec. 29, 2014) ........................................................... 12, 17

*Union P. R.R. Co. v. Cal. Public Util. Commission*,
   346 F.3d 851 (9th Cir. 2003) ................................................................................... 22

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) ............................................................................. 24, 25

*United Transp. Union v. Long Island R.R.*,
   455 U.S. 678 (1982) .................................................................................................... 4

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   959 F.3d 1201 (9th Cir. 2020) ................................................................................... 6

**Statutes**

42 U.S.C. § 7041 .............................................................................................................. 3

42 U.S.C. § 7543(a) ....................................................................................................... 20

42 U.S.C. § 7543(e) .................................................................................................. 18, 19

42 U.S.C. § 7543(e)(1) .............................................................................. 1, 5, 6, 18, 19, 20

42 U.S.C. § 7543(e)(1)(B) ............................................................................................. 20

42 U.S.C. § 7547(a)(5) ..................................................................................................... 5

49 U.S.C. § 10101 ............................................................................................................ 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

49 U.S.C. § 10501(b) ............................................................................................................... 5

**Regulations and Other Authorities**

40 C.F.R. pt. 1033, subpart B ................................................................................................. 5

40 C.F.R. § 1033.101 ........................................................................................................ 5, 20

40 C.F.R. § 1033.101(g)(3) ..................................................................................................... 9

40 C.F.R. § 1033.101(g)(4) ..................................................................................................... 9

40 C.F.R. § 1033.901 ............................................................................................................. 18

40 C.F.R. § 1033.115(g) ........................................................................................................ 16

62 Fed. Reg. 6366, 6397 (Feb. 11, 1997) ............................................................................. 6

63 Fed. Reg. 18978, 18994 (Apr. 16, 1998) ......................................................................... 6

H.R. Rep. No. 104-311 (1995) ............................................................................................... 5

S. Rep. No. 104-176 (1995) .................................................................................................... 5

**INTRODUCTION**

This lawsuit challenges a state agency's brazen disregard of clear limits on its authority.  For the first time in its 56 years of existence, the California Air Resources Board ("CARB" or "Agency") has adopted regulations that target railroad operations in the State and seek to dictate emissions standards for locomotives that will operate in and outside the State of California.  The regulation, entitled the "In-Use Locomotive Regulation" (the "Regulation"), is plainly preempted by federal law under Ninth Circuit precedent.  And the burden the Regulation will impose on members of Plaintiffs the Association of American Railroads ("AAR") and the American Short Line and Regional Railroad Association ("ASLRRA") is immense, amounting to more than a *billion* dollars in compliance costs and diverted resources every year.  The Regulation will take effect on October 1, 2023, and the burdens on railroad operators are already being felt *now*, as Plaintiffs' members must, among other things, begin investing millions of dollars to develop and install new technology to comply with the Regulation's onerous reporting requirements.  An immediate injunction is thus needed to preserve the status quo and spare Plaintiffs' members from suffering irreparable harm.

CARB was formed in 1967. Before now, it had *never* imposed regulations targeting locomotive emissions or railroad operations.  This half-century of regulatory forbearance is no accident.  Recognizing the inherently interstate nature of railroad operations, Congress has passed multiple laws that broadly preempt state and local regulations targeting railroads. These broadly preemptive federal laws ensure that interstate commerce will not be burdened by a patchwork of competing state standards.  For example, the Interstate Commerce Commission Termination Act of 1995 ("the ICCTA") provides a federal agency (the Surface Transportation Board) with "exclusive jurisdiction over a wide range of state and local regulation of rail activity."  *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018) (citations omitted).  Under the ICCTA, "state laws that may reasonably be said to have the effect of managing or governing rail transportation" are categorically preempted. *Id*. (citations omitted).  Similarly, the Clean Air Act forbids state regulators from adopting or trying to enforce "any standard or other requirement relating to the control of emissions from … [n]ew locomotives or new engines used in locomotives."  42 U.S.C. § 7543(e)(1).  In light of these and other preemptive federal laws, CARB recognized (until

1    recently) that directly regulating railroad operations was a non-starter.  Thus, in 2005, CARB

2    conceded that it likely lacked authority to issue rules "specifically designed to reduce emissions

3    from railroad locomotives" because state regulators may not dictate how "railroads are permitted to

4    use and operate" their locomotive fleets.  Compl., Ex. 4 at 16; *see id*. at 27-28.

5       Nothing since 2005 has changed to expand CARB's authority over railroad operations.  The

6    opposite is true:  the Ninth Circuit reconfirmed the broad preemptive scope of federal law in this

7    area, striking down regulations by the South Coast Air Quality Management District ("South Coast")

8    that targeted railroads.   In *Association of American Railroads v. South Coast Air Quality*

9    *Management District*, 622 F.3d 1094 (9th Cir. 2010), the Ninth Circuit held that South Coast's

10    regulation of locomotive "idling" and related record-keeping and reporting requirements were

11    "plainly" preempted by the ICCTA.  *Id.* at 1098.  As the court explained, the "ICCTA preempts

12    [state] rules unless they are rules of general applicability that do not unreasonably burden railroad

13    activity," nullifying state rules that "apply exclusively and directly to railroad activity."  *Id*.

14       The Regulation flouts this binding precedent.  Inexplicably, it includes rules on train idling

15    (§ 2478.9) and imposes record-keeping and reporting obligations (§ 2478.11) that mirror the

16    regulations the Ninth Circuit held were "plainly" preempted.  *Id*.  Even more remarkably, the

17    Regulation goes *substantially further* than South Coast attempted, inserting state regulators directly

18    into the management of rail operations.  The Regulation's so-called "Spending Account" provision

19    (§ 2478.4) effectively charges railroads for operating in the State, compelling Plaintiffs' members

20    to deposit *billions* of dollars in accounts that can only be used for certain CARB-approved purchases,

21    including zero-emissions technology that is unlikely to be available anytime soon.  As a result,

22    CARB's views on investment priorities supplant the railroads' own judgments regarding their

23    privately owned infrastructure and equipment.  The "In-Use Operational Requirements" (§ 2478.5),

24    in turn, make it unlawful for Plaintiffs' members to use locomotives in California that are federally

25    certified but that CARB deems too old, while also dictating (after a phase-in period) that new

26    locomotives will need to operate in a "zero emissions configuration."  In adopting these rules, CARB

27    has not hidden the scope of its ambition: the Agency expects that Class I operators (*e.g.*, Union

28    Pacific Railroad and BNSF Railway) will transform "their entire line haul locomotive fleet" on a

*national* basis to comply with CARB's mandates.  Compl., Ex. 6 at 88.

Plaintiffs have a high likelihood of success because the Regulation, among other flaws, is preempted by several federal statutes, including the ICCTA, 49 U.S.C. § 10101, *et seq.*, and the Clean Air Act, 42 U.S.C. § 7041, *et seq.*  The Regulation also violates the Dormant Commerce Clause by imposing substantial burdens on interstate transportation.  Equitable factors also strongly favor a preliminary injunction.  Absent immediate injunctive relief, Plaintiffs will suffer irreparable harm even before the Regulation's effective date.  To comply with the Regulation's reporting requirements as of that date, Plaintiffs' members must begin to purchase and install expensive, unwanted, and unnecessary new technology.  They must also divert capital into Spending Accounts, preventing railroads from making investments in their operations that do not align with CARB mandates.  The resulting losses will be highly disruptive and *per se* irreparable.  The Regulation is also likely to force some smaller operators out of business, a quintessential example of irreparable harm.  The balance of hardships and public interest likewise tip sharply in favor of enjoining the Regulation.  As courts have recognized, the public interest weighs against the enforcement of preempted or unconstitutional laws.  And because the Regulation would substantially burden both intrastate and interstate railroad operations, allowing it to go into effect would impose tremendous costs not only on railroads but also on railroad customers and the general public.

CARB has tried to justify the Regulation as needed to achieve emissions reductions that will improve ambient air quality and further the State's climate goals.  Plaintiffs and their members share those objectives, and have made significant investments to upgrade their technology and infrastructure to enhance air quality by reducing criteria pollutant and greenhouse gas emissions.  "But our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) (per curiam).  The Regulation is unlawful because it seeks to have a state agency dictate central aspects of railroad operation and locomotive design in clear defiance of federal law.  The Court should thus grant the motion for a preliminary injunction.  Plaintiffs respectfully urge the Court to act on their motion as promptly as is practicable, because Plaintiffs' members need guidance on their legal obligations in advance of the Regulation's expected October 1, 2023 effective date.

## BACKGROUND

### I. Railroad operations are subject to exclusive federal regulation.

The freight rail industry in the United States is a single interconnected system of six Class I railroads and hundreds of short line railroads that together own and maintain nearly 140,000 route-miles of track.[1] Class I railroads do not have state-specific fleets; they "have a national fleet." Compl., Ex. 6 at 129; *see also* Compl., Ex. 7 at 12 ("For Class I railroads, 72 percent of the nationwide line haul locomotives visit California in any given year."); Declaration of BNSF Railway ("BNSF Decl.") ¶ 15 (approximately 98% of the BNSF locomotive fleet that operates in California could also operate in any other state on any given day); Declaration of Union Pacific ("UP Decl.") ¶ 13 (approximately 90% of the Union Pacific high-horsepower locomotive fleet touched California at least once during 2022). At any given time, approximately 5% to 10% of line-haul locomotives operated by the six Class I railroads are owned or leased by another railroad.[2] This "locomotive run-through interoperability" means that line-haul locomotives from railroads in the United States, Canada, and Mexico commonly operate far from the tracks of the railroad that owns the locomotives. For example, although BNSF operates in 28 states, its locomotives can be found anywhere in the United States. BNSF Decl. ¶ 15. Thus, as CARB recognized, all North American railroads must be prepared to have their *entire fleet* "operate as needed in California." Compl., Ex. 2 at 177.

"Owing to its interstate nature, the railroad industry has long been subject to extensive and often exclusive federal regulation." *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1150 (9th Cir. 2022); *see also United Transp. Union v. Long Island R.R.*, 455 U.S. 678, 688 (1982) ("[T]he Federal Government has determined that a uniform regulatory scheme is necessary to the operation of the national rail system."). For purposes of this motion, two statutes are directly relevant.

**The ICCTA**: The ICCTA grants a federal agency (the Surface Transportation Board or "STB") exclusive jurisdiction over, as relevant here, "transportation by rail carriers, and the

---

[1] The Surface Transportation Board ("STB" or "Board") classifies railroad carriers as either Class I, Class II, or Class III, based on an annual review of their revenue. There are currently six Class I freight railroads in the United States, including BNSF Railway and Union Pacific. Class II and Class III railroads are often referred to as "short line railroads." *See* Compl. ¶¶ 17, 18, 29, 46, 76.

[2] A "line-haul locomotive" is a locomotive that is "powered by an engine with a maximum rated power (or a combination of engines having a total rated power)" of greater than 2300 horsepower. *See* 40 C.F.R. § 1033.901.

remedies provided … with respect to rates, classifications, rules … practices, routes, services, and facilities of such carriers." 49 U.S.C. § 10501(b). "Transportation" under the ICCTA is defined in sweeping terms to cover "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail," and "services related to that movement." *Id.* § 10102(9)(A), (B). Taking these provisions together, "it is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *BNSF Ry. Co.*, 904 F.3d at 760 (quotation marks and emphasis omitted). As the legislative history shows, Congress deliberately excluded state regulation in this area because "[s]ubjecting rail carriers" to any variation in state regulations "would greatly undermine the industry." S. Rep. No. 104-176, at 6 (1995). Congress thus prioritized "the uniformity of Federal standards" and sought to avoid any "risk [of] balkanization and subversion of the Federal scheme." H.R. Rep. No. 104-311, at 96 (1995).

      **The Clean Air Act**: The Clean Air Act requires the U.S. Environmental Protection Agency ("EPA") to "promulgate regulations containing standards applicable to emissions from new locomotives and new engines used in locomotives." 42 U.S.C. § 7547(a)(5). Exercising that authority, EPA has promulgated comprehensive standards and other regulations governing locomotive emissions. *See* 40 C.F.R. pt. 1033, subpart B. These regulations employ a tier system for locomotives, with Tier 0 locomotives having the oldest "original manufacture" date—and thus the most lenient emission standard—while Tier 4 locomotives are the newest locomotives and have the strictest emission standard. *See id.* § 1033.101. These emission standards apply to "new" locomotives during their "useful life," which is a period specified by the manufacturer in both years (a minimum of 10) and megawatt-hours; the useful life period lasts until either the specified years or megawatt-hours are exceeded or until the locomotive is remanufactured. *Id.* § 1033.101(g). In addition, EPA has interpreted the term "new" with respect to locomotives and locomotive engines to include "remanufactured or re-furbished" ones. *Id.* §§ 1033.901, 1074.5. Thus, a locomotive that has been remanufactured (or has a remanufactured engine) is subject to the EPA's emissions regulations during an additional useful-life period. *Id.* § 1033.101(g)(3)-(4).

      Congress directed that EPA's authority over locomotive emissions is exclusive. Section

209(e)(1) of the Clean Air Act provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from … [n]ew locomotives or new engines used in locomotives." 42 U.S.C. § 7543(e)(1).  This provision has long been understood to preempt emission regulations of locomotives even after they are no longer "new," since in-use emission rules create *de facto* standards for new locomotives that would subvert Congress's directive.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1218–19 (9th Cir. 2020); *Engine Mfrs. Ass'n v. U.S. E.P.A.*, 88 F.3d 1075, 1082–83, 1086 (D.C. Cir. 1996) (applying this reasoning in the case of nonroad engines subject to preemption under section 209(e)(1)); 62 Fed. Reg. 6366, 6397 (Feb. 11, 1997) (applying this rule to locomotives).  In addition, even with respect to "non-new" locomotives and engines, "§ 209(e)(2) creates a sphere of implied preemption" of any state regulation relating to emissions control until the state receives express authorization from EPA under a waiver process.  *Pac. Merch. Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1113 (9th Cir. 2008); Final Rule, *Emission Standards for Locomotives and Locomotive Engines*, 63 Fed. Reg. 18978, 18994 (Apr. 16, 1998) ("all state requirements relating to the control of emissions from in-use locomotives and locomotive engines … are subject to section 209(e)(2)'s waiver requirement").

## II.     CARB departs from its historic practices to directly regulate railroad operations and locomotive emissions by adopting the Regulation.

Over its 55-year history, CARB has imposed rules regulating cars, trucks, and buses—but not locomotives.  That is no oversight.  To the contrary, recognizing the limits on state authority in this area, CARB historically sought to work cooperatively with the railroad industry to achieve emissions reductions in a manner that was both practical and consistent with the law.  Plaintiffs and their members have been part of those efforts.  Thus, in 1998 and 2005, CARB entered into voluntary agreements with several AAR members operating in California to control emissions from locomotives.  Those agreements, which the members fully honored, resulted in significant environmental benefits.  Compl. ¶ 71.  In addition, railroads have undertaken their own initiatives to pioneer technology investments and change operations to limit emissions impacts.  *See id*.

Notably, at the time it entered the 2005 agreement, CARB rejected comments urging the

Agency to abandon cooperation in favor of direct regulation.  CARB explained that regulation was not a viable path because "the ICCTA basically protects the railroads from any regulation … that has a potential economic impact on railroad operations" and would "very likely" preempt state regulations "specifically designed to reduce emissions from railroad locomotives" that "affect how the railroads are permitted to use and operate those locomotives."  Compl., Ex. 4 at 16, 27-28.  CARB's legal analysis was confirmed by subsequent events.  One of California's air quality management districts (South Coast) opposed the 2005 agreement and chose to issue its own regulations "aimed at railroad operations in facilities in the District."  *AAR v. S Coast Air Quality Mgm't Dist.*, 2007 WL 2439499, at *3 (C.D. Cal. Apr. 30, 2007).  As described above, p. 2, *supra*, South Coast imposed regulations to "limit idling of unattended locomotives" and require railroads to prepare "emissions inventory reports."  *Id.*  The district court held that "the [r]ules at issue … [were] exactly the type of local regulation Congress intended to preempt by enacting the ICCTA in order to prevent a 'patchwork.'"  *Id.* at *8.  The Ninth Circuit affirmed, concluding that the rules "plainly" were preempted because they "appl[ied] exclusively and directly to railroad activity, requiring the railroads to reduce emissions and to provide, under threat of penalties, specific reports on their emissions and inventory."  622 F.3d at 1098.  Notably, the Ninth Circuit rejected the South Coast's argument that it could avoid ICTTA preemption by dint of the possibility that the EPA might *later* authorize the regulations under federal law.  That possibility was "irrelevant" because the South Coast's rules "did not have the force and effect of federal law, even if they might in the future."  *Id.*

Notwithstanding this precedent, CARB has now chosen a different path.  Beginning in 2020, CARB announced its intention to adopt an "In-Use Locomotive Regulation" targeting railroads and locomotives.  Compl. ¶ 73.  Since that time, Plaintiffs have engaged extensively with the Agency, including by submitting oral and written comments during the rulemaking process.  Compl. ¶ 74.  AAR explained that CARB lacked authority to regulate railroad operations and locomotive emissions and urged the agency to return to a cooperative posture.  *Id.*  AAR also identified significant technical shortcomings with the proposed rules, explaining that CARB's assumptions about the near-term availability of zero emissions technologies were unrealistic, as the Agency ignored the absence of meaningful testing data on whether uncertain technological projections (*e.g.*,

proposed battery-electric or zero-emission hydrogen locomotives) would be sufficiently safe and reliable to use at commercial scale.  *See* Compl., Ex. 1 at 33-35; *see also* Compl. ¶ 75.

Other commentors, including ASLRRA and its members, explained that the proposed rule would have a particularly devastating impact on short line operators in the State.   Class III railroads—which represent 84% of short line railroads, including all of California's short line railroads—employ an average of just 22 people per railroad and earn an average of only $4.7 million in annual revenue.  Compl., Ex. 5 at 4.  Because these railroads are small businesses that "operate[] on relatively small profit margins," commentators explained that CARB's regulatory proposal threatens to "significantly destabilize the state's short line railroad industry," *id.* at 8—likely forcing many of these companies into bankruptcy.  Compl., Ex. 5 at 4-11; *see also* Declaration of Mendocino Railways ("Mendocino Decl.") ¶ 11.  CARB recognized as much, noting the possibility that some California Class III locomotive operations "would be *eliminated*" due to "the costs of the Proposed Regulation."  Compl., Ex. 6 at 143 (emphasis added).[3]

Undeterred, CARB adopted the Regulation after making only minor changes to its draft proposal—the most substantive of which added a new alternative compliance option that CARB itself recognized is not viable for freight railroads.  Compl., Ex. 3 at 7.  The Regulation has four primary components, all of which directly target railroad operations: the Spending Account; the In-Use Operational Requirements; the Idling Requirements; and the Reporting and Recordkeeping Requirements.  Those central provisions (and a few others) are set forth below.

**Spending Account (§ 2478.4)**:  Railroads must "establish a Spending Account" into which they must make annual deposits.  § 2478.4(a)-(b).  To comply, railroads must "begin tracking California locomotive activity in each air district" in California (there are 35), and deposit funds into the Spending Account using a formula based upon "their locomotives' cumulative diesel emissions," as measured by the megawatt hours "their locomotives operated in each California air district over

---

[3] CARB asserted that short line railroads *might* be able "to pass on the costs of the Proposed Regulation to customers."  Compl., Ex. 6 at 143.  But California's short line railroads are subject to aggressive competition from trucks—not to mention serious product and geographic constraints— and have limited pricing power, making it unrealistic for them to simply pass on costs downstream. Compl., Ex. 5 at 9; *see also* Declaration of San Joaquin Valley Railroad ("SJVR Decl.") ¶ 16; Declaration of Arizona & California Railroad Company ("ARZC Decl.") ¶ 16; Declaration of California Northern Railroad Company ("CFNR Decl.") ¶ 16.

the previous year."  Compl., Ex. 2 at 49; *see id.* at 98.

Funds deposited in the Spending Account are then subject to restrictions (the "Purchase Restrictions").  § 2478.4(d)-(g).  These funds (and any interest earned therefrom) may be spent only on "the purchase, lease, or rental of" certain narrow categories of locomotives and locomotive equipment, many of which are not commercially available.  § 2748.4(d).  Before January 1, 2030, Spending Account funds may be spent on "Cleaner Locomotive(s), or for the Remanufacture or Repower to a Cleaner Locomotive(s)," *id.*, defined as locomotives "with exhaust emission levels that are equal to or less than Tier 4," § 2478.3(a); *see* p. 5, *supra*.  But manufacturers who purchase new Tier 4 locomotives will *still* incur an obligation to set aside additional funds to a Spending Account based on the emissions of those new locomotives.  *See* § 2478.4(g)(2).  After January 1, 2030, railroads may only spend funds from these mandatory trust accounts on locomotives and accompanying infrastructure that are "zero emission" ("ZE") or capable of operating in a zero emission configuration.  § 2748.4(d).  A "Zero Emission (ZE) Locomotive" is "a Locomotive that never emits *any* criteria pollutant, toxic pollutant, or greenhouse gas from an onboard source of power at any power setting, including any propulsion power that is connected to and moves with the locomotive when it is in motion."  § 2478.3(a) (emphasis added).[4]

**In-Use Operational Requirement (§ 2478.5)**:  Beginning in 2030, any locomotive that is "23 years or older"—as determined by its "Original Engine Build Date"—is banned from operating in California (subject to narrow exceptions).  § 2478.5(a).  The ban applies even when the locomotive's engine has been remanufactured, § 2478.3(a) (definition of "Original Engine Build Date"), contradicting federal law, which defines a "remanufactured" locomotive as "new" and recognizes a renewed "useful life" for that locomotive.  *See* 40 C.F.R. §§ 1033.101(g)(3)-(4), 1033.901.  Moreover, because it is infeasible for railroads to change locomotives at the border, CARB recognized this provision will compel railroads to replace their "entire [national] fleet" in order to continue operating within California.  Compl., Ex. 2 at 177, 200; *see also* Compl., Ex. 6 at 88 (assuming operators will need "to make their entire line haul locomotive fleet compliant").

---

[4] A "ZE Capable" locomotive is essentially equivalent:  To qualify as ZE Capable, the operator of the locomotive must show "that the Locomotive was *only* Operated in a ZE Configuration when Operating in California during the Calendar Year."  *Id.* (emphasis added).

The Regulation also mandates that all locomotives built no earlier than 2030 (for switch, industrial, and passenger locomotives) or 2035 (for freight line haul locomotive engines) must operate "in a ZE Configuration at all times while in California." § 2478.5(b)-(c).  To comply, the locomotive "shall not emit any criteria pollutant, toxic pollutant, or greenhouse gas from any onboard source of power at any power setting."  § 2478.3(a).  The combined effect of these provisions is to prohibit locomotives that remain within their useful life periods under federal law while dictating emissions standards for new locomotives operating in the State.

**Idling Requirements (§ 2478.9)**:  The Idling Requirements limit the amount of time a locomotive can remain stationary without turning off its engine—the same regulation category the Ninth Circuit held is preempted.  *See AAR,* 662 F.3d at 1096; *see also AAR*, 2007 WL 2439499, at *3 (explaining that the preempted regulation required "the Railroads to limit idling of unattended locomotives to 30 minutes or less in certain circumstances").  Any locomotive with an "automatic engine stop/start" ("AESS") must be "shut off no more than 30 minutes after the Locomotive becomes stationary," save for locomotives operating in ZE configuration and a few other narrow exceptions.  §§ 2478.9(a), (e).  The Regulation also requires railroads to maintain their AESS capabilities, disabling the device only for maintenance.  *Id.* § 2478.9(b)-(c).

**Reporting and Recordkeeping Requirements (§ 2478.11)**:  The Regulation imposes extensive reporting and recordkeeping requirements, which require railroads to develop and install an array of new technology to gather the mandatory information.  The relevant provisions require that all locomotive operators submit annual reports documenting a host of particularized emissions information for non-ZE locomotives, § 2478.11(b); an itemized list of the description and location of each item purchased with the Spending Account, § 2478.11(c); and particularized power usage data for each locomotive operated in California, § 2478.11(d).  To comply, the railroads must collect extensive data on the use and location of each locomotive operating in California as they move through the State's 35 air districts.  The railroads operating in the State do not currently have this capability.  Many locomotives lack the necessary hardware to collect this data, particularly at the level of geographic precision the Regulation demands.  BNSF Decl. ¶ 12; Mendocino Decl. ¶ 11.  Railroads will also need to develop and install software to collect and collate this data, at enormous

1   additional cost and effort.  *See* UP Decl. ¶ 12; Mendocino Decl. ¶ 11.  And because these data

2   collection obligations are triggered on the Regulation's effective date, the railroads must take action

3   before October 1, 2023 to timely comply.  See UP Decl. ¶ 12; BNSF Decl. ¶ 14.

4         **Other Provisions**:  To administer its new regulatory regime, CARB requires all

5   "Locomotive Operators" in the State to pay a nonrefundable $175 fee "per locomotive" (with limited

6   exceptions for "historic locomotives" and "zero emission locomotives").  § 2478.12(b).

7         The Regulation also provides two alternative compliance options: the Alternative

8   Compliance Plan ("ACP") and the Alternative Fleet Milestone Option ("AFMO").  §§ 2478.7,

9   2478.8.  Neither option relieves a railroad from complying with the Regulation's Reporting and

10  Recordkeeping or Idling Requirements, because the alternatives may substitute only for the

11  Spending Account and In-Use Operational Requirements. *See* §§ 2478.7(a), 2478.8(a).  The AFMO

12  allows for a transformation of an operator's fleet in roughly five-year stages, but CARB expects this

13  option to be viable (at best) for passenger rail, not freight rail.  *See* Compl., Ex. 3 at 7-8.

14        The ACP, in turn, directs that locomotive operators may forgo compliance with the Spending

15  Account and In-Use Operational Requirements if they develop their own plans to achieve emissions

16  reductions that are "equivalent to or greater than the reductions that would have been achieved"

17  through direct compliance with the regulations; in addition, emission reductions for particulate

18  matter and NOx must be "achieved at or within three miles" of the railroad's California operations.

19  § 2478.7(b), (c).  Thus, a railroad that pursues an ACP path would still need to overhaul its fleet to

20  achieve the specific emissions reductions mandated by CARB—requiring "the same investment" in

21  new technology "as that required by the Spending Account."  BNSF Decl. ¶ 16; *see also* UP Decl.

22  ¶ 19.  Moreover, the ACP still entails substantial intrusion by CARB into railroad operations: the

23  plan must be approved by CARB's Executive Director, with the applicant required to submit

24  extensive information to CARB and to pay higher administrative fees.  §§ 2478.7(d)-(e), 2478.12(c).

25  An approved participant must then submit detailed annual reports to CARB, and CARB's Executive

26  Officer may "revoke[]" the ACP "at any time."  § 2478.7(i)(2).

27        Finally, the Regulation imposes substantial burdens on the railroads that begin even before

28  the Regulation's formal effective date and further accelerate over time.  The Idling Requirements

1   go into force on the effective date, § 2478.9; Compl., Ex. 2 at 130; Compl., Ex. 11 at 128, requiring

2   the railroads to take immediate steps to comply.  Likewise, railroads must make their first deposits

3   in the Spending Accounts by July 1, 2024.  §§ 2478.4(a), (g); *see also* Compl., Ex. 2 at 49; Compl.,

4   Ex. 11 at 104.  The railroads will need to divert capital they were planning to spend on other priorities

5   to make these substantial deposits next year.  UP Decl. ¶ 15; BNSF Decl. ¶ 19.  The Reporting and

6   Recordkeeping Requirements likewise mandate that railroads submit their first reports on July 1,

7   2024, but with data going back to the prior calendar year.  § 2478.11(a)(5); *see also* Compl., Ex. 2

8   at 49; Compl., Ex. 11 at 104.  Because the railroads must begin collecting data as of October 1, 2023,

9   § 2478.11, the railroads will be compelled to invest unrecoverable sums to modify their systems to

10  collect the necessary information in advance of that date.

11                                              **ARGUMENT**

12          "To obtain a preliminary injunction, a plaintiff must establish (1) a likelihood of success on

13  the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the

14  balance of equities favors the plaintiff, and (4) that an injunction is in the public interest."  *Geo Grp.,*

15  *Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc).  "When the government is a party, the

16  last two factors (equities and public interest) merge."  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d

17  640, 668 (9th Cir. 2021).  The preliminary injunction "factors are evaluated on a sliding scale."  *Id*.

18  Here, all four factors strongly favor granting preliminary injunctive relief.

19  **I.      Plaintiffs are likely to succeed on their claims that the Regulation is unlawful.**

20          The Regulation is preempted, in whole or in part, under the ICCTA and the Clean Air Act.

21  It also violates the Dormant Commerce Clause by substantially burdening interstate transportation.

22          **A.      The Regulation is preempted in full by the ICCTA.**

23          Congress adopted the ICCTA in recognition of the fact that "rail transportation" is an

24  "intrinsically interstate form of transportation."  *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 804

25  (5th Cir. 2011).  "Allowing states and localities to create a variety of complex regulations governing

26  how an instrument of interstate commerce is operated, equipped, or kept track of … would directly

27  conflict with the goal of uniform national regulation of rail transportation."  *United States Env't*

28  *Prot. Agency Petition for Declaratory Ord.* ("*U.S. EPA*"), FD 35803, 2014 WL 7392860, at *9 (STB

Dec. 29, 2014).  The ICCTA thus broadly preempts state and local authority to regulate railroad operations, including locomotives and their movements.

The ICCTA preempts regulations governing railroads in two different ways.  First, the ICCTA *categorically* preempts regulations that directly target railroad operations, and thus "have the effect of 'managing' or 'governing' rail transportation." *Delaware v. STB*, 859 F.3d 16, 19 (D.C. Cir. 2017); *accord BNSF Ry. Co.*, 904 F.3d at 760-61.  The ICCTA also preempts a state law that, "as applied," has "the effect of unreasonably burdening or interfering with rail transportation." *Delaware*, 859 F.3d at 19.  CARB's Regulation is preempted under both tests.  *See* Compl. ¶¶ 101-102.  For purposes of this motion, categorical preemption establishes Plaintiffs' likelihood of success because it presents purely legal issues.  *See, e.g., Delaware*, 859 F.3d at 19; *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 644 (2d Cir. 2005).

The Regulation is categorically preempted because it is not a "law of 'general applicability'' with a mere "'remote or incidental' effect on rail transportation." *BNSF Ry. Co.*, 904 F.3d at 761 (quoting *AAR*, 622 F.3d at 761).  To the contrary, the Regulation directly targets "railroad operators," § 2478.1(a), with the clear purpose and effect of "managing or governing rail transportation," *BNSF Ry. Co.*, 904 F.3d at 761 (quotation marks omitted) (holding that law requiring railroads to collect fee from shippers of hazardous material would be preempted because it applied to shippers "only if they ship by rail"[5]); *Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010) (state regulation cannot "discriminate against rail carriers"); *N.Y. Susquehanna v. W. Ry. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007) ("[F]or a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry.").

This issue is beyond fair debate.  Even the name of the Regulation—the "In-Use *Locomotive* Regulation"—shows that it targets railroad operations, and CARB has described the Regulation as intended to "achieve emission reductions from Locomotives Operating in California."  Compl., Ex. 8 at 1.  Analysis of individual sections of the Regulation only confirms the point:  the Regulation creates a complex regulatory apparatus to control critical railroad functions and management

---

[5] The Ninth Circuit ultimately held that the provision was "protect[ed] from preemption" by a separate federal statute that is not applicable here. *Id.* at 761.

1   decisions, ranging from the locomotives that railroads may purchase and use, to how those
2   locomotives operate, all supported by burdensome reporting requirements that will, on their own,
3   require many millions of dollars to implement.

4   **Spending Account (§ 2478.4) and Administrative Fee (§ 2478.12)**: The Regulation
5   requires railroads—but not trucking or other transportation companies—to make significant annual
6   expenditures that are subject to CARB's direction.  *See* Compl., Ex. 11 at 82 (describing the
7   Spending Account as "a regulatory concept developed to address the unique circumstances of the
8   railroad industry").  These payment requirements take two forms:  the "Spending Account," which
9   imposes charges based on the operation of a locomotive within California, and a yearly
10  administrative fee charged to the locomotive operator.  §§ 2478.4, 2478.12.  Both provisions directly
11  target railroads, and both are preempted by the ICCTA.

12         The Spending Account is an especially clear ICCTA violation.  First, the financial burden
13  on railroads is enormous:  for example, the two Class I railroads operating in California (Union
14  Pacific and BNSF) estimate they will collectively have to deposit about $*1.5 billion annually* into
15  their Spending Accounts.  *See* BNSF Decl. ¶ 19; UP Decl. ¶ 16.  Second, the provisions are designed
16  to interfere with how railroads manage their locomotive fleets by dictating that funds will be spent
17  only on CARB-approved locomotives, rail equipment, or infrastructure.  § 2478.4(d).  Although
18  CARB claims that the "Spending Account" structure grants railroads flexibility, Compl., Ex. 2 at
19  99, the Regulation hijacks railroads' ability to make their own decisions about capital expenditures,
20  forcing them to spend huge sums purchasing locomotives and other assets that CARB wants
21  operators to prioritize—including locomotives that railroads believe are not commercially viable.
22  *See* BNSF Decl. ¶¶ 6, 19; UP Decl. ¶¶ 16, 21.  As a result, the Regulation will have a disruptive
23  impact on the railroads' allocation of resources and their ability to execute planned capital projects.
24  BNSF Decl. ¶ 19; UP Decl. ¶ 16; Mendocino Decl. ¶ 16.

25  **In-Use Operational Requirement (§ 2478.5)**:  The Regulation imposes an effective ban on
26  the operation of certain locomotives in the State—locomotives that continue to comply with all
27  federal regulations—simply because those locomotives have been in operation for 23 years since
28  their original engine build date.  *See* § 2478.5; p. 9, *supra*.  It is difficult to imagine a more direct

interference with railroad operations.  Confirming the point, CARB understands that its Regulation will impact fleets of all North American Class I railroads on a nationwide basis, since it is infeasible for interstate networks like the Class I railroads to maintain separate state-specific fleets.  *See*, p. 9, *supra*.  Indeed, the In-Use Locomotive Requirement appears to be driven by CARB's disagreement with federal law, as CARB rationalized this provision by reference to the supposed inadequacy of federal regulations that let railroad operators "remanufacture" older locomotives.  Compl., Ex. 2 at 19.  To state the obvious, CARB's disagreement with the federal law provides no basis for it to sidestep federal preemption.[6]  If the rule were otherwise, each state could adopt its own view of effective locomotive regulation, leading to exactly the type of "patchwork of regulation" that the ICCTA was designed to prevent.  *Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1338 (11th Cir. 2001); *cf. S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 774 n.4 (1945) (noting the unworkability of competing state standards for locomotives).

**Idling Requirements (§ 2478.9)**:  The Regulation's restrictions on train idling are materially indistinguishable from the South Coast regulations that the Ninth Circuit in *AAR* held were preempted by the ICCTA.  *See* 662 F.3d at 1098.  As with those invalidated rules, the Regulation "limits the permissible amount of emissions from idling trains," *id.* at 1096, by mandating (subject to limited exceptions) that railroad operators shut off their locomotives within 30 minutes of the locomotive becoming stationary.  § 2478.9(a); p. 10, *supra*.  This direct regulation of railroad operations once again is "plainly" preempted by the ICCTA.  *AAR*, 662 F.3d at 1098; *see also U.S. EPA*, 2014 WL 7392860, at *8 (recognizing that state and local regulators lack authority "to decide for the railroads what constitutes unnecessary idling").

CARB has suggested that the Idling Requirements are unobjectionable because they supposedly are "consistent with" existing EPA regulations.  Compl., Ex. 2 at 21, 69.  That statement is impossible to square with CARB's rationale for adopting this provision: namely, its desire "to

---

[6]  CARB also failed to acknowledge the significant benefits of remanufacturing.  As AAR explained, remanufacturing leads to increased fuel efficiency, reduced emissions, and significant recycling benefits—all while improving the locomotives' reliability and effectiveness.  Compl., Ex. 1 at 12-13.  CARB, in fact, supported EPA's adoption of the remanufacturing regulations when they were developed and promulgated, explaining that it "fully support[ed] the direction that U.S. EPA is taking to control emissions from" locomotives.  *Id*. at 14 n.36.

strengthen enforcement and limit unnecessary locomotive idling." *Id.* at 23.  In fact, CARB's proposed regulation places significant additional burdens on locomotive owners and operators— unlike the existing federal rule, which focuses on the original equipment manufacturer or remanufacturer.  *See* 40 C.F.R. § 1033.115(g).   Regardless, there is no exception from ICCTA preemption for regulations that supposedly parallel or supplement federal law.  The ICCTA expressly reserves the entire field of locomotive regulation to the federal government.  And "[w]here Congress has occupied an entire field … even complementary state regulation is impermissible." *Arizona v. United States*, 567 U.S. 387, 401 (2012) (holding that a law "add[ing] a state-law penalty for conduct proscribed by federal law" was preempted because it "intrudes on [a] field … in which Congress has left no room for States to regulate").

**Reporting and Recordkeeping Requirements (§ 2478.11)**:   The Reporting and Recordkeeping Requirements exist to facilitate the Spending Account (by providing the emissions inputs into CARB's formula, *see* Compl. Ex. 11 at 129), which is itself preempted under the ICCTA. *See* p. 14, *supra*.  Moreover, as with the Regulation's Idling Requirements, these requirements closely mirror the provisions that the Ninth Circuit held violate the ICCTA.  *See AAR*, 622 F.3d at 1096 (regulations imposed "various reporting requirements, backed by threat of penalties" including an inventory of locomotive emissions).  Under the Regulation, locomotive operators must collect extensive data on the use and location of each locomotive operating in California, requiring railroads to develop and install new technology on many locomotives.  *See* p. 10, *supra*.  And because the provision applies to any locomotive operated in California for any portion of the year, § 2478.11(b), it will force railroads to ensure that *any* locomotive in their fleet that may enter California at any point is equipped with this tracking technology, even if the locomotive is not ordinarily operated in the State.  *See* BNSF Decl. ¶ 15; UP Decl. ¶ 13.  As the STB has explained, such state-specific recordkeeping obligations are inconsistent with the ICCTA.  *See U.S. EPA*, 2014 WL 7392860, at *9 (recognizing that requiring "railroad employees to comply with … recordkeeping rules for each jurisdiction … would likely result in an unworkable variety of regulations").

In sum, CARB's Regulation is impossible to square with the ICCTA.  The Regulation directly targets railroads in a self-described effort to transform locomotive fleets and operations both

1   within and beyond California. That is plainly impermissible. *See AAR*, 622 F.3d at 1098. CARB

2   effectively conceded as much in its Final Statement of Reasons, as the primary defense it put forward

3   against ICCTA preemption is that CARB "anticipates seeking, and receiving, authorization from

4   U.S. EPA," in the form of a section 209(e)(2) waiver, which CARB contends would avoid a conflict

5   with the ICCTA. *See* Compl., Ex. 11 at 21, 35. CARB is wrong about that. *See U.S. EPA*, 2014

6   WL 7392860, at *7. But regardless, because EPA has *not* authorized the Regulation, CARB's

7   speculation that EPA *might* do so *someday*—in the face of significant legal challenges— provides

8   no basis for CARB to defend and enforce the Regulation *now*. *See AAR*, 622 F.3d at 1098.

9       Nor do either of CARB's putative "alternative" compliance options avoid any of these

10  preemption problems. To start, both programs leave unchanged the onerous Idling and Reporting

11  and Recordkeeping Requirements, which apply immediately. *See* p. 11, *supra*. As for the remaining

12  requirements, even CARB admits that the AFMO option is not viable for freight rail. *See id.* The

13  ACP, in turn, continues to subject railroads to burdensome mandates that directly restrict their

14  operations. After all, the ACP requires railroads to achieve the *same or greater* reductions in

15  emissions in the five-year period following implementation of the Regulation that CARB projects

16  from its mandates, and participation in the program remains subject to CARB oversight.

17  §§ 2478.7(b), (e)-(l). Because the railroads must still make extensive upgrades to their fleets to

18  further CARB's policy objectives, the ACP has the "effect of 'managing' or 'governing' rail

19  transportation." *Delaware*, 859 F.3d at 19. In any event, the mere existence of "alternative options"

20  does not mitigate the preemption problem. The South Coast regulation at issue in *AAR* provided "a

21  series of alternative options for achieving" emissions goals—a factor that did not change the Ninth

22  Circuit's preemption analysis. 622 F.3d at 1096.

23      The ICCTA accordingly preempts the Regulation in full, and the Court need go no further

24  in finding that Plaintiffs have shown a likelihood of success on the merits.

25      **B.    The Spending Account and In-Use Requirements are also preempted by the**

26          **Clean Air Act.**

27      The Clean Air Act precludes any state "standard or other requirement relating to the control

28  of emissions from … [n]ew locomotives or new engines used in locomotives." 42 U.S.C.

§ 7543(e)(1).  This statute preempts the Spending Account and In-Use Operational Requirements.

### 1.    The In-Use Operational Requirements are preempted.

The In-Use Operational Requirements provision is preempted by Section 209(e) of the Clean Air Act.  To begin, CARB's bar on operating a locomotive older than 23 years (from the original engine build date), unless the locomotive falls below specified emissions levels or lifetime energy usage, is an attempt to enforce a standard or other requirement relating to locomotive emissions control.  Indeed, this requirement simply bans the in-state operation of locomotives that CARB believes to be excessive emitters.  CARB does not hide that it selected the age of a locomotive as a proxy for emissions.  It states that its 23-year age limit "is necessary to prevent older, higher-polluting locomotives from continuing to operate in California despite the availability of cleaner locomotive emission technologies."  Ex. 2 at 109.

It makes no difference that CARB chose a proxy for emissions rather than directly enforcing an emission standard.  As the Ninth Circuit recently reiterated, "States and localities can't skirt the text of broad preemption provisions by doing indirectly what Congress says they can't do directly." *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1056 (9th Cir. 2023).  In the context of the Clean Air Act's analogous preemption provision for motor vehicles, the Supreme Court explained that the statute preempts all sorts of "enforcement techniques" and "methods of standard enforcement." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist. (EMA)*, 541 U.S. 246, 253 (2004); *see Pac. Merch. Shipping Ass'n*, 517 F.3d at 1114 ("the means of compliance are irrelevant").  Banning a proxy for emissions is one such enforcement technique.

Nor is the 23-year cap spared by section 209(e)(1)'s language referring to standards and requirements related to "new" locomotives and engines.  First, the Regulation applies even to locomotives that are "new" under federal law because CARB starts the 23-year clock from the original engine's assembly *without regard to any subsequent remanufacture*. *See* § 2478.3(a).  By contrast, federal law provides that "[a] locomotive or engine also becomes new if it is remanufactured or refurbished," and recognizes that such locomotives are entitled to an additional useful life period.  40 C.F.R. §§ 1033.101(g)(3)-(4), 1033.901.  CARB's ban on these federally permitted locomotives during their useful life thus qualifies as a requirement "relating to the control

1   of emissions from … [n]ew locomotives." 42 U.S.C. § 7543(e)(1); p. 5, *supra*.  Second, this

2   requirement would be preempted even if it could be characterized as applying only to non-"new"

3   locomotives and engines, because California has neither applied for nor received the requisite waiver

4   under Section 209(e)(2).  *See* p. 6, *supra*; *see* Compl., Ex. 11 at 22 (stating that CARB "anticipates

5   seeking" a waiver at some undisclosed time in the future).

6        The subsequent provisions of the In-Use Operational Requirements are also preempted.

7   They mandate that locomotives built after a specified year must operate "in a ZE Configuration at

8   all times while in California"—setting 2030 as the year for switch, industrial, and passenger

9   locomotives and 2035 as the year for freight line haul locomotive engines.  *See* § 2478.5(b)-(c).

10  This is an undisguised ban on emissions for these locomotives, which is preempted by Section

11  209(e).  *See Pac. Merchant Shipping Ass'n*, 517 F.3d at 1114.

12        **2.        The Spending Account sets "standard[s] or other requirement[s]"**

13              **relating to the control of emissions from new locomotives.**

14        The Spending Account provision is likewise preempted under section 209(e) of the Clean

15  Air Act in two distinct ways.  First, the Funding Requirement imposes a "requirement" relating to

16  emissions controls by effectively charging railroads to operate in California based on the emissions

17  from their locomotives.   Second, the Purchase Restrictions set emissions-related standards or

18  requirements on new locomotive purchases in the State.

19        Beginning with the Funding Requirement, the command to locomotive operators that they

20  "shall" use a formula to calculate their "funding requirement for each Locomotive" and "shall"

21  deposit funds into a Spending Account, § 2478.4(g)(2), fits within the plain meaning of a "standard

22  or other requirement," 42 U.S.C. § 7543(e)(1).  *See EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 925 (9th

23  Cir. 2018) (defining "require" as "[s]omething that must be done" (quoting Black's Law Dictionary

24  (10th ed. 2014)).   The Funding Requirement also "relat[es] to the control of emissions" from

25  locomotives.  "The goal" of the Spending Account "is to increase uptake of cleaner diesel

26  locomotives and zero-emission locomotives."  Compl., Ex. 9 at 111.  To further that goal, the

27  Regulation charges locomotives operating in the State based on their emissions levels, where "[t]he

28  amount deposited in the account is calculated by using the locomotive's annual usage in megawatt

1  hours (MWh) and the locomotive's emission factors."  Compl., Ex. 2 at 20.  The Funding

2  Requirement thus attaches "liability" for past emissions, which is "a potent method of governing

3  conduct and controlling policy."  *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008).

4       The Purchase Restrictions in § 2478.4(d) likewise are preempted as an "attempt to enforce"

5  a "standard or other requirement relating to the control of emissions."  42 U.S.C. § 7543(e)(1).  The

6  Supreme Court has "clarified the breadth of the word 'standard.'"  *Jensen Family Farms, Inc. v.*

7  *Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 941 (9th Cir. 2011).  In interpreting

8  section 209(a) of the Clean Air Act (governing preemption for motor-vehicle emission standards),

9  the Supreme Court determined that a "standard" means an established "criteria" according to which

10 "the vehicle or engine must not emit more than a certain amount of a given pollutant, must be

11 equipped with a certain type of pollution-control device, or must have some other design feature

12 related to the control of emissions."  *EMA*, 541 U.S. at 253.  The Court further held that "purchase

13 restrictions" directed to buyers qualify as a "means of enforcing standards."  *Id*. at 253-54.  Thus,

14 because "[a] command, accompanied by sanctions, that certain purchasers may buy only vehicles

15 with particular emission characteristics is …an 'attempt to enforce' a 'standard,'" such state-law

16 purchase mandates are preempted by the Clean Air Act.  *Id*. at 255.

17      Under the reasoning of EMA, the Purchase Restrictions in § 2478.4(d) of the Regulation are

18 impermissible attempts to enforce "standard[s] … relating to the control of emissions" from new

19 locomotives, 42 U.S.C. § 7543(e)(1).  The Regulation dictates the new locomotives that operators

20 may purchase with the funds conscripted by the State based on explicit emissions criteria—initially,

21 locomotives that satisfy the State's emissions-based definition of "Cleaner Locomotives,"[7] and

22 ultimately only "ZE" or "ZE Capable" Locomotives that operate without emitting any pollutants or

23 greenhouse gases, *see* § 2478.3(a), which is far more restrictive than any federal emissions standard,

24 *see* 40 C.F.R. § 1033.101.  These purchase mandates are backed by penalties for non-compliance,

25 *see* § 2478.16, and are intended to dictate the emissions standards for new locomotives purchased

26

27      [7] The fact that this requirement is defined by reference to the federal Tier 4 standard does not save
   the provision from preemption.  CARB is barred not only from adopting its own emissions standards,

28 but also from "attempt[ing] to enforce" any standard relating to emissions control from new
   locomotives, which the purchase requirement plainly does.  42 U.S.C. § 7543(e)(1)(B).

1   by railroads operating in California.  *See* Compl., Ex. 2 at 98.  The Purchase Restrictions are thus

2   preempted.  *See Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 200 (2d Cir. 1998) (holding that "a

3   requirement that a particular percentage of vehicle sales be [zero-emission vehicles] has no purpose

4   other than to effect a general reduction in emissions" and is therefore preempted); *Ass'n of Int'l*

5   *Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Prot.*, 208 F.3d 1, 6 (1st Cir. 2000) (same).

6         **C.**      **The Regulation violates the Dormant Commerce Clause.**

7         The Regulation also violates the Dormant Commerce Clause.  The Dormant Commerce

8   Clause is a "limitation on state power" arising from the negative implication of the Commerce

9   Clause, which reserves the power to regulate interstate commerce to the federal government.  *Nat'l*

10   *Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012).  The Supreme

11   Court has repeatedly applied this doctrine to invalidate "certain state regulations on instrumentalities

12   of interstate transportation—trucks, trains, and the like." *Nat'l Pork Producers Council v. Ross*, 143

13   S. Ct. 1142, 1158 n.2 (2023).  In these cases, because "a lack of national uniformity would impede

14   the flow of interstate goods," the Court has held that Commerce Clause "pre-empts [that] entire field

15   from state regulation." *Id.* (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978)

16   (emphasis omitted)); *see id.* at 1164 n.4 (plurality op.) (noting that "a majority [of the Supreme

17   Court] agrees" that cases that "seek to protect the instrumentalities of interstate transportation" lie

18   in the "heartland" of Dormant Commerce Clause precedent).

19         For example, in *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 352 U.S. 761 (1945), the

20   Supreme Court held that an Arizona law prohibiting the in-state operation of trains of a certain length

21   ran afoul of the Dormant Commerce Clause.  *Id.* at 781-82.  As the Court explained, state-by-state

22   regulation would require "breaking up and reassembling long trains at the nearest terminal points

23   before entering and leaving that regulating state." *Id.* at 775.  It would thus "serious[ly] imped[e]

24   the free flow of commerce," leading to the "obstructi[on] to interstate train operation," and a

25   "seriously adverse effect on transportation efficiency and economy." *Id.* at 775, 781.

26         Similarly, the Ninth Circuit has instructed that, where an activity is "inherently national or

27   requires a uniform system of regulation," a state law violates the Dormant Commerce Clause when

28   it "impose[s] significant burdens on interstate commerce as a consequence of inconsistent

1    regulation" of the activity. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d

2    937, 952 (9th Cir. 2013). As the court has recognized, a "classic example of this type of [invalid]

3    regulation is one that imposes significant burdens on interstate transportation." *Nat'l Ass'n of*

4    *Optometrists*, 682 F.3d at 1148. Thus, in *Union Pacific Railroad Co. v. California Public Utilities*

5    *Commission*, 346 F.3d 851 (9th Cir. 2003), the Ninth Circuit invalidated California's regulation of

6    performance-based safety standards for trains. The court explained that, "if California can require

7    the Railroads to develop and to implement performance-based standards, so can every other state,

8    and there is no guarantee that the standards will be similar. The effect of such a patch-work

9    regulatory scheme would be immense." *Id.* at 871.

10        The reasoning of these decisions fully applies here. As discussed above, railroads' only

11   options for complying with the Regulation are to change locomotives at the California border, or to

12   replace their entire nationwide fleets. *See* p. 9, *supra*. Either possibility imposes an unsustainable

13   burden on the flow of interstate goods. *See Nat'l Pork Producers*, 143 S. Ct. at 1158 n.2; *S. Pac.*,

14   325 U.S. at 781-82; *Union Pac.*, 346 F.3d at 871-72. The burden is compounded by the risk of

15   imitation: if California is permitted to enforce the Regulation, other states will likely follow suit

16   with their own regulations dictating design requirements for locomotives, creating a hugely

17   disruptive "patch-work regulatory scheme." *Union Pac.*, 346 F.3d at 871. The Dormant Commerce

18   Clause forbids such state-level interference with an inherently interstate form of transportation.

19   **II.    Plaintiffs' members will suffer immediate, irreparable harm absent an injunction.**

20        If Defendants are not preliminarily enjoined from enforcing the Regulation, Plaintiffs'

21   members will suffer imminent, irreparable harm. Plaintiffs' members will need to disrupt their own

22   operational plans and investments to devote vast expenditures to compliance efforts. Those

23   expenditures and compliance efforts are highly burdensome, inherently irreparable, and threaten the

24   very existence of short line railroads in the State.

25        Absent an injunction, the railroads will face upheaval in the coming weeks and months. The

26   railroads must upend their spending and budget priorities and shift their time and resources to an

27   entirely new set of projects. Before the Regulation even goes into effect, the railroads must start

28   installing new hardware and software to comply with the Reporting and Recordkeeping

MEMORANDUM OF POINTS AND AUTHORITIES ISO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION          Case No. 2:23-CV-01154-JAM-JDP

1   Requirements.  *See* BNSF Decl. ¶ 14 (explaining that BNSF needs "to immediately begin installing

2   the new technology and building this new back-end infrastructure"); UP Decl. ¶¶ 11-13 (explaining

3   that Union Pacific does not currently have the capacity to track MWh generation by air district).

4   Union Pacific estimates that this project alone will cost about $264 million—money it must start to

5   spend right away.  UP Decl. ¶ 12.  Because these funds would be spent on technology tailored

6   specifically to CARB's reporting obligations that are otherwise unneeded, the technology provides

7   no independent value to the railroads.  BNSF Decl. ¶ 17; UP Decl. ¶ 14.  Moreover, the railroads

8   must take certain portions of their fleet out of operation while this technology is being installed,

9   leading to service disruptions.  BNSF Decl. ¶ 16.

10         In addition, the railroads must reprioritize their current budgets and project plans to withdraw

11   the necessary deposits for the Spending Account.  As Union Pacific explained, to comply with the

12   Spending Account mandate, it "must immediately divert capital it was planning to spend on other

13   projects and/or priorities designed to," for example, "enhance safety [and] upgrade and/or reinforce

14   track"—projects identified by Union Pacific as "priorities needed to manage a safe and efficient

15   railroad company."  UP Decl. ¶ 16; *see also* BNSF Decl. ¶ 19 (likewise explaining that the

16   impending deposit obligation will force BNSF to shift money "it was otherwise planning to spend

17   on important infrastructure and maintenance across its nationwide network").  Again, these changes

18   must be made in the coming months to allow the railroads to deposit potentially millions of dollars

19   each (for the Class I railroads) next year.  BSNF Decl. ¶ 19; UP Decl. ¶ 16.

20         All of these harms are both imminent and irreparable.  First, the economic losses that

21   Plaintiffs' members will suffer are inherently irreparable because no railroad will be able to recover

22   damages from CARB or its officers under the Eleventh Amendment.  *See, e.g., Rocky Mountain*

23   *Farmers Union v. Corey*, 913 F.3d 940, 950 (9th Cir. 2019) (holding that CARB's officers could

24   not be sued for damages).  Under Ninth Circuit precedent, when sovereign immunity bars any

25   "adequate legal remedy" for the harm the plaintiffs will experience, the economic loss is

26   "irreparable."  *E. Bay Sanctuary*, 993 F.3d at 677 (citation omitted); *see also Blue Lake Rancheria*

27   *v. Lanier*, 106 F. Supp. 3d 1134, 1140-41 (E.D. Cal. 2015) (Mendez, J.) (a plaintiff's inability "to

28   obtain damages … because of the state's [Eleventh Amendment] immunity" renders economic loss

*per se* "irreparable"); *Ass'n for Accessible Medicines v. Bonta*, 562 F. Supp. 3d 973, 987-88 (E.D. Cal. 2021) (identifying irreparable harm resulting from the "huge sums of money" an association's members were forced to pay to comply with a law, and explaining that "monetary injury can be irreparable when Eleventh Amendment sovereign immunity prevents a plaintiff from recovering damages"); *April in Paris v. Becerra*, 494 F. Supp. 3d 756, 769 (E.D. Cal. 2020) (same).

Second, even apart from the issue of sovereign immunity, the Regulation's direct interference with railroad operations and the forced diversion of resources will result in irreparable injury.  Once the railroads prevail, there will be no way to unwind the clock to remedy service disruptions or the lost time and resources that the railroads were not able to spend on the projects they have identified as most pressing.  *See* BNSF Decl. ¶ 17; UP Decl. ¶ 16; Mendocino Decl. ¶ 16. Such a diversion of resources and the loss of investment opportunities is irreparable harm.  *See, e.g.,* *Se. Pa. Transp. Authority v. Pa. Public Utility Comm'n*, 210 F. Supp. 2d 689, 726 (E.D. Pa. 2002) (agreeing that Amtrak would be irreparably harmed where, among other reasons, it would be "forced to divert resources toward paying" governmental assessments); *see also Bay Sanctuary Covenant*, 993 F.3d at 677 (holding that a forced change in an organization's programs is an irreparable injury); *Centro Legal de law Raza v. Exec. Off. of Immigr. Rev.*, 524 F. Supp. 3d 919, 977 (N.D. Cal. 2021) (irreparable harm established where the "plaintiffs have been forced to divert resources away from their core programs to address the new policy" (quotation marks and brackets omitted)).

Third, although the immediate obligations imposed by the Regulation will be onerous for all railroads in the State, they pose an existential threat to the short line railroads.  As Mendocino Railway explains, making the required technology upgrades to its fleet "would be cost prohibitive." Mendocino Decl. ¶ 11.  Because Mendocino Railway "is a small Class III carrier with very narrow margins," it may "be forced into bankruptcy" if "the Regulation takes effect while this litigation proceeds."  *Id.*  CARB *acknowledged* that some short line railroads may be "eliminated" due to the high compliance costs of the Regulation.  *See* pp. 8, *supra*; Compl., Ex. 6 at 143.  This "threat of being driven out of business" is a textbook example of irreparable injury that warrants preliminary injunctive relief.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022).

Finally, where a state law "is unconstitutional on its face, an injunction prohibiting its

1   enforcement is proper." *Ass'n for Accessible Medicines*, 562 F. Supp. 3d at 988; *see also United*

2   *States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) ("We have "stated that an alleged constitutional

3   infringement will often alone constitute irreparable harm").  Here, Plaintiffs are likely to prevail in

4   their claims that the Regulation is preempted by federal law and violates the Commerce Clause.

5   **III.**     <u>**The balance of hardships and public interest favor injunctive relief.**</u>

6        In cases against the government, the court "consider[s] the balance of equities and public

7   interest together." *California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018); *see also Drakes Bay Oyster*

8   *Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party, these last two

9   factors merge.").  These factors weigh strongly in favor of granting the injunction.

10        First, "the public interest favors applying federal law correctly." *Small v. Avanti Health Sys.*,

11   LLC, 661 F.3d 1180, 1197 (9th Cir. 2011).  As a result, there is no public interest in enforcing a law

12   that is preempted.  *See Nat'l City of Indiana v. Boutris*, 2003 WL 21536818, at *7 (E.D. Cal. July

13   2, 2003) (the public interest was "served by enjoining the enforcement of the [preempted] provisions

14   of state law") (alteration in original).  Thus, the "plaintiffs' likelihood of success as to preemption

15   compels finding in favor of plaintiffs" with respect to the public interest too.  *April*, 494 F. Supp. 3d

16   at 771; *see Ass'n for Accessible Medicines*, 562 F. Supp. 3d at 989 (similar regarding a dormant

17   Commerce Clause claim).

18        Second, a preliminary injunction would be in the public interest because the Regulation

19   adopts a flawed, technically unrealistic approach to reducing locomotive emissions and improving

20   air quality in the State.  These goals are undeniably worthy, and Plaintiffs' members have already

21   made significant investments to achieve them. *See, e.g.*, Compl., Ex. 1 at 3-4; BNSF Decl. ¶¶ 5-6;

22   UP Decl. ¶ 4.  But the regulatory mandates imposed by CARB are untested and unrealistic.  They

23   do not provide a viable path forward for achieving environmental goals while maintaining a

24   functioning freight-rail service in the State.  To the contrary, they will force some railroads to

25   abandon their productive efforts to reduce emissions in order to reallocate funds.  SNR Decl. ¶ 13.

26   This defies the public interest and thus favors maintaining the status quo.

27                                     <u>**CONCLUSION**</u>

28        The Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

Dated: June 20, 2023                By:  /s/ *Hayes P. Hyde*
                                        HAYES P. HYDE (SBN 308031)
                                        *HHyde@goodwinlaw.com*
                                        **GOODWIN PROCTER LLP**
                                        Three Embarcadero Center, 28TH Floor
                                        San Francisco, CA 94111
                                        Phone:  +1 415 733 6000

                                        BRIAN T. BURGESS (*pro hac vice* application
                                        pending)
                                        *BBurgess@goodwinlaw.com*
                                        **GOODWIN PROCTER LLP**
                                        1900 N Street NW
                                        Washington, DC 20036
                                        Phone: +1 202 346 4000

                                        JORDAN F. BOCK (SBN 321477)
                                        JESSE LEMPEL (*pro hac vice* application
                                        pending)
                                        **GOODWIN PROCTER LLP**
                                        *JBock@goodwinlaw.com*
                                        *JLempel@goodwinlaw.com*
                                        100 Northern Avenue
                                        Boston, MA 02210
                                        Phone:  +1 617 570 1000

                                        Attorneys for Plaintiffs
                                        ASSOCIATION OF AMERICAN
                                        RAILROADS and AMERICAN SHORT
                                        LINE AND REGIONAL RAILROAD
                                        ASSOCIATION