1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  ASSOCIATION OF AMERICAN               No. 2:23-cv-01154-DJC-JDP
    RAILROADS and AMERICAN SHORT LINE
12  AND REGIONAL RAILROAD
    ASSOCIATION,
13                                        ORDER
        Plaintiffs,
14
            v.
15
    LIANE M. RANDOLPH, in her official
16  capacity as Chair of the California Air
    Resources Board; STEVEN S. CLIFF, in his
17  official capacity as Executive Officer of the
    California Air Resources Board; and ROB
18  BONTA, in his official capacity as Attorney
    General of the State of California,
19
        Defendants,
20
            and
21
    EAST YARD COMMUNITIES FOR
22  ENVIRONMENTAL JUSTICE, PEOPLE'S
    COLLECTIVE FOR ENVIRONMENTAL
23  JUSTICE, and SIERRA CLUB,
24      Defendant-Intervenors.
25
26
27
28

                              1

1    Pending before this Court is Defendants Liane M. Randolph, Steven S. Cliff, and

2  Rob Bonta's Motion to Dismiss Plaintiffs Association of American Railroads ("AAR") and

3  American Short Line and Regional Railroad Association's ("ASLRRA") Amended

4  Complaint.  (ECF No. 20.)

5    For the reasons set forth below, the Court will GRANT Defendants' Motion in

6  part, and DENY it in part.

7                              **BACKGROUND**[1]

8  ## I.    California's Locomotive Regulation

9    The California Air Resources Board ("CARB") recently adopted an "In-Use

10  Locomotive Regulation" ("Regulation") on April 27, 2023, the final version of which

11  was submitted to the California Office of Administrative Law ("OAL") on September

12  15, 2023.  (First Am. Compl. ("FAC") (ECF No. 18) ¶ 1.)  As amended, the Regulation

13  has four primary components, all of which target railroad operations: (1) the Spending

14  Account; (2) the In-Use Operational Requirements; (3) the Idling Requirements; and

15  (4) the Reporting and Recordkeeping Requirements.  (*Id.* ¶¶ 42–63.)  There is also an

16  Administrative Payment Provision.  (*Id.* ¶ 50.)

17

18

---

19  [1] The Court grants Defendants' unopposed Request for Judicial Notice in Support of their Motion to

20  Dismiss ("Defendants' RNJ").  (ECF No. 21.)  Specifically, the Court finds that Exhibits A and D of Defendants' RJN are the proper subject of judicial notice, as the facts for which they are relied on "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

21  Fed. R. Evid. 201.  Further, the Court finds that Exhibits B, C, E, and F of Defendants' RJN are proper subjects of judicial notice as they are publicly available on government websites and the facts for which

22  they are relied upon can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010)

23  (stating that it was appropriate to take judicial notice of information "made publicly available by government entities" on their websites where "neither party disputes the accuracy of the web sites or

24  the accuracy of the information displayed herein").  The Court also grants Plaintiffs' unopposed Request for Judicial Notice in Support of Their Opposition to Defendants' Motion to Dismiss ("Plaintiffs' RJN").

25  (ECF No. 28.)  The Court finds that Exhibits A and B of Plaintiffs' RJN are the proper subjects of judicial notice as the documents are publicly available on a government website, *see Daniels-Hall*, 629 F.3d at

26  998–99, and the facts for which they are relied on "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  Finally, Exhibit C of

27  Plaintiffs' RJN is also the proper subject of judicial notice because the fact for which it is relied on "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

28  Fed. R. Evid. 201.

1        Spending Account (§ 2478.4[2]): By July 1, 2026, railroads must "establish a

2    Spending Account" into which they must make annual deposits "solely dedicated to

3    compliance with the Spending Account requirements."  § 2478.4(a)–(b); FAC ¶¶ 43,

4    46.  The amount that a railroad must deposit is calculated based on its locomotive's

5    emissions in California the previous calendar year.  § 2478.4(f); FAC ¶ 44.  Spending

6    Account funds are subject to purchase restrictions: they may be spent only to

7    purchase, lease, or rent clean locomotives; to convert dirtier locomotives into clean

8    ones; to purchase, lease or rent zero-emission equipment or infrastructure; or for

9    zero-emission pilot projects and demonstrations.  § 2748.4(d); FAC ¶ 47.

10        In-Use Operational Requirements (§ 2478.5): Beginning in 2030, any

11    locomotive that is "23 years or older," as determined by its original engine build date,

12    is banned from operating in California unless the locomotive has not exceeded a

13    specified quantity of energy usage over its lifetime or exclusively operates in a zero-

14    emission configuration[3] ("ZE Configuration") within California.  § 2478.5(a); FAC ¶ 52.

15    The Regulation also sets dates after which all locomotives with engines built after

16    specified years–2030 for many locomotives and 2035 for those that haul freight long

17    distances–must operate "in a ZE Configuration at all times while in California."

18    § 2478.5(b)–(c); FAC ¶¶ 54–55.

19        Idling Requirements (§ 2478.9): The Idling Requirements, which take effect

20    immediately, regulate several aspects of a locomotive's function and maintenance.

21    The Environmental Protection Agency ("EPA") has long required locomotive

22    manufacturers to install automatic engine stop/start ("AESS") devices on new

23    locomotives that shut down the engine "after no more than 30 continuous minutes of

24    idling."  73 Fed. Reg. 25098, 25125 (May 6, 2008); Mot. Dismiss at 3.  The Regulation

---

[2] The Regulation is codified at Cal. Code Regs., tit. 13, §§ 2478–2478.17.  Unless otherwise noted, all citations of regulatory provisions refer to that title.

[3] In ZE Configuration, a locomotive emits no pollution of any kind–either because it is a zero-emission locomotive (*e.g.*, one that runs exclusively on electricity or hydrogen fuel cells) or because it can use either a diesel engine or a zero-emission power source to run its electric motor and uses the latter in California.  (FAC ¶ 49; Mot. Dismiss at 3 n.1.)

requires operators to keep these idling devices in working condition.  Specifically, the
Regulation prohibits railroads from disabling an AESS device unless necessary for
maintenance and requires railroads to ensure the AESS device is functional during
locomotive operation, with an obligation to replace or repair an inoperative AESS
device within 30 days.  § 2478.9(b)–(c); FAC ¶ 58.  In addition, the Regulation imposes
idling limits, such that locomotive operators must "ensure an AESS equipped
Locomotive Engine is shut off no more than 30 minutes after the Locomotive becomes
stationary" (subject to narrow exceptions), § 2478.9(a), and must "manually shut off"
the engine "no more than 30 minutes after the Locomotive becomes stationary" when
an AESS device is inoperative, § 2478.9(c)(2).  (FAC ¶ 57.)

Reporting and Recordkeeping Requirements (§ 2478.11): Beginning July 1,
2026, locomotive operators must annually report a host of emissions information for
non-zero emissions locomotives, § 2478.11(b)(2), which are used to calculate
Spending Account deposits, § 2478.4(f); the "time, date, location, and duration of
each instance" an AESS-equipped locomotive "idled for longer than 30 minutes in
California," § 2478.11(b)(3)(A); and an itemized list of the description and location of
each item purchased with the Spending Account, § 2478.11(c)(6).  (FAC ¶¶ 60–63.)

Administrative Payment Provision (§ 2478.12): The Administrative Payment
Provision authorizes CARB to collect an annual payment of $175 per locomotive, with
certain limited exceptions.  § 2478.12; (FAC ¶ 50.)  The Administrative Payment
provision is due with the railroads' submission of their annual emissions report.
§ 2478.12.

## II.   Regulation of Locomotive Emissions under the Clean Air Act

The Clean Air Act ("CAA") (codified at 42 U.S.C. 7401 *et seq.*) requires the EPA
to establish emissions standards for "new" locomotives.  42 U.S.C. § 7547(a)(5).  The
EPA's regulations provide that a locomotive ceases to be "new" when the earlier of
two events occurs: (1) the locomotive's equitable or legal title is transferred to an

4

1     ultimate purchaser,[4] or (2) the locomotive is placed into service (or back into service if

2     the locomotive has been remanufactured).  40 C.F.R. § 1033.901.  Congress has

3     prohibited states from setting standards for "new" locomotives, 42 U.S.C.

4     § 7543(e)(1)(B), but permits states to regulate non-new locomotive emissions, subject

5     to the EPA's approval.  Specifically, under section 209(e)(2)(A) of the CAA, California is

6     permitted to adopt emissions "standards and other requirements" for "any nonroad

7     vehicles or engines other than those referred to in subparagraph (A) or (B)," 42 U.S.C.

8     § 7543(e)(2)(A), where subparagraph (B) refers to "new locomotives," *id.*

9     § 7543(e)(1)(B).  However, any such California regulations require authorization from

10    the EPA.  *Id.* § 7543(e)(2)(A).

11        A section 209(e)(2)(A) authorization proceeding begins with a request from

12    California that includes the State's determination that its nonroad vehicle "standards

13    will be, in the aggregate, at least as protective of public health and welfare as

14    applicable Federal standards."  42 U.S.C. § 7543(e)(2)(A).  The EPA must then consider

15    California's request in a public proceeding.  *Id.*; 40 C.F.R. § 1074.101(b).  The CAA

16    provides three bases for denial: "(i) the determination of California is arbitrary and

17    capricious, (ii) California does not need such California standards to meet compelling

18    and extraordinary conditions, or (iii) California standards and accompanying

19    enforcement procedures are not consistent with this section."  42 U.S.C.

20    § 7543(e)(2)(A).   If none of the three statutory bases for denial are established by the

21    record, the EPA "shall" grant the authorization.  *See id.*  The EPA's action is reviewable

22    only in the appropriate Court of Appeals.  *Id.* § 7607(b)(1).

23 **III.   Procedural History**

24        On June 9, 2023, CARB first transmitted the Regulation to the OAL for review.

25    (FAC ¶ 80.)  Soon after, Plaintiffs, who are associations representing both freight and

26

27

28    [4] "Ultimate purchaser means the first person who in good faith purchases a new locomotive for purposes other than resale."  40 C.F.R. § 1033.901.

passenger railroads,[5] filed this suit and moved for a preliminary injunction.  (ECF Nos. 1, 8.)  CARB withdrew the Regulation from OAL review, prompting Plaintiffs to withdraw their motion for preliminary injunction.  (FAC ¶ 81.)  CARB then amended and readopted the Regulation, leaving all the main substantive provisions in place while moving back the effective date of some provisions (*e.g.*, the deadline for the first deposits into the Spending Account and the first annual emissions report) while leaving others in place (*e.g.*, the Idling Requirements, which come into force immediately).  (*Id.*)  The Regulation became final under California law in October 2023 and is effective as of January 1, 2024.  (Mot. Dismiss (ECF No. 20) at 5.)  On November 7, 2023, CARB submitted a section 209(e)(2) authorization request to the EPA.  (*Id.*; Defendants' RJN, Ex. D (ECF No. 21-1).)

Plaintiffs filed their Amended Complaint on October 13, 2023, bringing four causes of action for declaratory/injunctive relief.  Specifically, Plaintiffs allege: (1) the Interstate Commerce Commission Termination Act ("ICCTA") preempts the Regulation in its entirety (FAC ¶¶ 93–103); (2) the CAA preempts the Spending Account and In-Use Operational Requirements (*id.* ¶¶ 104–13); the Locomotive Inspection Act ("LIA") preempts the Idling Requirements (*id.* ¶¶ 114–18); and (4) the Regulation violates the Dormant Commerce Clause (*id.* ¶¶ 119–24).

Defendants filed the pending Motion to Dismiss on November 10, 2023, arguing: (1) Plaintiffs' LIA preemption claim must be dismissed for lack of jurisdiction; (2) Plaintiffs' CAA preemption claim must be dismissed for lack of jurisdiction or failure to state a claim; (3) Plaintiffs' Amended Complaint must be dismissed under the primary jurisdiction doctrine; (4) Plaintiffs have failed to state an ICCTA preemption claim; and (5) Plaintiffs have failed to state a Dormant Commerce Clause claim.  (*See generally* Mot. Dismiss.)

---

[5] Plaintiff AAR represents both freight and passenger railroads, and AAR's members include some of the largest (Class I) and some of the smallest (Class III) railroads in the county.  (FAC ¶¶ 12-16.)  Plaintiff ASLRRA represents the interests of approximately 600 Class II and Class III railroads.  (*Id.* ¶¶ 17-18.)  Both Plaintiffs have members who own or lease and operate locomotives within California.  (*Id.* ¶ 18.)

1    The Court held a hearing on January 18, 2024, with Brian Burgess and Hayes

2    Hyde appearing for Plaintiffs, and Margaret Meckenstock and Dylan Johnson

3    appearing for Defendants.  The Court took the matter under submission.

4                              **LEGAL STANDARD**

5            A party may move to dismiss a complaint for "lack of subject matter jurisdiction"

6    under Federal Rule of Civil Procedure 12(b)(1).  "The party asserting federal subject

7    matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm*

8    *Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).  In a "facial attack" under Rule

9    12(b)(1), "the challenger asserts that the allegations contained in a complaint are

10   insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*,

11   373 F.3d 1035, 1039 (9th Cir. 2004).  "The district court resolves a facial attack as it

12   would a motion to dismiss under Rule 12(b)(6): [a]ccepting the plaintiff's allegations as

13   true and drawing all reasonable inferences in the plaintiff's favor, the court determines

14   whether the allegations are sufficient as a legal matter to invoke the court's

15   jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  "By contrast, in a

16   factual attack, the challenger disputes the truth of the allegations that, by themselves,

17   would otherwise invoke federal jurisdiction." *Meyer*, 373 F.3d at 1039.  In resolving a

18   factual attack on jurisdiction, the district court may review evidence beyond the

19   complaint without converting the motion to dismiss into a motion for summary

20   judgment, and the court need not presume the truthfulness of the plaintiff's

21   allegations. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

22           A party may also move to dismiss for "failure to state a claim upon which relief

23   can be granted." Fed. R. Civ. P. 12(b)(6).  The motion may be granted only if the

24   complaint lacks a "cognizable legal theory or sufficient facts to support a cognizable

25   legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir.

26   2008).  The court assumes all factual allegations are true and construes "them in the

27   light most favorable to the nonmoving party." *Steinle v. City & County of San*

28   *Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019).  However, if the complaint's

1   allegations do not "plausibly give rise to an entitlement to relief" the motion must be

2   granted.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A complaint need contain only a

3   "short and plain statement of the claim showing that the pleader is entitled to relief,"

4   Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550

5   U.S. 544, 555 (2007).  However, this rule demands more than unadorned accusations;

6   "sufficient factual matter" must make the claim at least plausible.  *Iqbal*, 556 U.S. at

7   678.  In the same vein, conclusory or formulaic recitations of elements do not alone

8   suffice.  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that

9   allows the court to draw the reasonable inference that the defendant is liable for the

10  misconduct alleged." *Id.*

## DISCUSSION

### I.   The Spending Account and In-Use Operational Requirements

13         Plaintiffs allege the Spending Account and In-Use Operational Requirements

14  are (1) preempted by the ICCTA, (2) preempted by the CAA, and (3) violate the

15  Dormant Commerce Clause.  (FAC ¶¶ 95–97, 101–103, 105–113, 121–23.)

16         Defendants challenge Plaintiffs' CAA preemption claim on ripeness grounds,

17  arguing there "is no case or controversy between the parties as to whether [the

18  Spending Account and In-Use Operational Requirements] are currently preempted by

19  CAA Section 209(e)(2)" because those sections seek to regulate locomotive emissions

20  and CARB must obtain EPA authorization prior to enforcement of those sections.

21  (Reply (ECF No. 39) at 2.)  Defendants argue that the "parties agree that CARB cannot

22  presently enforce those requirements," and point out that the Spending Account and

23  In-Use Operational Requirements cannot be enforced until July 2026 and January

24  2030, respectively, at the earliest.  (*Id.* at 2–3.)  Thus, Defendants argue there is no live

25  case or controversy for the Court to resolve because the EPA must approve the

26  Spending Account and In-Use Operational Requirements before they may be

27

28

1  enforced, and this Court cannot prejudge the outcome of the EPA proceedings.[6]  (*Id.*

2  at 3; Mot. Dismiss at 7–8.)

3          The Court finds that all of Plaintiffs' claims concerning the Spending Account

4  and In-Use Operational Requirements, including Plaintiffs' ICCTA preemption and

5  Dormant Commerce Clause claims, are not ripe.  "The 'basic rationale' of the ripeness

6  requirement is 'to prevent the courts, through avoidance of premature adjudication,

7  from entangling themselves in abstract disagreements.'"  *Portman v. County of Santa*

8  *Clara*, 995 F.2d 898, 902 (9th Cir. 1993) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S.

9  136, 148 (1967)).  Ripeness involves both a constitutional and prudential component.

10  *Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014), *as amended* (Sept. 2, 2014).  "The

11  constitutional component of the ripeness inquiry is often treated under the rubric of

12  standing and, in many cases, ripeness coincides squarely with standing's injury in fact

13  prong."  *Thomas v. Anchorage Equal Rts. Comm'n,* 220 F.3d 1134, 1138 (9th Cir.

14  2000); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (Article

15  III standing and ripeness issues often "boil down to the same question").  "In assuring

16  [6] Defendants argue, in the alternative, that the primary jurisdiction doctrine applies and compels
dismissal of Plaintiffs' CAA preemption claim, reasoning the EPA's determination as to whether the

17  Spending Account and In-Use Operational Requirements fall within the scope of state regulation
expressly anticipated by section 209(e)(2)(A) is a question of first impression that Congress has

18  committed to the EPA. (Mot. Dismiss at 8–9.) Defendants also argue that dismissal of Plaintiffs' CAA
preemption claim under the primary jurisdiction doctrine necessitates dismissal of Plaintiffs' LIA, ICCTA,

19  and Dormant Commerce Clause claims as well, because any eventual approval by the EPA under the
CAA will need to be harmonized with preemption under the LIA and ICCTA, as well as the limitations

20  imposed by the Dormant Commerce Clause. (*Id.* at 9.) The primary jurisdiction doctrine allows courts
to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue

21  within the special competence of an administrative agency. *Clark v. Time Warner Cable*, 523 F. 3d
1110, 1114 (9th Cir. 2008). The doctrine is a "prudential" one, under which a court determines that an

22  otherwise cognizable claim implicates technical and policy questions that should be addressed in the
first instance by the agency with regulatory authority over the relevant industry rather than by the

23  judicial branch. *Id.* While this would appear to be a paradigmatic case for application of the primary
jurisdiction doctrine over the CAA claims, as explained below, Defendants admit they cannot enforce

24  the Spending Account and In-Use Operational Requirements absent EPA approval. Accordingly, the
Court will dismiss all claims concerning those provisions, including Plaintiffs' CAA preemption claim, for

25  lack of ripeness. (Reply at 2–3.) As the Court lacks jurisdiction over Plaintiffs' CAA preemption claim,
the Court need not consider whether the primary jurisdiction doctrine applies. Concerning the Idling

26  Requirements, Reporting and Recordkeeping Requirements, and Administrative Payment Provision,
Defendants do not argue those provisions require EPA approval under section 209(e)(2)(A) to be

27  enforced. Accordingly, the Court does not see how resolution of claims related to those provisions falls
within the special competence of the EPA, or would need to be harmonized with EPA approval, and

28  declines to exercise the primary jurisdiction doctrine accordingly.

1  that this jurisdictional prerequisite is satisfied, [courts] consider whether the plaintiffs
2  face a realistic danger of sustaining direct injury as a result of the statute's operation or
3  enforcement." *Thomas*, 220 F.3d at 1139 (internal quotation marks omitted).  A
4  plaintiff's injury must be "concrete, particularized, and actual or imminent; fairly
5  traceable to the challenged action; and redressable by a favorable ruling." *Coons*,
6  762 F.3d at 897 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).)
7  Although "imminence is concededly a somewhat elastic concept," it should not be
8  stretched beyond its purpose, which is to "ensure that the alleged injury is not too
9  speculative for Article III purposes." *Id.* (quoting *Clapper*, 568 U.S. at 409).  Thus,
10  courts have repeatedly held "that allegations of *possible* future injury are not
11  sufficient." *Id.* (quoting *Clapper*, 568 U.S. at 409) (emphasis in original).

12        Here, Plaintiffs cannot show that enforcement of either the Spending Account
13  or In-Use Operational Requirements is sufficiently concrete or imminent for Article III
14  ripeness purposes.  Defendants concede that California cannot enforce these
15  requirements absent EPA approval, and there is no clear timetable for EPA review.
16  And critically, EPA approval is far from guaranteed.  As Plaintiffs themselves argue,
17  "[u]ntil April 2023, CARB had never issued rules directly regulating aspects of railroad
18  operations or locomotive emissions" (FAC ¶ 6) because CARB has historically
19  recognized it lacked authority to regulate railroad operations and emissions (FAC
20  ¶¶ 71–84).

21        Indeed, CARB faces two hurdles with EPA's review.  As an initial matter, the EPA
22  is required to consider Plaintiffs' arguments that the Spending Account and In-Use
23  Operational Requirements constitute an attempt to regulate "new" engines, which
24  California is absolutely prohibited from doing.  (Opp'n at 6–7; FAC ¶¶ 107, 110–11.)
25  Specifically, the EPA may deny a requested authorization if "California standards and
26  accompanying enforcement procedures are not consistent with [section 209 of the
27  CAA]."  42 U.S.C. § 7453(e)(2)(A)(iii).  The EPA's regulations interpret this text as
28  requiring California's regulatory program to be "consistent with section 209(a), section

1    209(e)(1), and section 209(b)(1)(C)," meaning, *inter alia*, that California may not

2    "regulate engine categories that are permanently preempted from state regulation"

3    under Section 209(e)(1), including new locomotives.  80 Fed. Reg. 76,685, 76,686

4    (Dec. 10, 2015) (emphasis added); *see also* 88 Fed. Reg. 77,004, 77,007–08 (Nov. 8,

5    2023) (EPA will consider whether California regulations are "prohibited by section

6    209(e)(1)(B)").  As California has never directly attempted to regulate emissions from

7    locomotives, the EPA has not yet clearly defined the line between new and non-new,

8    as evidenced by the Parties own arguments.  (*See* Reply at 6 ("Plaintiffs assert EPA's

9    definition does not determine the line between 'new' and 'non-new[,]' [b]ut they

10   identify no alternative place to draw that line.").)

11        Even if the EPA concludes California is not regulating "new" locomotives, the

12   EPA must still consider whether to grant authorization for the Spending Account and

13   In-Use Operational Requirements under the other two statutory bases for denial, i.e.,

14   whether "the determination of California is arbitrary and capricious," and

15   whether "California does not need such California standards to meet compelling and

16   extraordinary conditions," 42 U.S.C. § 7543(e)(2)(A), which again, will be a question of

17   first impression for the EPA.  The significant uncertainty over whether and when the

18   Spending Account and In-Use Operational Requirements will become enforceable

19   compels the conclusion that claims concerning these sections of the Regulation are

20   unripe at this juncture.  *See Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1044 (9th

21   Cir. 1999) (en banc) ("A claim is not ripe for adjudication if it rests upon contingent

22   future events that may not occur as anticipated, or indeed may not occur at all."

23   (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998))).

24        Accordingly, the Court dismisses Plaintiffs' first cause of action (ICCTA

25   preemption), second cause of action (CAA preemption), and fourth cause of action

26   (Dormant Commerce Clause) as to the Spending Account and In-Use Operational

27   Requirements, without prejudice to renewal of these claims at a more appropriate

28   date.

## II.   The Idling Requirements

Plaintiffs allege the Idling Requirements are (1) preempted by the ICCTA, (2) preempted by the LIA, and (3) violate the Dormant Commerce Clause.  (FAC ¶¶ 95, 98, 101–03, 116–18, 121–23.)

The Idling Requirements regulate both (1) locomotive equipment and (2) locomotive operation.  Plaintiffs allege that the equipment regulation aspect of the Idling Requirements is preempted by the LIA, which "occup[ies] the entire field of regulating locomotive equipment," *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 631 (2012) (quoting *Napier v. Atl. Coast Line R.R. Co.*, 272 U.S. 605, 611 (1926)), because it requires locomotive operators to keep EPA-mandated AESS equipment on their locomotives, and to ensure that the equipment remains in working order.  (FAC ¶¶ 116–17.)  Plaintiffs allege that the locomotive operation aspect of the Idling Requirements is preempted by the ICCTA, which "expressly preempts 'a wide range of state and local regulation of rail activity,'" *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1152 (9th Cir. 2020) (quoting *Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist. ("AAR")*, 622 F.3d 1094, 1096–97 (9th Cir. 2010), because it "mandate[s] that railroads shut off their locomotives (with limited exceptions) within 30 minutes of the locomotive becoming stationary" which "has the effect of managing or governing rail transportation."  (FAC ¶ 98.)  Finally, Plaintiffs allege that the Idling Requirements generally violate the Dormant Commerce Clause as the Regulation's burdens on interstate commerce are excessive in relation to the Regulation's local benefits.  (*Id.* ¶¶ 119–23.)

Defendants argue Plaintiffs lack standing to challenge the locomotive equipment aspect of the Idling Requirements under the LIA because they have not alleged any of their members intends to violate these requirements by removing idling devices for purposes other than maintenance, or leaving devices inoperable for more than 30 days after discovering a malfunction.  (Mot. Dismiss at 6.)  According to Defendants, such conduct is already prohibited by federal law.  Thus, Defendants

1  argue it is unclear how any member is "imminently injured by a prohibition against

2  taking either of those actions." (*Id.*)

3        The Court finds Plaintiffs lack standing as to their LIA preemption claim.

4  Typically, in a pre-enforcement challenge such as this one, plaintiffs must allege "a

5  concrete plan to violate the law in question" in order to establish "a realistic danger of

6  sustaining a direct injury." *Thomas*, 220 F.3d at 1139 (internal quotations omitted).

7  While the plan need not be cast in stone, it must be more than a hypothetical intent to

8  violate the law.[7] *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022).  Plaintiffs have

9  alleged no such intent here.

10       Plaintiffs argue their injury stems not from the risk of enforcement, however, but

11  rather economic harm, as the Regulation requires Plaintiffs' members to ensure AESS

12  equipment remains in working order, forcing Plaintiffs' members to incur incremental

13  operating and training costs to comply.  (Opp'n (ECF No. 26) at 15.)  As Plaintiffs

14  argue, these are classic pocketbook injuries sufficient to create standing.  *See Clark v.*

15  *City of Lakewood*, 259 F.3d 996, 1007 (9th Cir. 2001) ("The Court routinely recognizes

16  . . . economic injury resulting from governmental actions . . . as sufficient to satisfy the

17  Article III 'injury in fact' requirement." (quoting *Clinton v. City of New York*, 524 U.S.

18  417, 432-33 (1998)).)

19       However, Plaintiffs fail to sufficiently allege this pocketbook injury in their

20  Amended Complaint, stating only "[o]nce the Regulation becomes effective, Plaintiffs'

21  members will be forced immediately to follow the Idling Requirements."  (FAC ¶ 85.)

22  Plaintiffs attempt to substantiate their alleged pocketbook injury by pointing to

23  declarations submitted as part of their summary judgment papers.  (*See* Opp'n at 15.)

24  Reference to material outside the Complaint, however, cannot rebut a facial attack on

25  standing.  *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir.

26

27  [7] However, a plaintiff who wishes to challenge a law is not required "to confess that he will in fact violate
    that law."  *Susan B. Anthony List*, 573 U.S. at 163; *see also Yellen*, 34 F.4th at 850.  Rather, it is sufficient
    that "petitioners' intended future conduct is arguably proscribed by the statute they wish to challenge."

28  *Susan B. Anthony List*, 573 U.S. at 162.

1    2003) (in evaluating a facial jurisdictional challenge, a court can only consider

2    "allegations in the complaint" to resolve the motion).

3         Even considering those declarations, however the Court agrees with

4    Defendants that Plaintiffs have failed to sufficiently allege or show an economic injury.

5    Given that federal law appears to already mandate the activity that falls under LIA

6    preemption (that is, the locomotive equipment aspects of the Regulation), Plaintiffs fail

7    to establish what operational and training costs their members already incur to

8    maintain AESS equipment, and what *additional* costs they will incur comply with the

9    Regulation. (*See* Reply at 1–2.) For example, as Defendants argued at the hearing, 40

10   C.F.R. 1068.101(b), which sets forth federal idling requirements, already prohibits

11   "everyone" from removing or rendering inoperative AESS equipment even after a

12   locomotive is sold to an ultimate purchaser. Thus, Plaintiffs must explain what

13   equipment maintenance costs the Idling Requirements impose on their members

14   beyond the costs they already incur to comply with federal regulations.

15        By contrast, Plaintiffs do have standing to bring their ICCTA and Dormant

16   Commerce Clause claims as these implicate the portions of the Idling Requirements

17   that regulate locomotive operation and impose new requirements on Plaintiffs'

18   members, and Defendants do not challenge Plaintiffs' standing as to those claims. For

19   example, Plaintiffs claim the Idling Requirements are preempted by the ICCTA

20   because their members will now be required to comply with idling limits while

21   operating locomotives, i.e., ensuring an AESS-equipped locomotive is shut off no

22   more than 30 minutes after the locomotive becomes stationary, including a

23   requirement to manually shut off locomotives when devices that would ordinarily do

24   so are inoperable. (*See* FAC ¶ 98 (explaining the "Idling Requirements mandate that

25   railroads shut off their locomotives (with limited exceptions) within 30 minutes of the

26   locomotive becoming stationary . . . [which] has the effect of managing or governing

27   rail transportation."; § 2478.9(c)(2) ("For the time an AESS is inoperative, the

28   Locomotive shall be manually shut off no more than 30 minutes after the Locomotive

1    becomes stationary . . . .").)  Unlike the rules governing equipment maintenance,

2    which Defendants argue already apply to Plaintiffs under federal law, the idling limits

3    impose requirements on them beyond what is currently required by federal law (FAC

4    ¶ 59), giving rise to standing as to that portion of the Idling Requirements.

5         Accordingly, the Court dismisses Plaintiffs' third cause of action (LIA

6    preemption) with leave to amend.  However, for the reasons set forth above, as well as

7    in Section III *infra*, the Court declines to dismiss Plaintiffs' first cause of action (ICCTA

8    preemption) and fourth cause of action (Dormant Commerce Clause) as to the Idling

9    Requirements.

10   **III.    Reporting and Recordkeeping Requirements**

11        Plaintiffs allege the Reporting and Recordkeeping Requirements are

12   (1) preempted by the ICCTA and (2) violate the Dormant Commerce.  (FAC ¶¶ 95, 99,

13   101–03, 121–23.)

14        Defendants argue Plaintiffs have failed to state either facial ICCTA preemption

15   or facial Dormant Commerce Clause claims because they have not established there

16   are no set of circumstances under which the Regulation would be valid under *United*

17   *States v. Salerno*, 481 U.S. 739 (1987).  (Mot. Dismiss at 12, 14.)  Defendants also argue

18   Plaintiffs have not stated as-applied claims as Plaintiffs have failed to sufficiently

19   identify a "defined subset" of the Regulations' applications that are preempted or

20   violate the Dormant Commerce Clause, and lack standing to do so because the Court

21   needs the participation of individual railroads in order to craft a workable remedy.  (*Id.*

22   at 13–14; Reply Mot. Dismiss at 9.)

23        Under *Salerno*, a facial challenge to legislation "must establish that no set of

24   circumstances exists under which the Act would be valid."  481 U.S. at 745; *see also*

25   *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 444 (9th Cir. 2019).  By contrast, an

26   as-applied attack does not necessarily challenge the entire statute, focusing instead

27   on "only one of the rules in a statute, a subset of the statute's applications, or the

28   application of the statute to a specific factual circumstance," under the assumption

1    that the court can separate valid from invalid subrules or applications.  *Hoye v. City of*

2    *Oakland*, 653 F.3d 835, 857 (9th Cir. 2011).

3        **A.      ICCTA Preemption**

4        The ICCTA preempts all state and local laws and regulations impacting railroad

5    operations unless they are (1) "rules of general applicability," and (2) "do not

6    unreasonably burden railroad activity."  *AAR*, 622 F.3d at 1098.  As Plaintiffs argue, the

7    Regulation, including the Reporting and Recordkeeping Requirements, fails both

8    prongs of this test as it is not a generally applicable law but rather specifically targets

9    the railroad industry, and burdens the railroad industry by, among other things,

10   imposing "onerous recordkeeping and reporting obligations."  (*See* FAC ¶¶ 93–103.)

11       Defendants argue, however, that there are local railroads operating only in

12   California which fall outside the scope of ICCTA preemption.  (Mot. Dismiss at 12–13.)

13   "In order for federal preemption to apply under the ICCTA, the activity in question

14   must first fall within the statutory grant of jurisdiction to the Surface Transportation

15   Board [("STB")]."  *Or. Coast Scenic R.R., LLC v. Or. Dep't State Lands*, 841 F.3d 1069,

16   1072 (9th Cir. 2016).  For the STB to have jurisdiction, the relevant activity must be

17   "(1) 'transportation' (2) 'by rail carrier' (3) 'as part of the interstate rail network.'"  *Id.* at

18   1073 (quoting 49 U.S.C. § 10501(a)).  Thus, Defendants argue the Regulation is not

19   preempted as to locomotives that do not form part of an interstate rail network.

20       Plaintiffs do not dispute that there are some locomotives operating in California

21   outside the scope of STB jurisdiction.  (Opp'n at 10–11;) *see, e.g., Napa Valley Wine*

22   *Train, Inc. Petition for Declaratory Ord.*, 7 I.C.C.2d 954, 969 (I.C.C. July 18, 1991);

23   *Peninsula Corridor Joint Powers Board – Petition for Declaratory Ord.*, No. FD 35929,

24   2015 WL 4065035, at *3 (S.T.B. July 2, 2015) (Caltrain commuter passenger service).

25   Rather, Plaintiffs argue that they may assert a facial challenge which has the

26   characteristics of both a facial challenge and as-applied challenge where the

27   challenge "does not seek to strike [a law] in all its applications," but reaches beyond

28   the facts of a particular case to invalidate a defined subset.  (Opp'n at 12 (quoting *Doe*

16

1  *v. Reed*, 561 U.S. 186, 194 (2010)).  For such a hybrid claim, Plaintiffs argue they need

2  only satisfy the "standards for a facial challenge to the extent of that reach."  *Id.*

3  　　　　The Court finds that Plaintiffs have failed to successfully allege a facial

4  challenge.  The Supreme Court has explained that while "[n]ormally, a plaintiff

5  bringing a facial challenge must 'establish that no set of circumstances exists under

6  which the law would be valid,' or show that the law lacks a 'plainly legitimate sweep,'"

7  in the "First Amendment context . . . we have recognized 'a second type of facial

8  challenge, whereby a law may be invalidated as overbroad if a substantial number of

9  its applications are unconstitutional . . . ."  *Ams. for Prosperity Found. v. Bonta*, 141 S.

10  Ct. 2373, 2387 (2021) (citations omitted).  However, the Ninth Circuit has noted that,

11  although the "Supreme Court and this court have called into question the continuing

12  validity of the *Salerno* rule in the context of First Amendment challenges," in "cases

13  involving federal preemption of a local statute" the "rule applies with full force."  *Sprint*

14  *Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008) (en

15  banc); *see also Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) ("Whether

16  the 'substantial number of applications' test applies to facial preemption challenges

17  has not yet been decided by the Supreme Court.  Without more direction, we have

18  chosen to continue applying *Salerno*.").  Here, Plaintiffs mount a federal preemption,

19  not First Amendment, challenge, and accordingly, *Salerno* applies.  Under *Salerno*,

20  Plaintiffs have failed to demonstrate there are no set of circumstances under which the

21  Regulation would be valid.  Thus, Plaintiffs have failed to plead a facial ICCTA

22  preemption claim.

23  　　　　However, the Court finds that Plaintiffs have standing to bring an as-applied

24  claim.  An entity has associational standing where (1) "its members would otherwise

25  have standing to sue in their own right;" (2) "the interests it seeks to protect are

26  germane to the organization's purpose;" and (3) "neither the claim asserted nor the

27  relief requested requires the participation of individual members in the lawsuit."

28  *AlohaCare v. Hawaii*, 572 F.3d 740, 747 (9th Cir. 2009).  Although the first two

requirements are constitutional in nature, the third is prudential.  *United Food & Com. Workers Union Loc. 751 v. Brown Group*, 517 U.S. 544, 555–57 (1996).  Defendants challenge the third requirement of Plaintiffs' associational standing, arguing the Court will need the participation of individual railroads in order to craft a workable remedy. The Court agrees with Plaintiffs, however, that there is no prudential reason here for preventing Plaintiffs from seeking relief on behalf of their members.  In particular, Plaintiffs seek only prospective equitable relief, which is ideally suited for representational lawsuits.  *See, e.g., Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 839 (9th Cir. 2012).  Additionally, as the Ninth Circuit has reasoned, what matters at the motion to dismiss stage is "that Plaintiffs' allegations are sufficient to establish . . . associational standing," and "concerns about the details of injunctive relief may be addressed if the court ultimately awards Plaintiffs [a] remedy."  *Id.*

Further, although Defendants argue Plaintiffs have failed to clearly identify a "defined subset" of the Regulation's applications that are preempted at this stage, this is not a strict pleading requirement.  Rather, as the Supreme Court has instructed, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case . . . . The distinction . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010); *see also Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.  So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy, but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." (citations and quotations omitted)).  Plaintiffs identify the subset of the Regulation that is preempted

1   as all railroad transportation within the STB's exclusive jurisdiction; that is sufficient at

2   this stage.[8]  (Opp'n at 13; FAC ¶ 33.)

3        Accordingly, the Court will not dismiss Plaintiffs' first cause of action (ICCTA

4   preemption) as to the Reporting and Recordkeeping Requirements.

5        **B.    Dormant Commerce Clause**

6        "[T]he Commerce Clause . . . is in its negative aspect . . . a limitation on the

7   regulatory authority of the states.  Thus, although a state has power to regulate

8   commercial matters of local concern, a state's regulations violate the Commerce

9   Clause if they are discriminatory in nature or impose an undue burden on interstate

10  commerce . . . ."  *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1179 (9th Cir.

11  1998) (citations and internal quotations omitted).

12       Defendants argue that Plaintiffs have failed to state a facial Dormant Commerce

13  Clause claim under *Salerno* because some railroads operate locomotives only within

14  California, and "Plaintiffs do not and cannot explain how application of the Regulation

15  to those purely intrastate locomotives would require changes to other locomotives

16  that may cross state borders or would affect the nationwide fleets of other operators."

17  (Mot. Dismiss at 14.)  Defendants also contend that the Complaint fails to adequately

18  allege an impact on interstate commerce.  (*Id.*)

19       As with Plaintiffs' ICCTA preemption claim, the Court finds that Plaintiffs have

20  failed to state a facial Dormant Commerce Clause claim as Plaintiffs concede they "are

21  not seeking to invalidate applications of the law that do not affect interstate

22  commerce."  (Opp'n at 13–14.)  However, for the reasons stated in Section III.A *supra*,

23

24  _____

25  [8] The Court acknowledges that, as argued by Defendants at the hearing, proceeding with this defined subset may make crafting an ultimate remedy complex as the STB's determinations of whether it has jurisdiction over a particular activity of a particular railroad can be fact intensive.  (*See* Hr'g Tr. (ECF No.

26  44) at 30:8–31:4.)  To the extent Plaintiffs wish to amend their ICCTA preemption claim and define a different or narrower defined subset at this juncture, they are welcome to do so.  However, the Court

27  does not see how imposing this requirement on Plaintiffs at this stage impacts the law that must be applied to the merits of Plaintiffs' claims.  Accordingly, the Court finds that Plaintiffs' ICCTA preemption

28  claim is sufficiently pled.

1    the Court finds that Plaintiffs have standing to bring an as-applied claim, and that

2    Defendants' "defined subset" concerns need not be addressed at this stage.[9]

3         Further, the Court finds that Plaintiffs' allegations concerning the burdens the

4    Regulation, including the Reporting and Record Keeping Requirements, will place on

5    interstate commerce are sufficient to state a Dormant Commerce Clause claim at this

6    juncture.  (See, e.g., FAC ¶¶ 91 ("[T]he railroads will need to commit resources to

7    comply with the Reporting and Recordkeeping Requirements well before July 2026

8    . . . in order to ensure their systems are capable of collecting and recording the

9    required information on locomotive usage and idling."); 99 (the Reporting and

10   Recordkeeping Requirements "mandate that railroads collect extensive operational

11   data and report it to CARB" which will "impose significant burdens on the railroad

12   industry" as the industry "will need to make technological adaptations to collect the

13   necessary data."); 121–23 (asserting the Regulation's costs will impose "significant

14   burdens on interstate transportation" in a manner that "is clearly excessive in relation

15   to the putative local benefits").)  Given the fact-intensive nature of the balancing

16   required by Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), dismissal at the pleading

17   stage is inappropriate.  Cf. id. at 142  ("Where the statute regulates even-handedly to

18   effectuate a legitimate local public interest, and its effects on interstate commerce are

19   only incidental, it will be upheld unless the burden imposed on such commerce is

20   clearly excessive in relation to the putative local benefits."); Nat'l Pork Producers

21   Council v. Ross, 143 S. Ct. 1142, 1157 (2023) ("While many of our dormant Commerce

22   Clause cases have asked whether a law exhibits facial discrimination . . . the Pike line

23   serves as an important reminder that a law's practical effects may also disclose the

24   presence of a discriminatory purpose." (citations and quotations omitted)).

25        Accordingly, the Court will not dismiss Plaintiffs' fourth cause of action

26   (Dormant Commerce Clause) as to the Reporting and Recordkeeping Requirements.

27   _____
     [9] For the reasons stated in fn.8 supra, Plaintiffs are free to amend their Dormant Commerce Clause
     claim to allege a defined subset more clearly at this stage, but the Court will not impose this
28   requirement.

## IV.   Administrative Payment Provision

Plaintiffs allege that the Administrative Payment Provision independently violates the Dormant Commerce Clause as it "imposes an annual flat fee of $175 per locomotive operated in California," which "penalizes interstate travel and imposes an impermissible burden on interstate commerce." (Compl. ¶ 124.)

Defendants argue this claim must be dismissed as the Administrative Payment Provision is a flat, per-locomotive charge to cover the costs of administering the Regulation, a type of charge the Supreme Court previously approved in *American Trucking Associations, Inc. v. Michigan Public Service Commission* ("*Michigan*"), 545 U.S. 429 (2005). (Mot. Dismiss at 15.)

The Court finds Plaintiffs have adequately stated a claim. In *Michigan*, the Supreme Court approved an annual $100 flat fee for trucks that undertook point-to-point hauls between Michigan cities. *Id.* at 431. The Court found that the flat fee did not violate the Dormant Commerce Cause primarily because it was imposed only intrastate transactions, finding the "statute applie[d] evenhandedly to all carriers that make domestic journeys" and "does not reflect an effort to tax activity that takes place, in whole or in part, outside the State." *Id.* at 434 ("Nothing in our case law suggests that such a neutral, locally focused fee or tax is inconsistent with the dormant Commerce Clause.").

Here, on the other hand, nothing in the Regulation suggests that the Administrative Payment Provision applies only to intrastate transactions. Thus, while the Court is skeptical that $175 is "clearly excessive" in relation to the Regulation's local benefit, *see Pike*, 397 U.S. at 142, the Court finds that Plaintiffs' allegations concerning the Administrative Payment Provision are sufficient at this stage. *See Magna Legal Servs. v. Ariz. ex rel. Bd. of Certified Reps.*, No. CV-13-00802-PHX-NVW, 2013 WL 4478933, at *7 (D. Ariz. Aug. 21, 2013) ("A more searching application of the *Pike* balancing test in this case would necessarily involve weighing of facts involving the purposes of the Regulations, the burden on interstate commerce they in fact

1   create, if any, and whether other less burdensome alternatives were available.  That

2   balancing will be more finely calibrated once the Court has had the opportunity to

3   consider actual evidence.").

4        Thus, the Court will not dismiss Plaintiffs' fourth cause of action (Dormant

5   Commerce Clause) as to the Administrative Payment Provision.

6   **CONCLUSION**

7        In accordance with the above, it is hereby ORDERED Defendants' Motion to

8   Dismiss (ECF No. 20) is GRANTED IN PART.

9        Specifically, the Court GRANTS DISMISSAL of:

10        1.  Plaintiffs' first, second, and fourth causes of action on ripeness

11           grounds as to the Spending Account and In-Use Operational

12           Requirements, without prejudice to renewal of these claims at a later

13           date.

14        2.  Plaintiffs' third cause of action on standing grounds.  Plaintiffs are

15           granted leave to amend this claim within twenty-one (21) days.

16   The Court DENIES DISMISSAL of:

17        1.  Plaintiffs' first and fourth causes of action as to the Idling

18           Requirements, Reporting and Recordkeeping Requirements, and the

19           Administrative Payment Provision.

20

21        IT IS SO ORDERED.

22   Dated:  **February 16, 2024**

23   Hon. Daniel J. Calabretta
    UNITED STATES DISTRICT JUDGE

24

25

26   DJC4 – Ass'nAmRR23-cv-1154.MTD

27

28

22