ADRIANO L. MARTINEZ (CA Bar No. 237152)
amartinez@earthjustice.org
YASMINE L. AGELIDIS (CA Bar No. 321967)
yagelidis@earthjustice.org
(Designated as counsel for service)
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
Tel: (415) 217-2000 / Fax: (415) 217-2040

DAVID R. PETTIT (CA Bar No. 67128)
dpettit@nrdc.org
Natural Resources Defense Council
1314 2nd Street
Santa Monica, CA 90401
Tel: (310) 434-2300 / Fax: (310) 434-2399

*Counsel for Defendant-Intervenors East
Yard Communities for Environmental Justice,
People's Collective for Environmental Justice,
and Sierra Club*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS and AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board; STEVEN S. CLIFF, in his official capacity as Executive Officer of the California Air Resources Board; and ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>    Defendants,<br><br>and<br><br>EAST YARD COMMUNITIES FOR ENVIRONMENTAL JUSTICE, PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, and SIERRA CLUB,<br><br>    Defendant-Intervenors. | Civ. No.  2:23-cv-01154-DJC-JDP<br><br>**DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     April 25, 2024<br>Time:    1:30 PM<br>Courtroom: 10<br>Judge:    Hon. Daniel J. Calabretta |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ..........................................................................................................1

BACKGROUND ............................................................................................................2

REGULATION OVERVIEW ..........................................................................................8

PROCEDURAL HISTORY .............................................................................................9

STANDARD OF REVIEW .............................................................................................9

ARGUMENT ................................................................................................................9

    I.    Plaintiffs are not entitled to summary judgment on their ICCTA claim because EPA's authorization process is underway, and the Regulation must be harmonized once it becomes federal law. ......................................................10

    II.   Plaintiffs have failed to show that the Idling Requirements and the Reporting and Recordkeeping Requirements are not generally applicable rules. ...........13

    III.  Plaintiffs have not shown, and cannot show, that any of the remaining provisions at issue violate the Dormant Commerce Clause. ...........................17

    IV.  The public interest strongly weighs against issuing an injunction. .................21

CONCLUSION ............................................................................................................22

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*Adrian & Blissfield R.R. Co. v. Vill. of Blissfield,*
   550 F.3d 533 (6th Cir. 2008) ................................................................... 14

5

*Amoco Prod. Co. v. Vill. of Gambell,*
6    480 U.S. 531 (1987) ................................................................................ 21

7

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, (1986) ............................................................................... 10

8

9

*Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.,*
   622 F.3d 1094 (9th Cir. 2010) ............................................... 11, 12, 14, 16

10

*BNSF Ry. Co. v. Cal. Dept of Tax & Fee Admin.,*
11   904 F.3d 755 (9th Cir. 2018) ................................................................... 12

12

*BNSF Ry. Co. v. Clark Cnty.,*
   11 F.4th 961 (9th Cir. 2021) .................................................................... 11

13

14

*Borough of Riverdale Petition for Declaratory Ord. the N.Y. Susquehanna
   & W. Ry. Corp.,*

15   4 S.T.B. 380 (1999) ................................................................................. 20

16

*Boston & Maine Corp. & Town of Ayer,*
   5 S.T.B. 500, 2001 WL 458685 (2001) .................................................... 11

17

18

*Burlington Northern R. Co. v. Dep't of Pub. Service Reg.,*
   763 F.2d 1106 (9th Cir. 1985) ................................................................. 21

19

*Celotex Corp. v. Catrett,*
20   477 U.S. 317, 323 (1986) .......................................................................... 9

21

*Davis v. United States,*
   854 F.3d 594, 598 (9th Cir. 2017) ............................................................. 9

22

23

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ................................................................................ 21

24

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
25   541 U.S. 246 (2004) ................................................................................ 18

26

*Green Mountain R.R. Corp. v. Vermont,*
   404 F.3d 638 (2d Cir. 2005) .................................................................... 14

27

28

*Island Park, LLC v. CSX Transp.,*
   559 F.3d 96 (2d Cir. 2009) ...................................................................... 13

*Massachusetts v. Env't Prot. Agency*,
    549 U.S. 497 (2007) ................................................................................. 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................. 10

*N.Y. Susquehanna & W. Ry. Corp. v. Jackson*,
    500 F.3d 238 (3d Cir. 2007) ..................................................... 14, 16, 17

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ................................................................................. 17

*Norfolk S. Ry. v. Alexandria*,
    608 F.3d 150, 158 (4th Cir. 2010) ....................................................... 20

*Pike v Bruce Church, Inc.*,
    397 U.S. 137 (1970) ................................................................................. 17

*Safe Air For Everyone v. U.S. EPA*,
    488 F.3d 1088 (9th Cir. 2007) .............................................................. 13

*San Francisco Herring Ass'n v. Dep't of Interior*,
    946 F.3d 564 (9th Cir. 2019) ................................................................ 10

*Southern Pacific Co. v. Arizona ex rel. Sullivan*,
    325 U.S. 761 (1945) ................................................................................. 18

*Swinomish Indian Tribal Cmty. V. BNSF Ry. Co.*,
    951 F.3d 1142 (9th Cir. 2020) ....................................................... 11, 21

*Union Pac. R. Co. v. Cal. Pub. Utilities Comm'n*,
    346 F.3d 851 (9th Cir. 2003) .......................................................... 17, 20

**FEDERAL STATUTES**

42 U.S.C. § 7409(b)(1) ....................................................................................... 5

42 U.S.C. § 7410 .......................................................................................... 5, 13

42 U.S.C. § 7543 ................................................................................................ 5

42 U.S.C. § 7543(e) ........................................................................................... 8

42 U.S.C. § 7543(e)(2) .................................................................. 1, 17, 18, 19

42 U.S.C. § 7543(e)(2)(A) ............................................................................... 11

42 U.S.C. § 7543(e)(2)(A)(iii) ........................................................................ 11

42 U.S.C. § 7543(e)(2)(B)(i) ........................................................................... 20

42 U.S.C. § 7547(d)................................................................................11, 12

42 U.S.C. § 7607(b)(1) ................................................................................12

**STATE STATUTES**

Cal. Health & Safety Code § 39002............................................................15

Cal. Health & Safety Code § 43013............................................................15

**REGULATIONS**

40 C.F.R. pt. 1074, Appendix A to subpt. A ................................................12

40 C.F.R. § 1033.901 ..................................................................................19

Cal. Code Regs., tit. 13 § 1958....................................................................14

Cal. Code Regs., tit. 13 § 1962.2.................................................................14

Cal. Code Regs., tit. 13 § 2014.1(a)(4)(B) ..................................................15

Cal. Code Regs., tit. 13 § 2014.1(a)(4)(C) ..................................................15

Cal. Code Regs., tit. 13 § 2023.8.................................................................16

Cal. Code Regs., tit. 13 § 2478.4.................................................8, 15, 18, 19

Cal. Code Regs., tit. 13 § 2478.5...................................................................8

Cal. Code Regs., tit. 13 § 2478.9...................................................................8

Cal. Code Regs., tit. 13 § 2478.9(a)..........................................................9, 19

Cal. Code Regs., tit. 13 § 2478.9(c)(2) .....................................................9, 19

Cal. Code Regs., tit. 13 § 2478.9(d)..........................................................9, 19

Cal. Code Regs., tit. 13 § 2478.11..........................................................9, 15, 19

Cal. Code Regs., tit. 13 § 2478.11(b) ..........................................................19

Cal. Code Regs., tit. 13 § 2478.11(c) ..........................................................19

Cal. Code Regs., tit. 13 § 2478.11(d) ..........................................................20

Cal. Code Regs., tit. 13 § 2478.12..........................................................9, 20

Cal. Code Regs., tit. 13 § 2480....................................................................15

Cal. Code Regs., tit. 13 § 2485....................................................................15

Cal. Code Regs., tit. 13 § 7407(a) ................................................................. 13

**LEGISLATIVE HISTORIES**

H.R. Rep. No. 104-311 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793 ............................ 14

36 Cong. Rec. S16895-01, Amendments-Conference Report (Oct. 27, 1990), 1990 WL 164490 ........................................................................ 17

Amendments-Conference Report (Oct. 27, 1990), 1990 WL 164490, at S16976 ................................................................................................. 17

**COURT RULES**

Fed. R. Civ. P. 56(c)(2) ................................................................................. 10

Fed. R. Civ. P. 56(c)(4) ................................................................................. 10

**FEDERAL REGISTER**

73 Fed. Reg. 37,096 (June 30, 2008) ............................................................. 4

88 Fed. Reg. 77,004 (Nov. 8, 2023) ............................................................. 17

*California State Nonroad Engine Pollution Control Standards; In-Use Locomotive Regulation; Requests for Authorization; Opportunity for Public Hearing and Comment,*
89 Fed. Reg. 14,484 (Feb. 27, 2024) ................................................. 10, 11

**INTRODUCTION**

The rail industry challenges California's federally protected right to safeguard its residents from locomotive pollution that has a host of harms ranging from asthma to premature death. California's In Use Locomotive Regulation (the "Regulation"), adopted pursuant to its federally preserved Clean Air Act authority to reduce emissions from non-"new" locomotives, 42 U.S.C. § 7543(e)(2), addresses one sector of diesel-polluting equipment that exacerbates California's pervasive air pollution and public health crises. Plaintiffs Association of American Railroads and American Short Line and Regional Railroad Association (collectively, "Plaintiffs") complain that California singles out the rail industry to clean up its equipment, but this is not true. In fact, over the last decade, the California Air Resources Board ("CARB") promulgated dozens of regulations tackling emissions from other sources of pollution like motor vehicles, leaf blowers, ships, and cargo handling equipment before turning to locomotives. California's pervasive air pollution problems mean that it can no longer ignore locomotive pollution. Californians deserve the immense emission reduction and public health benefits from the Regulation, which will save 3,200 lives and provide Californians $32 billion in health benefits.

In an effort to rush through this litigation as quickly as possible, Plaintiffs argue this Motion for Summary Judgment turns on purely legal questions of federal law and preemption. But the issues in this case rest on highly technical determinations and mixed questions of law and fact that Plaintiffs have not addressed. Regardless, even if this Court accepts Plaintiffs' premise that this lawsuit presents purely legal questions, Plaintiffs' mischaracterization of the law paints a skewed and inaccurate picture of federal preemption law and the Dormant Commerce Clause. Accordingly, for the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment.

1

**BACKGROUND**[1]

2        Millions of Californians breathe unsafe air. A primary culprit of this air pollution is

3    diesel-powered equipment. Defendant-Intervenors East Yard Communities for

4    Environmental Justice, People's Collective for Environmental Justice, and Sierra Club

5    (collectively, "Intervenors") represent members on the front lines of railyards and rail

6    lines in Southern California and face the air pollution, noise, vibrational, and safety risks

7    associated with diesel locomotives on a regular basis. Decl. of Darby Osnaya in Supp. of

8    Opp'n to Mot. for Summ. J. ("Osnaya Decl."), ¶ 17; Decl. of Bernard De La Garza in

9    Supp. of Opp'n to Mot. for Summ. J. ("De La Garza Decl."), ¶ 7; Decl. of Paola Vargas in

10   Supp. of Opp'n to Mot. for Summ. J. ("Vargas Decl."), ¶ 10; Decl. of Jan Victor Andasan

11   in Supp. of Mot. to Intervene ("Andasan Decl."), ECF No. 19-13 ¶¶ 17–19; Decl. of Ivette

12   Torres in Supp. of Mot. to Intervene ("Torres Decl."), ECF No. 19-14 ¶¶ 10, 21.

13   Intervenors' members experience similar life-threatening health effects from other diesel-

14   polluting machinery, like trucks, ships, and cargo-handling equipment. Torres Decl. ¶¶

15   17, 24; Vargas Decl. ¶¶ 10, 16, 24; Osnaya Decl. ¶ 19; De La Garza Decl. ¶ 15; *see*

16   Defendant-Intervenors' Request for Judicial Notice ("RJN") Ex. A at 2-3.

17       Locomotives are a significant source of California's overall air pollution. *See* ECF

18   No. 19-5 at 110. One train, comprised of four locomotives pulling 130 double-stacked

19   containers, emits more nitrogen oxides ("NOx") and particulate matter 2.5 micrometers

20   or smaller ("PM2.5") pollution than 260 trucks transporting the equivalent amount of

21   goods over the same distance. RJN Ex. B. In fact, in California, "[e]xposure to the

22   emissions from one train is worse than being exposed to the emissions from 400 trucks."

23   RJN Ex. C at 4. By 2030, locomotive emissions are expected to grow—locomotive

24   operations will contribute 14 percent of California's freight diesel NOx inventory and 16

25   percent of the state's freight diesel PM2.5 emissions. ECF No. 19-5 at 110.

26   _____

27   [1] Defendant-Intervenors join Defendants' Response to Plaintiffs' Statement of Undisputed Facts.
     While the document notes that Defendants will seek discovery, Intervenors will not seek

28   discovery on Plaintiffs. *See* ECF No. 40 at 2 (Order granting intervention on condition that
     Intervenors will not pursue discovery on Plaintiffs).

DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

2

1    Dirty air is deadliest and most inescapable near industrial hotspots like railyards,

2  ports, refineries, warehouses, airports, and freeways. Intervenors' members live near at

3  least four major Class I railyards, including the Burlington Northern Santa Fe ("BNSF")

4  San Bernardino and Commerce railyards, and Union Pacific's ("UP") Colton railyard and

5  Intermodal Container Transfer Facility, and experience negative health effects because

6  of their forced proximity to these polluting facilities. Andasan Decl. ¶¶ 6, 15; Osnaya

7  Decl. ¶ 17; Torres Decl. ¶¶ 10, 12; Vargas Decl. ¶ 10; Decl. of Yassamin Kavezade in

8  Supp. of Mot. to Intervene ("Kavezade Decl."), ECF No. 19-12 ¶ 12. Residents who live

9  on the fenceline of railyards are deeply concerned about the health impacts of diesel

10  locomotive pollution. These fears are driven by the high level of air pollutants inside and

11  outside people's homes, and the health impacts that ravage railyard-adjacent

12  communities. Torres Decl. ¶¶ 28, 33–38. Extreme air contamination from diesel

13  locomotives translates to childhood asthma and infants using nebulizers to breathe

14  through the night. Andasan Decl. ¶¶ 14–21. It leads to debilitating migraines,

15  nosebleeds, allergies, and persistent itchy throats. Torres Decl. ¶ 28; Vargas Decl. ¶ 14.

16  Exposure to excessive air pollution leads to cancer clusters like the one identified by

17  CARB near the BNSF San Bernardino Railyard. Torres Decl. ¶ 30. Air pollution is so

18  thick during the day that residents often stay indoors to escape bouts of heavy coughing

19  and buildup in the throat. *See, e.g.*, De La Garza Decl. ¶¶ 12–13.

20    When presented with this pollution crisis posed by rail operations, Plaintiffs claim

21  that their members—some of which are amongst the wealthiest companies in the

22  world—"continue[] to explore and invest in emissions-reducing initiatives." *See* Am.

23  Compl., ECF No. 18 at ¶ 3. Little evidence has been presented to support this

24  contention. In fact, reality shows an industry that is barely creeping towards cleaner,

25  modern equipment. The U.S. Environmental Protection Agency's ("EPA") adoption of the

26  most recent Tier 4 emission standard in 2008—which can control ninety percent of NOx

27  and 95 percent of particulate matter compared to pre-Tier 0 locomotives—should have

28  led to a noticeable uptick in Plaintiffs' members' deployment of less-polluting Tier 4

DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT                                                3

locomotives. *See* 73 Fed. Reg. 37,096, 37,098 (June 30, 2008); ECF No. 19-6 at 8. But today, sixteen years later, only six percent of Class I line-hauls and two percent of Class I switchers are Tier 4. RJN Ex. D at 11. Instead, an outlandish eighty percent of switcher locomotives remain at pre-Tier 0 and Tier 0 emission levels today. ECF No. 19-6 at 14. This failure to deploy modern equipment continues to harm local communities and our regional air quality as "[o]ne Pre-Tier 0 switcher emits the same toxic diesel PM as 24 Tier 4 switchers." RJN Ex. C at 13. While Plaintiffs may be "exploring" cleaning up their pollution, they appear to have little concern with the important federally prescribed deadlines to meet clean air standards and the real consequences of California's failure to meet these standards, including the lives lost prematurely, the children forced to miss school due to pollution, and other harms Californians face daily.

Moreover, far from "moving aggressively to pursue lower- and zero-emissions locomotive technologies," *see* Am. Compl. ¶ 3, Plaintiffs' members have a long legacy of fighting any attempt by federal, state, and local air regulators to encourage locomotive emission reductions. *See, e.g.*, RJN Ex. E at 38–39. At the CARB Board public hearing on the Regulation on November 18, 2022, the representative for the Association of American Railroads threatened that "[w]ere the Board to adopt these proposals, the inevitable result will be litigation and judicial decisions prohibiting the Board from proceeding." *Id.* BNSF and UP also recently attempted to derail the South Coast Air Quality Management District's ("District") Railyard Indirect Source Review rule by, in the final months of the rulemaking process, approaching the agency to pursue a voluntary agreement with the railroads to avoid regulation. RJN Ex. F. The District paused the rulemaking for four months to engage with BNSF and UP in an attempt to reach a favorable solution. Talks broke down when the District learned that a non-negotiable term for the Class I railroads was for the District to fund a portion of any fleet turnover agreed to by the parties. *Id.*

The clean air context for how CARB came to regulate a broad suite of equipment, including locomotives, is noticeably absent from any paper Plaintiffs have filed in this

1  case. The Regulation was the result of more than a half-century of work battling the most

2  notoriously polluted skies in the country. Under the Clean Air Act, EPA sets National

3  Ambient Air Quality Standards, which are standards set at levels "requisite to protect the

4  public health" with an adequate margin of safety. 42 U.S.C. § 7409(b)(1). Areas that fail

5  to meet these standards are considered nonattainment areas, and they must develop

6  roadmaps, called State Implementation Plans ("SIPs"), which demonstrate how the

7  regions will meet air standards. *Id.* § 7410. Congress recognized that California, as a

8  state that began regulating air pollution before the federal Clean Air Act was even

9  adopted, should retain authority to reduce pollution from various sources, including non-

10  new locomotives. *See id.* § 7543. Thus, in certain instances, California is entitled to

11  adopt regulations that would otherwise be preempted by the Clean Air Act.

12        Over the last two decades, California regulators have adopted several plans to

13  achieve air quality standards. The 2022 State Strategy, CARB's component of the State

14  Implementation Plan, marked an important reflective moment for California. The plan

15  acknowledged the heavy stakes of air planning in noting that "[e]ven with this progress,

16  more than half (21 million out of nearly 40 million) of Californians live in areas that

17  exceed the most stringent 70 ppb ozone standard, with many areas also exceeding the

18  previous ozone standards of 75 and 80 ppb." ECF No. 19-5 at 12–13. To make matters

19  more complicated, in some parts of California like the South Coast Air Basin, which

20  hosts the nation's second-largest metropolitan area, to comply with federal mandates to

21  meet the current ozone standard, California needs to reduce emissions by a staggering

22  67 percent above and beyond current regulations adopted and approved in prior plans.

23  *Id.* at 25.

24  //

25  //

26  //

27  //

28  //

1    The chart below demonstrates the daunting challenge California faces in

2    providing more than half of its residents the most fundamental right to breathe clean air.



**Figure 9 – South Coast Air Basin NOx Emissions under Current Control Program (emissions out to 100 nautical miles)[9]**

13    The gold dotted line shows the range of emissions reductions that must be achieved by

14    2037 to meet clean air standards in the South Coast Air Basin. Even with the dozens of

15    regulations already adopted and projected to be adopted prior to the adoption of the

16    2022 State Implementation Plan, the South Coast Air Basin would *still* have 196 tons per

17    day of NOx emissions pumped into its air. *Id.* at 14. To meet these federally mandated

18    air quality standards, California estimates based on modeling that it needs to reduce 124

19    tons per day of NOx emissions to achieve 60 tons per day of NOx emissions carrying

20    capacity. *Id.*

21    This great need to cut California's NOx pollution in half on top of current

22    measures means California must turn over every pollution stone to succeed in bringing

23    clean air to tens of millions of people. Importantly, the 2022 State Strategy identified

24    several under-regulated areas, one of which is locomotives. The following chart outlines

25    a glimpse into statewide NOx emissions. *Id.* at 106.

26    //

27    //

28    //

**Figure 17 - 2037 Statewide NOx Baseline Emissions Inventory[82]**



As this pie chart shows, California's locomotive emissions alone will be responsible in 2037 for more than all aviation emissions in the State. *Id.*

Moreover, in a document that preceded and informed the 2022 State Strategy called the Draft Measures Document, CARB noted that, "[w]hile enforceable agreements and federal locomotive standards have achieved emission reductions, more stringent emission standards are needed to address the air quality, public health, and climate change concerns associated with locomotive operations." RJN Ex. G at 37. Plainly stated, while California may have been able to get by without regulating locomotive emissions previously, in the 2022 State Strategy, it could no longer ignore the large contributions of emissions from locomotives. Giving the rail industry time to "explore" cleaning up pollution—as opposed to California actually using its clearly articulated authority to regulate—was not good enough to address the air quality crisis in California. *See* Am. Compl., ECF No. 18 ¶ 3.

California's commitment to its clean air obligations produced this life-saving Regulation with exceptional anticipated health benefits. Exposure to emissions from diesel-powered equipment—whether locomotives, trucks, ships, aircraft or other

1  machinery—causes cancer, respiratory issues, cardiovascular concerns, reproductive

2  problems, and more. ECF No. 19-5 at 15. Reducing non-new locomotive emissions,

3  including shifting to zero emissions over time, will avoid more than 3,233 premature

4  deaths, 1,486 emergency room visits, 500 hospitalizations for cardiovascular illness, and

5  close to 600 hospitalizations for respiratory illness. ECF No. 19-3 at 159. The largest

6  estimated health benefits correspond to regions in California with the most locomotive

7  activity, and as it turns out, the worst air pollution: South Coast, San Joaquin Valley, and

8  Mojave Desert air basins. *See id.* at 2, 160. Translating these health benefits into dollars

9  equates to $32 billion in health benefits from this Regulation alone. *Id.* At the height of

10  implementation, the Regulation will prevent 63 tons *per day* of NOx emissions, making it

11  the single largest NOx emission reduction measure in California's 2022 State

12  Implementation Plan. *See* ECF No. 19-3 at 160; ECF No. 19-5 at 38, 110–13.

13  Californians cannot afford to continue to live with this daily bombardment of diesel

14  pollution.

15  **REGULATION OVERVIEW**

16         CARB adopted the Regulation under its federally preserved Clean Air Act

17  authority, 42 U.S.C. § 7543(e), to reduce emissions from non-new nonroad engines

18  operating in California, including freight, passenger, and industrial locomotives. The

19  Regulation includes four main components: (1) the Spending Account (§ 2478.4)[2], which

20  requires operators, starting July 1, 2026, to deposit funds into an account annually

21  determined by the locomotive's annual usage in megawatt hours (MWh) and the

22  locomotive's emission factors; (2) the In-Use Operational Requirements (§ 2478.5),

23  which establish, among other things, that starting January 1, 2030 only locomotives with

24  original engine build dates 23 years old or less may operate in California unless the

25  locomotive is zero-emissions capable; (3) the Idling Requirements (§ 2478.9), which

26  specify procedures to ensure that locomotives do not idle for more than 30 minutes

27  _____

28  [2] The Regulation is codified at Cal. Code Regs., tit. 13 §§ 2478-2478.17. Unless otherwise noted, all citations of regulatory provisions refer to that title.

1  before the engine must be shut down, unless the locomotive meets certain exemptions;

2  and (4) Recordkeeping and Reporting Requirements (§ 2478.11), which require

3  locomotive operators to annually submit a report detailing operations and emissions for

4  all non-zero-emissions capable locomotives. Finally, an Administrative Payment

5  provision (§ 2478.12) authorizes CARB to collect an annual payment of $175 per

6  locomotive with certain exceptions for the costs of implementing and enforcing the

7  Regulation.

8  **PROCEDURAL HISTORY**

9  On February 16, 2024, this Court dismissed all of Plaintiffs' claims regarding the

10  Spending Account and In-Use Operational Requirements for lack of ripeness. Order,

11  ECF No. 48 at 9–11. Plaintiffs' facial Interstate Commerce Commission Termination Act

12  ("ICCTA") preemption and facial Dormant Commerce Clause claims as to the Idling

13  Requirements and Reporting and Recordkeeping Requirements were also dismissed. *Id.*

14  at 17, 19. Additionally, this Court dismissed Plaintiffs' Idling Requirements claims relating

15  to locomotive equipment (including the Locomotive Inspection Act claim in its entirety) for

16  lack of standing (§ 2478.9(a)-(c)(1)). Order, ECF No. 48 at 12–14.

17  Plaintiffs chose to rest on their Motion for Summary Judgment filed November 24,

18  2023. As such, the following claims remain live on this Motion: as-applied claims under

19  ICCTA and the Dormant Commerce Clause against § 2478.9(c)(2) and (d) of the Idling

20  Requirements; as-applied claims under ICCTA and the Dormant Commerce Clause

21  against the Reporting and Recordkeeping Requirements, and an as-applied claim under

22  the Dormant Commerce Clause against the Administrative Payment provision. Order,

23  ECF No. 48 at 14, 19–20, 22.

24  **STANDARD OF REVIEW**

25  A party seeking summary judgment "bears the burden of establishing the basis for

26  its motion and identifying evidence that demonstrates the absence of a genuine issue of

27  material fact." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) (citing *Celotex*

28  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A dispute is genuine "if the evidence is such

1   that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

2   *Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is material if it "might

3   affect the outcome of the suit under the governing law." *Id.* Importantly, "[o]n summary

4   judgment the inferences to be drawn from the underlying facts . . . must be viewed in the

5   light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v.*

6   *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party may object that the material cited

7   to support or dispute a fact cannot be presented in a form that would be admissible in

8   evidence. Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose

9   a motion must be made on personal knowledge, set out facts that would be admissible in

10  evidence, and show that the affiant or declarant is competent to testify on the matters

11  stated." Fed. R. Civ. P. 56(c)(4).

**ARGUMENT**

**I.**   **Plaintiffs are not entitled to summary judgment on their ICCTA claim because EPA's authorization process is underway, and the Regulation must be harmonized once it becomes federal law.**

Plaintiffs argue that the Regulation is categorically preempted under ICCTA, Pls.'

Mot. Summ. J. ("Pls.' MSJ"), ECF No. 29 at 12–17, but they ignore the fact that the

Clean Air Act's express preservation of state authority to regulate emissions from non-

new locomotives must be harmonized with ICCTA. Plaintiffs are not entitled to summary

judgment on their ICCTA claim until EPA finalizes its recently noticed authorization

process. *California State Nonroad Engine Pollution Control Standards; In-Use*

*Locomotive Regulation; Requests for Authorization; Opportunity for Public Hearing and*

*Comment*, 89 Fed. Reg. 14,484 (Feb. 27, 2024) (EPA's notice initiating the public

comment portion of the authorization process for the Regulation, including setting a

virtual public hearing date for March 20, 2024); *see San Francisco Herring Ass'n v. Dep't*

*of Interior*, 946 F.3d 564, 578 (9th Cir. 2019) ("[C]ourts do not intrude on the agency's

turf and thereby meddle in the agency's ongoing deliberations."). This is because until

EPA acts, the Court cannot know whether it needs to harmonize ICCTA with the Clean

1   Air Act, and if so, which provision it must harmonize with—Section 209(e), 42 U.S.C. §

2   7543(e)(2)(A), or Section 213(d), 42 U.S.C. § 7547(d). Likewise, California included the

3   Regulation as a proposed measure in its 2022 State SIP Strategy, and when EPA

4   incorporates the Regulation into the SIP, it will have the force and effect of federal law

5   and must be harmonized with ICCTA.

6        When there is a potential conflict between ICCTA and another federal law, the

7   courts "do not use the analytic framework applicable to federal preemption of state and

8   local regulation." *Swinomish Indian Tribal Cmty. V. BNSF Ry. Co.*, 951 F.3d 1142, 1152–

9   53 (9th Cir. 2020). Rather, if "an apparent conflict exists between ICCTA and a *federal*

10  law, then the courts must strive to harmonize the two laws, giving effect to both laws if

11  possible." *Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097

12  (9th Cir. 2010). The "principal example of federal laws that should be harmonized with

13  the ICCTA, if possible, is environmental laws." *BNSF Ry. Co. v. Clark Cnty.*, 11 F.4th

14  961, 966 (9th Cir. 2021). The Surface Transportation Board recognized as much when it

15  concluded that "nothing in [ICCTA] is intended to interfere with the role of state and local

16  agencies in implementing Federal environmental statutes, such as the Clean Air Act."

17  *Boston & Maine Corp. & Town of Ayer*, 5 S.T.B. 500, 2001 WL 458685, at *5 (2001).

18  Congress carefully designed this system to "preserve[] a role for state and local agencies

19  in the environmental regulation of railroads." *Ass'n of Am. R.Rs.*, 622 F.3d at 1098.

20       Importantly, on February 27, 2024, EPA formally initiated the public comment part

21  of its authorization process under Section 209(e)(2)(A) for all components of the

22  Regulation, including the Idling Requirements and the Reporting and Recordkeeping

23  Requirements. 89 Fed. Reg. 14,484. EPA's authorization decision will determine

24  whether the Regulation is or is "not consistent with" California's authority to "adopt and

25  enforce standards and other requirements relating to the control of emissions from" non-

26  new locomotives. *Id.* at 14,485–86; 42 U.S.C. § 7543(e)(2)(A)(iii). "To be consistent with

27  section 209(e)(1), California's nonroad standards and enforcement procedures must not

28  attempt to regulate engine categories that are permanently preempted from state

regulation." 89 Fed. Reg. at 14,486. Each component EPA determines is authorized by Section 209(e)(2)(A) cannot be preempted by ICCTA. This is because Section 209(e)(2)(A) must be harmonized with ICCTA. *See BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 763–65 (9th Cir. 2018) (Hazardous Materials Transportation Act, which affirmatively authorized state to charge a fee for transportation of hazardous materials by rail, protected against ICCTA preemption). Alternatively, EPA may conclude through the authorization process that part or all of the Regulation's provisions are "in-use requirements" subject to Section 213(d) of the Clean Air Act. 42 U.S.C. § 7543(d) ("Nothing in this part shall preclude or deny to any State or political subdivision therefor the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licenses motor vehicles."). In that case, Section 213(d) must be harmonized with ICCTA. *See also* 40 C.F.R. Part 1074, Appendix A to Subpart A (codifying EPA's interpretation).

      The lack of certainty regarding EPA's authorization determination underscores that Plaintiffs' motion for summary judgment on their ICCTA claim cannot be decided until EPA has issued a final authorization decision. EPA's authorization decision is already underway and is only appealable in the appropriate Court of Appeals, 42 U.S.C. § 7607(b)(1). Plaintiffs' route to challenge EPA's authorization determination is to engage in the public comment process and then, after EPA issues a final decision, Plaintiffs' challenge must be brought in the appropriate Court of Appeals. 42 U.S.C. § 7607(b)(1). Plaintiffs are not entitled to summary judgment on their ICCTA claim before EPA issues its authorization decision.

      Likewise, it is undisputed that EPA-approved SIPs must be harmonized with ICCTA. *Ass'n of Am. R.Rs.*, 622 F.3d at 1098.The Regulation is expected—even by Plaintiff Association of American Railroads—to be adopted into California's most recent SIP and thereafter be treated as federal law. RJN Ex. H at 18 (representative of Plaintiff Association of American Railroads noting that CARB will "incorporate[] the proposed In-Use Locomotive regulation into its SIP"). Under the Clean Air Act, the states maintain a

1  statutory obligation to develop SIPs that include proposed methods to attain the federal

2  air quality standards. 42 U.S.C. § 7410; *see id.* § 7407(a) ("Each State shall have the

3  primary responsibility for assuring air quality within the entire geographic area

4  comprising such State"). States submit SIPs to EPA for review, which then have the

5  "force and effect of federal law" upon EPA's approval. *Safe Air For Everyone v. U.S.*

6  *EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007) (internal quotation marks omitted). California

7  included the Regulation as a proposed measure—adopted pursuant to California's

8  obligation to meet the federal air quality standards set forth in 42 U.S.C. § 7410—in its

9  2022 State SIP Strategy. ECF No. 19-5 at 34; RJN Ex. G at 36–38. If EPA approves

10 California's 2022 SIP submission, this will have the force and effect of federal law and

11 must be harmonized with ICCTA. Moreover, when CARB submits the Regulation itself

12 into the SIP, this will similarly mean the Regulation has the force and effect of federal law

13 upon EPA approval. *See Safe Air For Everyone*, 488 F.3d at 1097 ("the SIP became

14 *federal* law, not *state* law, once EPA approved it").

15  **II.    Plaintiffs have failed to show that the Idling Requirements and the**
16  **Reporting and Recordkeeping Requirements are not generally applicable**
    **rules.**

17      Even if this Court finds that the Regulation is not protected from ICCTA

18 preemption by the Clean Air Act, Plaintiffs are still not entitled to summary judgment on

19 their categorical ICCTA preemption claim because they fail to show that the remaining

20 provisions of the Regulation are not generally applicable rules. Plaintiffs allege that the

21 Idling Requirements and the Reporting and Recordkeeping Requirements are

22 categorically preempted because they "directly target[]" locomotives and thus are not

23 "rule[s] of general applicability." Pls.' MSJ, ECF No. 29 at 13–14. Contrary to Plaintiffs'

24 assertions, this issue is not "beyond fair debate." *Id.* at 14.

25      Although ICCTA preemption is broad, "it does not categorically sweep up all state

26 regulation that touches upon railroads." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96,

27 104 (2d Cir. 2009). ICCTA does not preempt "laws of general applicability that do not

28

1   unreasonably interfere with interstate commerce." *Ass'n of Am. R.Rs.*, 622 F.3d at 1097.

2   This is because Congress intended to preserve certain traditional police powers

3   exercised by states, including "direct environmental regulations enacted for the

4   protection of the public health and safety, and other generally applicable, non-

5   discriminatory regulations." *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643

6   (2d Cir. 2005); *see also* H.R. Rep. No. 104-311, at 96 (1995), *reprinted in* 1995

7   U.S.C.C.A.N. 793, 808 (noting that under ICCTA, "States retain the police powers

8   reserved by the Constitution").

9        For a law to be generally applicable, "it must address state concerns generally,

10  without targeting the railroad industry." *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*,

11  500 F.3d 238, 254 (3d Cir. 2007). "This is a fact-intensive inquiry." *Id.* at 253. That a

12  state law "applies specifically" to railroads does not end the inquiry. *Adrian & Blissfield*

13  *R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 541–42 (6th Cir. 2008) (holding that a state

14  law requiring railroads to pay for sidewalks across railroad tracks is not discriminatory).

15  Rather, such a law may be considered generally applicable if it sets requirements for

16  railroads that parallel those for "similarly situated entities." *Id.* In that instance, evaluating

17  general applicability "requires comparing the substance of the . . . regulations that apply

18  to railroads with those that apply to similar industries . . . to determine if the State is

19  discriminating against rail carriage." *N.Y. Susquehanna*, 500 F.3d at 256.

20       Plaintiffs fail to conduct the fact-intensive inquiry necessary to establish that the

21  Idling Requirements and the Reporting and Recordkeeping Requirements are not

22  generally applicable. While Plaintiffs point to the Regulation's name and overarching

23  goal, Pls.' MSJ, ECF No. 29 at 14, these allegations are insufficient. Plaintiffs ignore the

24  fact that the Idling Requirements and the Reporting and Recordkeeping Requirements

25  are part of a comprehensive regulatory scheme enacted by CARB to address air

26  pollution from the full sweep of mobile sources, including cars, motorcycles, trucks,

27  locomotives, ships, construction equipment, and utility engines. *See* ECF No. 19-5 at 45.

28  *See, e.g.,* Cal. Code Regs. tit. 13 §§ 1958 (motorcycles), 1962.2 (passenger cars and

1  light-duty trucks), 2013 (state and local government fleets, including but not limited to

2  box trucks, dedicated snow removal vehicles, pickup trucks, and tractors), 2014

3  (drayage trucks), 2023 (transit buses), 2400 (small off-road engines), 2410 (off-highway

4  recreational vehicles and engines), 2440 (spark-ignition marine engines), 2449 (off-road

5  diesel fueled fleets), 2468 (portable outboard marine tanks and components).

6       The California State Legislature charges CARB with regulating emissions from all

7  vehicles, including on-road vehicles like cars, motorcycles, and trucks, and off-road, and

8  nonvehicle engine categories. *See* Cal. Health & Safety Code §§ 39002, 43013.

9  Pursuant to this mandate, CARB has enacted idling, reporting, and recordkeeping

10 requirements for a wide range of mobile source categories. In adopting requirements for

11 locomotives in the Regulation, CARB incorporated locomotives into a comprehensive

12 regulatory scheme generally applicable to mobile emission sources. *Massachusetts v.*

13 *Env't Prot. Agency*, 549 U.S. 497, 499 (2007) ("Agencies . . . do not generally resolve

14 massive problems in one fell swoop, . . . but instead whittle away over time, refining their

15 approach as circumstances change and they develop a more nuanced understanding of

16 how best to proceed . . . .") (citations omitted).

17       The Idling Requirements in the Regulation require operators to manually shut off

18 locomotive engines within 30 minutes of idling if an automatic engine start/stop (AESS)

19 device is inoperative, subject to certain exceptions. Cal. Code Regs. tit. 13

20 § 2478.9(c)(2). CARB has promulgated idling limits for myriad other mobile sources.

21 *See, e.g.*, *id.* § 2480 (idling provisions for school buses, transit buses, school pupil

22 activity buses, youth buses, general public paratransit vehicles, and other commercial

23 motor vehicles at schools); *id.* § 2485 (idling provisions for diesel fueled commercial

24 motor vehicles).

25       The Reporting and Recordkeeping Requirements require locomotive operators to

26 gather and report operational data, including locomotive emissions and idling incidents.

27 *Id.* § 2478.11. These requirements are similar to reporting and recordkeeping mandates

28 that CARB has enacted for other mobile sources. *See, e.g., id.* § 2014.1(a)(4)(B), (C)

DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT                                                    15

1   (drayage trucks recordkeeping requirements); *id.* § 2023.8 (reporting requirements for

2   transit agencies).

3        Finally, Plaintiffs' reliance on *American Association of Railroads v. South Coast*

4   *Air Quality Management District*, 622 F.3d 1094 (9th Cir. 2010) is unavailing. Pls.' MSJ,

5   ECF No. 29 at 15. That case did not involve a comprehensive regulatory scheme that

6   imposed idling and reporting requirements across mobile sources. *Ass'n of Am. R.Rs.*,

7   622 F.3d at 1098. Accordingly, the court did not address the relationship between the

8   locomotive regulations at issue and analogous requirements for other mobile sources.

9   Here, the state legislature has granted CARB broad authority to set emission standards

10  for all mobile sources. CARB has acted on this authority to enact comprehensive idling,

11  reporting, and recordkeeping requirements applicable to a multitude of mobile sources,

12  including locomotives.

13       Because the Idling Requirements and the Reporting and Recordkeeping

14  Requirements impose analogous requirements on locomotives to those on other mobile

15  sources, these provisions of the Regulation are generally applicable rules that address

16  general state concerns about the public health impacts from air pollution, without

17  targeting the railroad industry for discriminatory treatment. Plaintiffs fail to consider this

18  relationship between the Regulation and other idling, reporting, and recordkeeping

19  requirements set by CARB. Accordingly, Plaintiffs fail to show that the Idling

20  Requirements and the Reporting and Recordkeeping Requirements are not generally

21  applicable rules and therefore are not entitled to summary judgment on their categorical

22  ICCTA preemption claim. *See N.Y. Susquehanna*, 500 F.3d at 256 (remanding to the

23  district court for consideration of whether solid waste regulations specific to rail carriers

24  are discriminatory given similar regulations on other facilities).

25       Plaintiffs have failed to show that the Regulation's remaining provisions are not

26  generally applicable, and Plaintiffs have explicitly disavowed moving on their as-applied

27  preemption claim. Pls.' MSJ, ECF No. 29 at 13. Regardless, Plaintiffs have not alleged

28  facts sufficient to show that the Idling Requirements and the Reporting and

1  Recordkeeping Requirements impose an unreasonable burden on interstate commerce

2  that is "so draconian that it prevents the railroad from carrying out its business in a

3  sensible fashion." *See N.Y. Susquehanna*, 500 F.3d at 254.

**III.    Plaintiffs have not shown, and cannot show, that any of the remaining provisions at issue violate the Dormant Commerce Clause.**

Plaintiffs claim that the Dormant Commerce Clause preempts the "entire field" of

locomotives—and therefore also CARB's Regulation—from state regulation "because 'a

lack of national uniformity would impede the flow of interstate goods.'"[3] Pls.' MSJ, ECF

No. 29 at 23–25 (quoting *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 379 n.2

(2023)). But this theory is completely misguided. "[T]he Supreme Court has interpreted

the [Commerce] clause to prohibit the states from unduly interfering with interstate

commerce *absent congressional intent*." *Union Pac. R. Co. v. Cal. Pub. Utilities Comm'n*,

346 F.3d 851, 870 (9th Cir. 2003) (emphasis added). Here, Congress specifically

articulated in the text of the Clean Air Act that California retains authority "to adopt and

enforce standards and other requirements relating to the control of emissions from" non-

new locomotives and engines. 42 U.S.C. § 7543(e)(2). Indeed, by the time Congress

adopted the federal Clean Air Act, California had already been regulating air pollution for

years in an effort to clean the State's smog-filled skies. Accordingly, Congress ensured

that California retained authority in Section 209(e)(2) to follow through on its commitment

to ensure it is safe for Californians to breathe. *See* U.S. Senate, 136 Cong. Rec.

S16895-01, Clean Air Act Amendments-Conference Report (Oct. 27, 1990), 1990 WL

164490, at S16976 ("States also fully retain existing authority to regulate emissions from

all types of existing or in-use nonroad engines or vehicles."); *see also* 88 Fed. Reg.

77,004, 77,005–06 (Nov. 8, 2023) ("California retained the ability to regulate . . . non-

---

[3] Plaintiffs do not assert on this Motion that any part of the Regulation imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike v Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); Pls.' MSJ, ECF No. 29 at 23. The overwhelming negative health and air quality costs of operating highly-polluting diesel locomotives close to communities practically ensures that the benefits analysis of this inquiry would outweigh any burdens to Plaintiffs.

1    new locomotives and locomotive engines.'"). Indeed, unlike in *Southern Pacific Co. v.*

2    *Arizona ex rel. Sullivan*, 325 U.S. 761 (1945), where Arizona adopted a state law

3    prohibiting in-state operation of trains greater than a certain length pursuant to state

4    authority alone, *id.* at 764, California adopted the Regulation pursuant to its authority

5    outlined in the federal Clean Air Act and in fulfillment of California's SIP obligations. *See*

6    42 U.S.C. § 7543(e)(2).

7         The Regulation in its entirety fits squarely within California's congressionally

8    recognized authority to "adopt and enforce standards and other requirements relating to

9    the control of emissions from" non-new locomotives and engines. *Id.* A "standard," as

10   defined in this title of the Clean Air Act, "denote[s] requirements such as numerical

11   emission levels with which vehicles or engines must comply" or "emission-control

12   technology with which they must be equipped." *Engine Mfrs. Ass'n v. S. Coast Air*

13   *Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004) (citations omitted). By preserving

14   California's authority to adopt and enforce not only "standards" but also "other

15   requirements" to support its efforts to reduce air pollution, Congress ensured California

16   retained authority to effectuate the measures needed to reduce emissions from non-new

17   nonroad sources. 42 U.S.C. § 7543(e)(2).

18        Each of the Regulation's components is within the scope of congressionally

19   preserved authority. The Idling Requirements control emissions from non-new

20   locomotives by setting parameters for the use of pollution control equipment. *See*, *e.g.*, §

21   2478.9(c)(2) ("For the time an AESS is inoperative, the Locomotive shall be manually

22   shut off no more than 30 minutes after the Locomotive becomes stationary . . ."); §

23   2478.9(d) ("Locomotives equipped to connect to Wayside Power shall turn off all

24   engines, . . . and use Wayside Power if stationary for longer than 30 minutes and if

25   Wayside Power is available."); § 2478.9(a) ("A Locomotive Operator shall ensure an

26   AESS equipped Locomotive Engine is shut off no more than 30 minutes after the

27   Locomotive becomes stationary."). The Reporting and Recordkeeping Requirements

28   "relat[e] to the control of emissions," from non-new locomotives, 42 U.S.C. § 7543(e)(2),

1   by guaranteeing California has accurate, timely data regarding locomotive emissions for

2   those locomotives operating in the state, deposited Spending Account funds, and

3   purchases made with Spending Account funds, among other things. § 2478.11. The

4   Administrative Payment provision supports the administration of the Regulation, which

5   was adopted in line with California's authority. § 2478.12.

6        Moreover, in line with Section 209(e)(2), the Regulation only regulates non-"new"

7   locomotives.[4] A locomotive is "new" if "its equitable or legal title has never been

8   transferred to an ultimate purchaser" or "it is remanufactured or refurbished." 40 C.F.R.

9   § 1033.901. Importantly, "[a] remanufactured locomotive or engine *ceases to be new*

10  *when placed back into service.*" *Id.* (emphasis added). If, as Plaintiffs suggest, the

11  additional "useful life" period given to a remanufactured locomotive made a locomotive

12  "new" again, 40 C.F.R. § 1033.901 would include contradictory language and effectively

13  nullify Section 209(e)(2) by allowing manufacturers to evade state regulation by

14  remanufacturing locomotives. *See* Pls.' MSJ, ECF No. 29 at 19.

15       Again, every component of the Regulation regulates only those locomotives

16  already placed into service in California. *See, e.g.*, Cal. Code Regs., tit. 13,

17  § 2478.9(c)(2) ("For the time an AESS is inoperative, the Locomotive shall be manually

18  shut off no more than 30 minutes after the Locomotive becomes stationary . . ."");

19  § 2478.9 (d) ("Locomotives equipped to connect to Wayside Power shall turn off all

20  engines, . . . and use Wayside Power if stationary for longer than 30 minutes and if

21  Wayside Power is available."); § 2478.9(a) ("A Locomotive Operator shall ensure an

22  AESS equipped Locomotive Engine is shut off no more than 30 minutes after the

23  Locomotive becomes stationary."). The Reporting and Recordkeeping Requirements

24  relate only to locomotives already in service in California. *See, e.g.*, § 2478.11(b)

25  ("[R]eport the Locomotive Operator name and contact information . . . for each non-ZE

26  Locomotive or ZE Capable Locomotive Operated in California . . . ."); § 2478.11(c)

27  _____

28  [4] Intervenors do not ask this Court to decide whether the Regulation's components are non-
    "new." This question is reserved for EPA. 42 U.S.C. § 7543(e)(2).

1  ("R]eport the . . . total amount deposited in the Spending Account to meet the Funding

2  Requirement . . . for the immediately preceding Calendar Year"); § 2478.11(d) ("For each

3  ZE Capable Locomotive Operated in California during the immediately preceding year . .

4  . ."). Finally, the Administrative Payment requires an annual payment only "for each

5  Locomotive they Operated in California during the immediately preceding Calendar

6  Year." § 2478.12. Accordingly, each carefully crafted component of the Regulation fits

7  squarely within Congress' clear authorization in Section 209(e)(2) that California retains

8  authority to regulate non-new locomotives, and therefore do not violate the Dormant

9  Commerce Clause.

10      Plaintiffs' fear that this Regulation opens the floodgates to a "patchwork regulatory

11  scheme" where other states are empowered to adopt their own unique regulations is

12  expressly limited by Section 209(e)(2)(B) of the Clean Air Act. *See* Pls.' MSJ, ECF No.

13  29 at 23–24. This argument ignores that Section 209(e)(2)(B) explicitly provides that

14  other states may only adopt and enforce standards that are "identical . . . to the

15  California standards." 42 U.S.C. § 7543(e)(2)(B)(i). *See Union Pac. R.R. Co.*, 346 F.3d

16  at 871 (noting that "the extra-territorial effects of only one state regulatory regime are

17  relatively minor"). Contrary to Plaintiffs' contentions, the Regulation will not lead to fifty

18  different locomotive regulations.

19      Finally, it is unclear how broadly Plaintiffs seek to find unconstitutional any state

20  regulation of locomotives. *See* Pls.' MSJ, ECF No. 29 at 23 ("In these cases, because 'a

21  lack of national uniformity would impede *the flow* of interstate goods,' the Court has held

22  that the Commerce Clause 'pre-empts [that] entire field from state regulation.'" (citation

23  omitted)). Under Plaintiffs' theory, any state law regulating trains in some way violates

24  the Dormant Commerce Clause. But courts have upheld other state and local regulations

25  touching locomotives. *See, e.g.*, *Borough of Riverdale Petition for Declaratory Ord. the*

26  *N.Y. Susquehanna & W. Ry. Corp.*, 4 S.T.B. 380 (1999) ("[N]ot all state and local

27  regulations that affect railroads are preempted" (citation omitted)); *Norfolk S. Ry. v.*

28  *Alexandria*, 608 F.3d 150, 158 (4th Cir. 2010) (state laws that fall within the State's

1    "general police powers" are not preempted by ICCTA even when they affect "railroad

2    activity."); *Burlington N. R.R. Co. v. Dep't of Pub. Serv. Regul.*, 763 F.2d 1106, 1114 (9th

3    Cir. 1985) (upholding Montana statute requiring railroad to maintain and staff certain

4    freight rail offices in the state); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d

5    1142, 1158 (9th Cir. 2020) (upholding enforcement of easement agreement between

6    Indian tribe and BNSF specifying the maximum number of trains and cars that could

7    travel over reservation land). Plaintiffs' attempt to invalidate this Regulation by way of

8    arguing that *any and all* non-federal regulations that have an impact on rail are

9    preempted is unsupported.

10   **IV.    The public interest strongly weighs against issuing an injunction.**

11        Based on all these reasons, the Court should deny Plaintiffs' Motion for Summary

12   Judgment on the merits. But even if it does not, this Court should nonetheless deny

13   Plaintiffs' request for a permanent injunction because the public interest would be

14   overwhelmingly disserved by such course of action. A plaintiff seeking a permanent

15   injunction must satisfy a four-factor test before a court may grant such relief: "(1) that it

16   has suffered an irreparable injury; (2) that remedies available at law are inadequate to

17   compensate for that injury; (3) that considering the balance of hardships between the

18   plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

19   would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*,

20   547 U.S. 388, 391 (2006) (citations omitted).

21        Even if Plaintiffs can show they satisfy the first three factors of this test, given that

22   California has failed to meet many federal air quality standards, which creates large

23   public health concerns that Californians are facing, the public interest would be

24   extremely disserved by this Court issuing a permanent injunction. Indeed, the result of

25   such an injunction would be "[e]nvironmental injury, [which] by its nature, can seldom be

26   adequately remedied by money damages and is often permanent or at least of long

27   duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545

28

1   (1987). The harm that would occur to the state and public if an injunction were granted

2   would be severe—this would amount to the equivalent of emitting 63 tons per day of

3   dangerous NOx pollution into California's already extremely polluted air. *See* ECF No.

4   19-10 at 2. Frontline communities would continue to endure elevated cancer rates,

5   respiratory illness, cardiovascular disease, and other debilitating health issues

6   associated with exposure to carcinogenic locomotive pollution. *See* ECF No. 19-3 at

7   157–60. The high exposure of air pollutants inside and outside people's homes and the

8   health impacts that ravage railyard-adjacent communities would remain. Torres Decl. ¶¶

9   28, 33-38. The extreme air contamination that imposes a lifetime of asthma on children

10  and forces infants to rely on nebulizers to breathe through the night would persist.

11  Andasan Decl. ¶ 19–21. The air pollution that leads to debilitating migraines,

12  nosebleeds, allergies, and persistent itchy throats would continue. Torres Decl. ¶ 28;

13  Vargas Decl. ¶ 14. Air pollution so thick that it keeps residents sequestered to their

14  homes during peak smog hours would remain a reality for millions of Californians. *See,*

15  *e.g.*, De La Garza Decl. ¶¶ 12–13. The toll of a permanent injunction would fall hardest

16  on California's already injured residents who are just trying to breathe. For these

17  reasons, even if this Court grants Plaintiffs' Motion for Summary Judgment, Defendant

18  Intervenors urge the Court to deny their request for a permanent injunction.

19                                    **CONCLUSION**

20          For all the foregoing reasons, Defendant Intervenors respectfully request that this

21  Court deny Plaintiffs' Motion for Summary Judgment and request for a permanent

22  injunction.

23

24

25

26

27

28

Respectfully submitted,

Dated:      March 5, 2024          /s/ Yasmine L. Agelidis
                                   YASMINE L. AGELIDIS (CA Bar No. 321967)
                                   ADRIANO L. MARTINEZ (CA Bar No. 237152)
                                   yagelidis@earthjustice.org
                                   amartinez@earthjustice.org
                                   Earthjustice
                                   707 Wilshire Blvd., Suite 4300
                                   Los Angeles, CA 90017
                                   Tel: (415) 217-2000 / Fax: (415) 217-2040

                                   DAVID R. PETTIT (CA Bar No. 67128)
                                   dpettit@nrdc.org
                                   Natural Resources Defense Council
                                   1314 2nd Street
                                   Santa Monica, CA 90401
                                   Tel: (310) 434-2300 / Fax: (310) 434-2399

                                   *Counsel for Defendant-Intervenors East Yard Communities for Environmental Justice, People's Collective for Environmental Justice, and Sierra Club*