1    Rob Bonta, State Bar No. 202668
    Attorney General of California
2    Myung J. Park, State Bar No. 210866
    Supervising Deputy Attorney General
3    Natalie E. Collins, State Bar No. 338348
    Michael S. Dorsi, State Bar No. 281865
4    Katherine Gaumond, State Bar No. 349453
    Micaela M. Harms, State Bar No. 329552
5    Dylan K. Johnson, State Bar No. 280858
    M. Elaine Meckenstock, State Bar No. 268861
6    Deputy Attorneys General
     1515 Clay Street, 20th Floor
7     P.O. Box 70550
     Oakland, CA  94612-0550
8     Telephone:  (510) 879-0299
     Fax:  (510) 622-2270
9     E-mail:  Elaine.Meckenstock@doj.ca.gov
    *Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASSOCIATION OF AMERICAN RAILROADS and AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION,**<br><br>                Plaintiffs,<br><br>    v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board; STEVEN S. CLIFF, in his official capacity as Executive Officer of the California Air Resources Board; and ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>               Defendants. | 2:23-cv-01154-DJC-JDP<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR A STAY OR DISMISSAL UNDER THE PRIMARY JURISDICTION DOCTRINE; AND DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        April 25, 2024<br>Time:       1:30 PM<br>Courtroom:  10 (13th Floor)<br>Judge:     Hon. Daniel J. Calabretta<br>Trial Date:  Not Set<br>Action Filed: June 6, 2023 |

1

**TABLE OF CONTENTS**

2
                                                                                                          **Page**

3   INTRODUCTION ................................................................................................................. 1

4   STATEMENT OF FACTS .................................................................................................... 2

    A.    Locomotive Emissions and their Regulation........................................................ 2

5         1.    EPA's Regulation of Locomotive Emissions .................................... 2

6         2.    Railroad Policies Concerning Locomotive Idling............................. 3

7         3.    State Regulation of Non-Road Vehicle Emissions, Including
                those from Locomotives .................................................................... 4

8         4.    EPA's Section 209(e)(2)(A) Authorization Process ......................... 6

9   B.    California's Mobile Source Emission Regulations ...................................... 6

10  C.    CARB's In-Use Locomotive Regulation...................................................... 7

    D.    Federal Regulation of "Rail Transportation" Under the ICCTA................. 8

11  E.    Procedural History ...................................................................................... 11

12  STANDARD FOR SUMMARY JUDGMENT ..................................................................... 11

    ARGUMENT ....................................................................................................................... 12

13  I.    Plaintiffs Have Not Established Standing for Any Claims Against the Idling
          Requirements ......................................................................................................... 12

14
    II.   This Court Should Apply the Primary Jurisdiction Doctrine and Stay (or
15        Dismiss) Any Remaining Claims ........................................................................... 15

16  III.  Defendants Are Entitled to Summary Judgment on Plaintiffs' Pike Claims
          Under the Dormant Commerce Clause ................................................................. 19

17        A.    Defendants Are Entitled to Summary Judgment ...................................... 20

18        B.    Plaintiffs' Motion Should Be Denied ........................................................ 22

19  IV.   Defendants Are Entitled to Summary Judgment on Plaintiffs' *Scheiner*
          Claim against the Administrative Payment Requirement ...................................... 24

20  V.    Plaintiffs Are Not Entitled to Summary Judgment on Their Remaining
          ICCTA Claims ........................................................................................................ 26

21        A.    The CAA's Preservation of State Authority to Control Non-New
                Locomotive Emissions Protects the Regulation ...................................... 26

22
          B.    Plaintiffs Have Not Established that Categorical Preemption Applies
23              Here ........................................................................................................... 30

          C.    Plaintiffs Have Not Identified a Remedy to Which They Would Be
24              Entitled Even If They Could Prevail ......................................................... 33

25  VI.   Should the Court Conclude that Any Part of the Regulation Is Invalid,
          Defendants Request the Opportunity to Address Severability .......................... 35

26  CONCLUSION.................................................................................................................... 35

27

28

                                                       i

**TABLE OF AUTHORITIES**

**Page**

CASES

*Adrian & Blissfield R. Co. v. Village of Blissfield*
    550 F.3d 533 (6th Cir. 2008) ................................................................ 33

*All Aboard Fla. F Operations LLC & All Aboard Fla. F Stations,* No. FD
    35680, 2012 WL 6659923 ..................................................................... 34

*Allway Taxi, Inc. v. City of New York*
    340 F. Supp. 1120 (S.D.N.Y. 1972)......................................................... 6

*Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*
    545 U.S. 429 (2005)............................................................................. 25

*American Trucking Associations, Inc. v. Scheiner*
    483 U.S. 266 (1987).................................................................. 24, 25, 26

*Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.* (*AAR*)
    622 F.3d 1094 (9th Cir. 2010) .........................................................*passim*

*Belt Ry. Co. of Chicago v. Weglarz Hotel III, L.L.C.*
    No. 18 C 7361, 2020 WL 6894664 (N.D. Ill. Nov. 24, 2020)....................... 31

*Bibb v. Navajo Freight Lines, Inc.*
    359 U.S. 520 (1959) .................................................................. 21, 22, 23

*BNSF Ry. Co. v. Albany & E. R.R. Co.*
    741 F. Supp. 2d 1184 (D. Or. 2010)........................................................ 28

*BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.* (*BNSF*)
    904 F.3d 755 (9th Cir. 2018) ............................................ 27, 28, 29, 30

*Bos. & Me.Corp. & Town of Ayer, Mass.*
    2001 WL 458685 (S.T.B. Apr. 30 2001) ................................................. 28

*Cal. Redev. Ass'n v. Matosantos*
    53 Cal.4th 231 (2011)........................................................................... 35

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) .............................................................................. 11

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*
    529 F. Supp. 2d 1151 (E.D. Cal. 2007) ............................................ 19, 28

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*
    254 F.3d 882 (9th Cir. 2001) ................................................................ 15

ii

## TABLE OF AUTHORITIES
### (continued)

Page

*Comm. for a Better Arvin v. EPA*
    786 F.3d 1169 (9th Cir. 2015) ................................................................. 6, 29

*Comptroller of Treasury of Maryland v. Wynne*
    575 U.S. 542 (2015) ................................................................................. 24

*Davel Commc'ns, Inc. v. Qwest Corp.*
    460 F.3d 1075 (9th Cir. 2006) ................................................................. 19

*Delaware v. Surface Transportation Bd.*
    859 F.3d 18 (D.C. Cir. 2017) ................................................................... 31

*Devereaux v. Abbey*
    263 F.3d 1070 (9th Cir. 2001) ............................................... 11, 14, 15, 26

*Donovan v. Coeur d'Alene Tribal Farm*
    751 F.2d 1113 (9th Cir. 1985) ................................................................. 33

*Doran v. Mass. Tpk. Auth.*
    348 F.3d 315 (1st Cir. 2003) ................................................................... 25

*Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*
    757 F. Supp. 2d 1006 (E.D. Cal. 2010) ................................................... 13

*Engine Mfrs. Ass'n v. EPA*
    88 F.3d 1075 (D.C. Cir. 1996) ........................................................ 5, 7, 19, 29

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
    541 U.S. 246 (2004) ................................................................................. 18

*Exxon Corp. v. Governor of Maryland*
    437 U.S. 117 (1978) (rejecting *Pike* claim for failure to establish
    cognizable burden)............................................................................. 20, 22

*Fontana v. Haskin*
    262 F.3d 871 (9th Cir. 2001) ................................................................... 12

*Hoye v. City of Oakland*
    653 F.3d 835 (9th Cir. 2011) ................................................................... 34

*Lujan v. Defs. of Wildlife*
    504 U.S. 555 (1992).................................................................................. 12

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*)
    627 F.2d 1095 (D.C. Cir. 1979) ............................................................. 4, 6

Memo in Supp. of Defendants' Cross-MSJ, Mot. for Stay, and Opp. to Pl. MSJ (2:23-cv-01154-DJC-JDP)

**TABLE OF AUTHORITIES**
(continued)

Page

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
    682 F.3d 1144 (9th Cir. 2012) ................................................................. 20

*Nat'l Pork Producers Council v. Ross* (*NPPC*)
    598 U.S. 356 (2023) ................................................................... *passim*

*Nat'l Pork Producers Council v. Ross* (*Ross*)
    6 F.4th 1021 (9th Cir. 2021) ............................................................. 20, 21

*New York Susquehanna & W. Ry. Corp. v. Jackson*
    500 F.3d 238 (3d Cir. 2007) ..................................................................... 32

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*
    514 U.S. 175 (1995) ......................................................................... 24, 26

*Oracle USA, Inc. v. Rimini St., Inc.*
    81 F.4th 843 (9th Cir. 2023) ..................................................................... 34

*Oregon Coast Scenic R.R., LLC v. Oregon Dep't of State Lands*
    841 F.3d 1069 (9th Cir. 2016) ..................................................................... 3

*Pac. Merch. Shipping Ass'n v. Goldstene*
    517 F.3d 1108 (9th Cir. 2008) ..................................................................... 4

*Parents for Priv. v. Barr*
    949 F.3d 1210 (9th Cir. 2020) ................................................................... 32

*Peninsula Corridor Joint Powers Board – Petition for Decl. Ord.*,
    No. FD 35929, 2015 WL 4065035 (S.T.B. July 2, 2015) ........................... 9

*People ex rel. State Air Res. Bd. v. Wilmshurst*
    68 Cal. App. 4th 1332 (1999) ................................................................... 22

*Phillips v. U.S. Customs & Border Prot.*
    74 F.4th 986 (9th Cir. 2023) ..................................................................... 12

*Physicians Surgery Ctr. of Chandler v. Cigna Healthcare Inc.*
    550 F. Supp. 3d 799 (D. Ariz. 2021) ........................................................... 33

*Pike v. Bruce Church, Inc.*
    397 U.S. 137 (1970) ......................................................................... *passim*

*Project Veritas v. Schmidt*
    72 F.4th 1043 (9th Cir. 2023) ............................................................. 9, 35

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Raymond Motor Transp., Inc. v. Rice*
    434 U.S. 429 (1978) ........................................................................... 23, 24

*Rocky Mountain Farmers Union v. Corey*
    730 F.3d 1070 (9th Cir. 2013) ........................................................... 19, 20

*Rocky Mountain Farmers Union v. Corey*
    913 F.3d 940 (9th Cir. 2019) ..................................................................... 34

*S. Pac. Co. v. Arizona ex rel. Sullivan*
    325 U.S. 761 (1945) ................................................................... 21, 22, 23

*Sam Francis Found. v. Christies, Inc.*
    784 F.3d 1320 (9th Cir. 2015) (en banc) .................................................. 35

*San Francisco Herring Ass'n v. DOI*
    946 F.3d 564 (9th Cir. 2019) ................................................................... 16

*Scott v. Harris*
    550 U.S. 372 (2007) ................................................................................. 13

*SocialCom, Inc. v. Arch Ins. Co.*
    No. 2:20-CV-04056, 2021 WL 10417393 (C.D. Cal. Nov. 4, 2021) ......... 34

*Soremekun v. Thrifty Payless, Inc.*
    509 F.3d 978 (9th Cir. 2007) ................................................................... 12

*Soriano v. Countrywide Home Loans, Inc.*
    No. 09-CV-02415-LHK, 2011 WL 13073307 (N.D. Cal. May 10, 2011) ... 33

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*
    951 F.3d 1142 (9th Cir. 2020) ........................................................... 27, 28

*Trailer Marine Transp. Corp. v. Rivera Vazquez*
    977 F.2d 1 (1st Cir. 1992) .................................................................. 24, 25

*TransUnion LLC v. Ramirez*
    594 U.S. 413 (2021) ................................................................................. 12

*Tyrrell V. Norfolk S. Ry. Co.*
    248 F.3d 517 (6th Cir. 2001) ................................................................... 31

*Union Pac. R.R. Co. v. Cal. Pub. Utilities Comm'n*
    346 F.3d 851 (9th Cir. 2003) ................................................................... 23

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Vivid Entm't, LLC v. Fielding*
    774 F.3d 566 (9th Cir. 2014) ................................................................. 35

4

5

*W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*
    451 U.S. 648 (1981) ........................................................................ 22

6

*Ward v. United Airlines, Inc.*
    986 F.3d 1234 (9th Cir. 2021) ................................................... 20, 22

7

8

*Yates v. United States*
    574 U.S. 528 (2015) ........................................................................ 18

9

*Yerger v. Mass. Tpk. Auth.*
    395 F. App'x 878 (3d Cir. 2010) ..................................................... 25

10

11

STATUTES

12

42 U.S.C. § 7410(a)(2)(A) ..................................................................... 29

13

42 U.S.C. § 7410(a)(2)(E) ....................................................................... 5

14

42 U.S.C. § 7507 ..................................................................................... 4

15

42 U.S.C. § 7543(a) ............................................................................ 4, 5

16

42 U.S.C. § 7543(b)(1) ....................................................................... 4, 5

17

42 U.S.C. § 7543(d) ......................................................................... 4, 18

18

42 U.S.C. § 7543(e) ................................................................................ 5

19

42 U.S.C. § 7543(e)(1)(A) ....................................................................... 4

20

42 U.S.C. § 7543(e)(1)(B) ....................................................................... 4

21

42 U.S.C. § 7543(e)(2) .......................................................................... 18

22

42 U.S.C. § 7543(e)(2)(A) ............................................................. *passim*

23

42 U.S.C. § 7543(e)(2)(B) ................................................................. 5, 30

24

42 U.S.C. § 7547(a)(5) ............................................................................ 2

25

42 U.S.C. § 7547(d) .............................................................................. 29

26

49 U.S.C. § 10102(9)(A) .......................................................................... 9

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3  49 U.S.C. § 10501(a)(1)(B)...............................................................................11

4  49 U.S.C. § 10501(a)(2)(A).........................................................................9, 10

5  49 U.S.C. § 10501(b)................................................................................28, 32

6  49 U.S.C. § 10501(b)(2)....................................................................................9

7  49 U.S.C. § 10501(c)(2)(A)...............................................................................9

8  49 U.S.C. § 22401(5)......................................................................................10

9  CALIFORNIA REGULATIONS

10
11 Cal. Code Regs., tit.13, Div. 3, Chapter 9.........................................................7

12 Cal. Code Regs., tit.13, §§ 1950-1978 .............................................................7

13 Cal. Code Regs., tit.13, § 2014(a) ..................................................................33

14 Cal. Code Regs., tit.13, § 2014.1(a)(6)(D) .....................................................33

15 Cal. Code Regs., tit.13, § 2015.4 ...................................................................33

16 Cal. Code Regs., tit.13, § 2015.5 ...................................................................33

17 Cal. Code Regs., tit.13, § 2016.......................................................................7

18 Cal. Code Regs., tit.13, § 2449(d)(2)(A) ........................................................32

19 Cal. Code Regs., tit.13, § 2449(g) ..................................................................32

20 Cal. Code Regs., tit.13, § 2478.3....................................................................10

21 Cal. Code Regs., tit.13, § 2478.4(f) ................................................................26

22 Cal. Code Regs., tit.13, § 2478.5....................................................................26

23 Cal. Code Regs., tit.13, § 2478.6....................................................................26

24 Cal. Code Regs., tit.13, § 2478.9....................................................................33

25 Cal. Code Regs., tit.13, § 2478.9(a) ..................................................14, 17, 18

26 Cal. Code Regs., tit.13, § 2478.9(b) ...............................................................14

27 Cal. Code Regs., tit.13, § 2478.9(c) ...............................................................13

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    Cal. Code Regs., tit.13, § 2478.9(c)(1) ........................................................... 13

4    Cal. Code Regs., tit.13, § 2478.9(c)(2) ........................................................... 13

5    Cal. Code Regs., tit.13, § 2478.9(d) ............................................................... 14

6    Cal. Code Regs., tit.13, § 2478.9(e) ............................................................... 14

7    Cal. Code Regs., tit.13, § 2478.11(b)) ............................................................ 26

8
     Cal. Code Regs., tit.13, § 2478.17(a) ............................................................. 35
9
     Cal. Code Regs., tit.13 § 2479(i) ................................................................... 32
10
     Cal. Code Regs., tit.13 § 2479(j) ................................................................... 32
11
     Cal. Code Regs., tit.13 § 2480 ...................................................................... 32
12
     Cal. Code Regs., tit.13, § 2485(c)(1)(B)(1) .............................................. 32, 33
13
     Cal. Code Regs., tit.13, § 2490.3 .................................................................. 33
14
     Cal. Code Regs., tit.17, 93130.7 ................................................................... 32
15
     Cal. Code Regs., tit.17, 93130.7(e) ............................................................... 33
16
     Cal. Code Regs., tit.17, 93130.7(f) ................................................................ 33
17
     Cal. Code Regs., tit.17, 93130.(g) ................................................................. 33
18
     Cal. Code Regs., tit.17, § 93118.5(h) ............................................................. 32
19
     Cal. Code Regs., tit.17, § 93118.5(m) ............................................................ 32
20
     Cal. Code Regs., tit.17, § 93118.5(n) ............................................................. 32
21
     Cal. Code Regs., tit.17, § 93118.5(o) ............................................................. 32
22

23   **FEDERAL REGULATIONS**

24   29 C.F.R. § 1910.178-1910.184 .................................................................... 33

25   40 C.F.R. § 1033 ....................................................................................... 2, 3

26
     40 C.F.R. § 1033.15(b) ................................................................................. 3
27
     40 C.F.R. § 1033.101(a) ............................................................................... 2

28

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3   40 C.F.R. § 1033.101(b) ........................................................................... 2

4   40 C.F.R. § 1033.115(a) ........................................................................... 2

5   40 C.F.R. § 1033.115(g) ....................................................................*passim*

6   40 C.F.R. § 1033.901 .............................................................................. 6

7   40 C.F.R. § 1068.101(b) .................................................................... 3, 14

8   40 C.F.R., Part 1074, Appendix A to Subpart A ................................. 19

9   40 C.F.R. § 1074.101(b) ......................................................................... 6

10

FEDERAL REGISTER

11

12   73 Fed. Reg. 37,096 (June 30, 2008) ........................................... 3, 4, 14

13   81 Fed. Reg. 39,424 (June 16, 2016) ..................................................... 5

14   82 Fed. Reg. 6,525 (Jan. 19, 2017) ..................................................... 17

15   82 Fed. Reg. 42,233 (Sept. 7, 2017) ..................................................... 5

16   88 Fed. Reg. 24,411 (Apr. 20, 2023) ................................................... 17

17   88 Fed. Reg. 72,461 (Oct. 20, 2023) .............................................. 16, 18

18   88 Fed. Reg. 77,004 (Nov. 8, 2023) ................................................ 6, 27

19   89 Fed. Reg.14,484 (Feb. 27, 2024) .............................................. 11, 16

20   OTHER AUTHORITIES

21   Pub. L. No. 101-549, 104 Stat. 2502 (Nov. 15, 1990) ......................... 29

22   Pub. L. No. 104-88, 109 Stat. 803 (1995) ........................................... 28

23

24

25

26

27

28

**INTRODUCTION**

In the 1990 amendments to the Clean Air Act (CAA), Congress established a cooperative federalism structure for the control of emissions from locomotives (and other non-road vehicles).  It required the United States Environmental Protection Agency (EPA) to establish emission standards for *new* locomotives, and preserved several ways for States to regulate emissions from locomotives that are no longer new.  Congress took these steps because it understood that locomotives produce substantial amounts of harmful pollution.  For the same reason, the California Air Resources Board (CARB) promulgated this In-Use Locomotive Regulation (Regulation).  CARB is pursuing the paths for state regulation that Congress expressly preserved, including seeking EPA authorization of this Regulation under Section 209(e)(2)(A), 42 U.S.C. § 7543(e)(2)(A).  EPA is actively considering CARB's authorization request.

Plaintiffs nonetheless ask this Court to cut the CAA's procedures short and invalidate the Regulation before EPA has an opportunity to make a single determination.  Plaintiffs argue that the Interstate Commerce Commission Termination Act (ICCTA) and the dormant Commerce Clause preclude the Regulation.  But Plaintiffs have not established standing, under either legal theory, to challenge one part of the Regulation: the Idling Requirements.  And neither of Plaintiffs' claims can be sustained in the face of Congress's intentional choice to permit state regulation of non-new locomotive emissions.  However, until EPA acts on CARB's pending authorization request, there is some uncertainty about *which* congressionally authorized path is at issue for *which* of the Regulation's provisions.  Thus, this Court should stay what remains of this case under the primary jurisdiction doctrine to allow EPA to complete its proceeding—the results of which will affect the analysis of Plaintiffs' remaining claims.

Should the Court proceed to the merits, it should grant Defendants' summary judgment on all remaining claims under the dormant Commerce Clause because Plaintiffs have not established, and cannot establish, the essential elements for those claims.  This Court should also deny Plaintiffs' summary judgment on all remaining

1

1    ICCTA preemption claims because (1) ICCTA does not preempt what the CAA

2    authorizes and (2) the regulatory requirements at issue are not within the scope of

3    categorical ICCTA preemption.  Moreover, Plaintiffs also have not identified a remedy to

4    which they would be entitled, even if they prevailed.

5                                    **STATEMENT OF FACTS**

6        **A.    Locomotive Emissions and their Regulation**

7        Diesel-powered locomotives emit multiple harmful pollutants, including particulate

8    matter of 2.5 microns or less (PM2.5) and nitrogen oxides (NOx).  ECF No. 18-3 at 16;

9    *see also id.* at 14-15, 60-61.  These pollutants cause serious health effects including

10   premature death, cancer, increased hospitalizations for heart and lung disease, asthma,

11   and decreased lung function.  *Id.* at 16-17, 24-25.  Children and the elderly are most

12   vulnerable, *id.* at 16, along with those who live in already overburdened communities

13   located near railroad operations, *id.* at 14, 61; *see also* ECF No. 19-1.  Locomotives also

14   emit large amounts of the greenhouse gases (GHGs) that are causing climate change,

15   leading to, *inter alia*, heat-related deaths, extreme wildfires, and threats to the State's

16   water supply and economy.  ECF No. 18-3 at 63; Exh. 14 at 13, 38-40.[1]

17       The CAA establishes a regulatory framework for limiting the harmful pollution

18   emitted by locomotives (and other non-road vehicles and engines).  That framework

19   establishes roles for EPA, for California, and for other States, as described below.

20                 **1.    EPA's Regulation of Locomotive Emissions**

21       EPA is required to establish standards to control harmful emissions from *new*

22   locomotives.  42 U.S.C. § 7547(a)(5).  These regulations are codified in Title 40, Part

23   1033 of the Code of Federal Regulations, whose Subpart B (sections 1033.101–

24   1033.150) is titled "Emission Standards and Related Requirements."  EPA's standards

25   include limits on exhaust emissions from line-haul and switch locomotives, 40 C.F.R.

26   § 1033.101(a), (b); limits on "crankcase emissions," *id.* § 1033.115(a); and a requirement

27   to install idling control devices with particular specifications, *id.* § 1033.115(g).

28   ───────────────
         [1] All citations to exhibits refer to those attached to the Decl. of Michael S. Dorsi.

                                              2

1    EPA's idling-control standard requires all "new" locomotives—whether brand new

2    or remanufactured—to "be equipped with automatic engine stop/start" (AESS) devices,

3    that will "shut off the main locomotive engine(s) after 30 minutes of idling (or less),"

4    unless one of four conditions is present.  40 C.F.R. § 1033.115(g).  It is "a violation of 40

5    CFR § 1068.101(b)(1) to circumvent" this idling standard.  *Id.*  Section 1068.101(b)(1)

6    prohibits "everyone"—including locomotive operators—from tampering with the AESS

7    devices.  *Id.* § 1068.101(b)(1); *see also id.* § 1033.15(b) (describing "everyone").[2]

8    Tampering includes "remov[ing] or render[ing] inoperative any device," as well as

9    operating the locomotive in a way "that renders the emission control system inoperative."

10   *Id.* § 1068.101(b)(1); SUF ¶¶ 2, 3.  Section 1068.101(b)(1) also provides that "the

11   standard-setting part"—i.e., Part 1033—"may include additional provisions regarding

12   actions prohibited."  *Id.*  Thus, the *additional* prohibition against "circumvent[ion]" in

13   Section 1033.115(g) extends to an operator's use of "the AESS system in a manner

14   other than that for which the system was designed and implemented per a railroad's

15   policy directive."  73 Fed. Reg. 37,096, 37,123 (June 30, 2008); SUF ¶¶ 4, 5.

16          **2.    Railroad Policies Concerning Locomotive Idling**

17         Federal law is not the only reason railroads limit locomotive idling.  Reducing idling

18   also reduces fuel and engine maintenance costs, extends engine life, and improves

19   operator well-being due to decreased noise levels.  SUF ¶ 7; Exh. 13 (EPA website); *see*

20   *also* Exh. 4 at 6 (AAR estimating "annual savings of approximately $2 million in fuel"

21   from idling reductions); 73 Fed. Reg. at 37,124 (recognizing "fuel savings" from idling

22   limits).  For these reasons, railroads have "had manual shut-down policies for decades,"

23   as Plaintiff AAR told EPA in 2007.  Exh. 3 at 3; SUF ¶ 9.  And some railroads voluntarily

24   began to adopt "idling reduction technology" that allowed for more frequent shut-downs,

25   _____

26   [2] Plaintiffs erroneously suggest CARB asserted EPA regulations do not apply to locomotive operators.  Pl. SUF ¶¶ 70, 71.  In fact, CARB correctly noted that its Regulation, unlike EPA's, does not apply to manufacturers.  ECF No. 18-3 at 219

27   (Regulation "requires no changes to … design or manufacture/remanufacture"); ECF No. 30-3 at 56 (responding to quoted text from EPA regulation "directed at manufacturers").

28   In any event, EPA's regulations speak for themselves.  *See also* MTD Order 14:9-12.

                                            3

even before EPA required AESS devices.  *Id.*  As EPA put it, the "individuals responsible for developing railroad policies have [no] incentive to encourage or allow unnecessary idling."  73 Fed. Reg. at 37,123.

### 3. State Regulation of Non-Road Vehicle Emissions, Including those from Locomotives

When it expanded the CAA to cover non-road vehicles (including locomotives), Congress intentionally preserved some state regulatory authority, building on the framework Congress had previously enacted for (on road) motor vehicles.  Under that framework, States are preempted from enforcing their own *new* motor vehicle emission standards.  42 U.S.C. § 7543(a).  EPA is required to waive that preemption for California "standards" and "accompanying enforcement procedures," unless one of three findings is supported by the record.  *Id.* § 7543(b)(1); *see also Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1114 (D.C. Cir. 1979) (describing consideration of "enforcement procedures").  Most other States may choose to adopt California's standards as their own.  42 U.S.C. § 7507.  And all States may, without EPA approval, regulate "the use, operation, or movement" of motor vehicles—regulations often referred to as "in-use requirements."  *Id.* § 7543(d); *Pac. Merch. Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1115 (9th Cir. 2008).  This effectively creates three categories of state regulations in the motor vehicle context:  (1) emission "standards" for new motor vehicles, 42 U.S.C. § 7543(b)(1); (2) their "accompanying enforcement procedures," *id.* § 7543(b)(1)(C); and (3) "in-use requirements" for non-new vehicles, *id.* § 7543(d).  The first and second categories require an EPA waiver to be enforceable; the third does not.

Congress kept a similar general design for non-road vehicles, with modifications.  It expressly preempted *all* States, including California, from regulating emissions from two categories of non-road vehicles:  new locomotives, 42 U.S.C. § 7543(e)(1)(B); and certain, new small-horsepower construction and farm vehicles, *id.* § 7543(e)(1)(A).  Outside those two categories, Congress impliedly preempted States from enforcing "standards [or] other requirements" and "accompanying enforcement procedures" for

4

1  *both* new and non-new non-road vehicles.  *Id.* § 7543(e)(2)(A); *see also Engine Mfrs.*

2  *Ass'n v. EPA*, 88 F.3d 1075, 1092 (D.C. Cir. 1996) (rejecting interpretation limiting this

3  preemption to *new* non-road vehicles.  As with new motor vehicles, EPA must waive this

4  preemption—must "authorize" California regulations that would otherwise be

5  preempted—absent at least one of three specified findings.  42 U.S.C. § 7543(e)(2)(A).

6  Congress also permitted most other States to adopt and enforce California's authorized

7  regulations, 42 U.S.C. § 7543(e)(2)(B), and preserved state authority for "in-use

8  requirements"—*e.g.*, limits on the mode or use of non-road vehicles—without EPA

9  approval, *Engine Mfrs.*, 88 F.3d at 1090 (upholding "EPA's interpretation that § 213(d)

10  incorporates into the nonroad regime at least the reservation of the states' right to

11  impose in-use regulations found in § 209(d)"); *id.* at 1082 (describing these regulations).

12  The CAA thus requires EPA authorization for more categories of state regulations

13  for non-road vehicles as compared to motor vehicles.  Specifically, for *new* non-road

14  vehicles, Section 209(e) impliedly preempts "other requirements," in addition to

15  "standards" and "accompanying enforcement procedures."  *Compare* 42 U.S.C. §

16  7543(e)(2)(A) *with id.* § 7543(b)(1).  And Section 209(e) also impliedly preempts

17  "standards," "other requirements," and "enforcement procedures" for *non-new* non-road

18  vehicles, whereas preemption in the motor vehicle context extends only to *new* vehicles.

19  *Compare id.* § 7543(e) *with id.* § 7543(a).  But, in both contexts, no EPA approval is

20  required for state "in-use requirements."  *Engine Mfrs.*, 88 F.3d at 1090.

21  State regulations in any of these categories are frequently submitted to EPA in

22  State Implementation Plans (SIPs) to meet federal air quality standards.  *E.g.*, 82 Fed.

23  Reg. 42,233 (Sept. 7, 2017) (Maine).  SIP submittals must provide "necessary

24  assurances that the State … is not prohibited by any provision of Federal …law from

25  carrying out" those regulations.  42 U.S.C. § 7410(a)(2)(E).  Thus, where a Section

26  209(b)(1) waiver or Section 209(e)(2)(A) authorization is necessary in order to enforce a

27  particular state regulation, States submit the regulations *after* the waiver or authorization

28  is granted.  *E.g.*, 81 Fed. Reg. 39,424, 39,430 (June 16, 2016) (approving SIP

1   submission because "EPA has issued waivers or authorization under section 209 for all

2   of the subject regulations").  "Once approved by EPA, a SIP becomes federal law."

3   *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1174 (9th Cir. 2015) (cleaned up).

4           **4.**    **EPA's Section 209(e)(2)(A) Authorization Process**

5      EPA's Section 209(e)(2)(A) proceedings begin with a request for authorization from

6   California that includes the State's determination that its nonroad vehicle "standards will

7   be, in the aggregate, at least as protective of public health and welfare as applicable

8   Federal standards."  42 U.S.C. § 7543(e)(2)(A).  EPA must then consider California's

9   request in a public proceeding.  *Id.*; 40 C.F.R. § 1074.101(b).  If none of the three

10   statutory bases for denial are established by the record, EPA "shall" grant the

11   authorization.  42 U.S.C. § 7543(e)(2)(A).

12      When a California request includes locomotive regulations, EPA will determine, on

13   a case-by-case basis, whether those regulations are preempted under Section

14   209(e)(1)—and thus ineligible for authorization—because they regulate new

15   locomotives.  42 U.S.C. § 7543(e)(2)(A); 88 Fed. Reg. 77,004, 77,007-08 (Nov. 8, 2023).

16   EPA's regulations provide that a locomotive ceases to be "new" when the earlier of two

17   events occurs:  (1) the locomotive's equitable or legal title is transferred to an ultimate

18   purchaser, or (2) the locomotive is placed into service (or back into service if the

19   locomotive has been remanufactured).  40 C.F.R. § 1033.901.  EPA has indicated it

20   "intends to consider the reasoning of *Allway Taxi*" when determining whether a California

21   regulation applies to new or non-new locomotives.  88 Fed. Reg. at 77,006.  In that case,

22   the court held that preemption of the regulation of "new" motor vehicles extends "only …

23   to the manufacture and distribution" of those vehicles.  *Allway Taxi, Inc. v. City of New*

24   *York*, 340 F. Supp. 1120, 1124 (S.D.N.Y. 1972), *aff'd,* 468 F.2d 624 (2d Cir. 1972).

25      **B.**    **California's Mobile Source Emission Regulations**

26      California began controlling emissions from motor vehicles well before Congress

27   authorized federal controls.  *MEMA I*, 627 F.2d at 1109.  The same was true of non-road

28   vehicles:  when Congress turned its attention to those sources in 1990, "California was

1   already in the lead." *Engine Mfrs.*, 88 F.3d at 1090.  And for good reason:  California

2   faces "severe air pollution problems."  *Id*.  California's long-standing struggles to reduce

3   ozone (or smog) are well documented.  Exh. 19 at 2-4; Exh. 18 at 18.  Although the

4   State has made significant progress on that front, tens of millions of Californians still live,

5   work, and learn in areas with the worst ozone levels in the country.  ECF Nos. 18-10 at

6   1-2, 18-3 at 59; Exh. 18 at 18.  California also has numerous, densely populated regions

7   where levels of PM2.5 exceed federal and state air quality standards.  Exh. 18 at 14.

8   And California faces extreme threats from climate change caused by greenhouse gas

9   emissions.  *E.g.*, Exh. 14 at 22-23.  Mobile sources—including non-road vehicles—are

10  the largest contributors to these pollution challenges.  ECF No. 18-10 at 4, 12.

11         To protect public health and meet its CAA obligations, CARB has promulgated

12  increasingly stringent and comprehensive mobile source emission regulations.  It now

13  regulates emissions from all types of motor vehicles—from motorcycles to passenger

14  cars and from buses to heavy-duty trucks.  *E.g.*, Cal. Code Regs., tit. 13, §§ 1950-1978,

15  § 2016.  CARB also regulates emissions from a wide range of non-road vehicles,

16  including diesel-fueled fleets (e.g., bulldozers, graders, etc.); small off-road engines;

17  commercial harborcraft; and ocean-going vessels docked in California ports.  *E.g.*, Cal.

18  Code Regs., tit. 13, Div. 3, Ch. 9.

19         **C.   CARB's In-Use Locomotive Regulation**

20         CARB has also long sought to reduce locomotive pollution in California.  To that

21  end, it entered into two Memoranda of Understanding with the major railroads operating

22  in the State.  ECF No. 18-3 at 45-48; *see also* Exhs. 1 (1998), 2 (2005).  Those voluntary

23  arrangements have not, however, produced the needed emission reductions.  ECF No.

24  18-3 at 48.  Indeed, as other mobile sources in California have become significantly

25  cleaner (due, at least in part, to CARB regulations), locomotives have lagged behind.

26  For example, CARB predicted that, by 2023, moving freight by rail would emit *more* NOx

27  and PM2.5 than moving the same freight by truck.  Exh. 15.

28

7

1    Finding that greater emission reductions were needed from locomotives operating

2    in California, CARB promulgated the Regulation to reduce non-new locomotive

3    emissions, using the authority Congress preserved in Section 209(e).  ECF No. 18-3 at

4    15, 61-67.  The Regulation has four main components: (1) Idling Requirements; (2) In-

5    Use Operational Requirements; (3) Spending Account Requirements; and (4) Reporting,

6    Recordkeeping and Registration Requirements.  *Id.* at 20.  It also requires an annual

7    Administrative Payment of $175 per locomotive to cover implementation costs.  *Id.* at 51.

8    These requirements are described in Defendants' Motion to Dismiss, ECF No. 20 at 3-4;

9    in the Court's order on that motion, ECF No. 48 (MTD Order) 3-4; and below.

10    CARB estimated that from 2023 to 2050 the Regulation would reduce cumulative

11    statewide emissions by approximately 7,455 tons of PM2.5, 389,630 tons of NOx, and

12    21.9 million metric tons of GHG.  ECF No. 18-3 at 26.  This is anticipated to reduce the

13    average cancer risk associated with living near railyards in California by more than 90

14    percent between 2020 and 2045.  *Id.* at 24.  CARB also estimated thousands fewer

15    premature deaths and emergency room visits, and hundreds fewer hospital admissions

16    from respiratory and cardiovascular illnesses in 2050, with a total valuation from avoided

17    health outcomes between 2024 and 2050 of approximately $32 billion.  *Id.* at 25.

18    On November 8, 2023, CARB requested authorization from EPA pursuant to CAA

19    Section 209(e)(2)(A).  ECF No 21-1 at 33-34.  In light of that pending authorization

20    request, CARB has not yet submitted the Regulation itself for approval into California's

21    SIP.  *See supra* 5:25-6:2.  However, the commitment to promulgate a regulation like this

22    one was included in CARB's 2022 State Strategy for the State Implementation Plan

23    which was submitted for EPA's approval on February 22, 2023.  Exh. 16 at 1, 34; Exh.

24    17.  This commitment is the largest NOx reduction strategy in the Strategy, responsible

25    for more than 31% of the total NOx reductions.  ECF No. 30-4 at 2.

26    **D.    Federal Regulation of "Rail Transportation" under the ICCTA**

27    Congress took a different approach to the regulation of rail "transportation" than it

28    did to the regulation of locomotive emissions.  Specifically, Congress chose to preempt

8

most state regulation of the transport of passengers or goods, giving exclusive jurisdiction to the Surface Transportation Board (STB) over "transportation by rail carriers, and the remedies provided [by the statute] with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers." 49 U.S.C. § 10501(b)(1).[3]  STB has recognized that its jurisdiction over "transportation by rail" does not "interfere with the role of state and local agencies in implementing Federal environmental statutes, such as the Clean Air Act." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.* (*AAR*), 622 F.3d 1094, 1098 (9th Cir. 2010) (internal quotation marks omitted).

The "transportation" to which STB's jurisdiction, and thus ICCTA preemption, attaches is defined to include, *inter alia*, "a locomotive," a "property," or a "facility." 49 U.S.C. § 10102(9)(A).  Accordingly, STB can have jurisdiction over some of a rail carrier's equipment, properties, or activities but not others. *E.g.*, *Peninsula Corridor Joint Powers Board – Petition for Decl. Ord.*, No. FD 35929, 2015 WL 4065035, at *2 (S.T.B. July 2, 2015) (Caltrain "subject to the Board's jurisdiction" for some purposes but "*[this] Project* is not subject to the Board's jurisdiction, and therefore, federal preemption does not apply.") (emphasis added).

In addition, Congress did not grant STB jurisdiction over *all* transportation by rail. Rather, when rail transportation occurs within a single State it must be "part of the interstate rail network" for the STB to have jurisdiction. 49 U.S.C. § 10501(a)(2)(A). Certain types of rail transportation are also exempt from STB jurisdiction—*e.g.*, "public transportation provided by a local government authority." *Id.* § 10501(c)(2)(A).

Thus, STB's exclusive jurisdiction and ICCTA preemption do not extend to certain passenger locomotives operating in California.  Plaintiff ASLRAA has conceded that some of its members operate such locomotives in California.  ECF 29-4 ¶ 8 (asserting members do not do so "*exclusively*") (emphasis added); FAC 18 (Mendocino Railway).

---

[3] Other areas of exclusive STB jurisdiction are not at issue. *Id.* § 10501(b)(2).

9

1  And, as another example, the San Joaquin Regional Rail Commission (an AAR member)

2  operates a commuter service between Stockton and San Jose.  ECF 21-1 at 37-38.

3       The STB similarly lacks jurisdiction when the entire route traveled is within a single

4  State.  For example, Union Pacific Railroad (an AAR member) moves sand and gravel

5  from quarries to processing plants on two routes entirely within California.  Exhs. 8, 9.

6  And BNSF Railway (also an AAR member) advertises similar services on its website, as

7  does California Western Railroad (an ASLRRA member).  Exh. 6 at 2 (offering

8  "Dedicated Train Service" to move "high volumes of single commodities from a single

9  origin to a single destination"); Exh. 7 at 1 (tariffs for "*local* and interchange" routes)

10  (emphasis added).[4]  When a non-railroad company uses locomotives to do the same

11  thing, they are referred to as "Industrial Operators."  Cal. Code Regs., tit. 13, § 2478.3.

12       In addition, when locomotives are involved in "intermodal" or "transloading"

13  services, those can be outside STB's jurisdiction—and ICCTA preemption—when the rail

14  portion of those services is exclusively in one State.  Both "intermodal" and

15  "transloading" services involve the transfer of goods to other forms of transport—e.g.,

16  truck, ship, or plane—for part of the route.  *See* 49 U.S. Code § 22401(5) (defining

17  "intermodal"); Exh. 20. (defining "transloading").  So, a locomotive may move goods from

18  the shipper's point of origin in California to another point in California, where the goods

19  are then transferred to trucks for the rest of their journey.  And that rail transportation

20  would not be operating as "part of the interstate rail network."  49 U.S.C.

21  § 10501(a)(2)(A).  Northern Sierra Railway appears to offer such a service.  Exh. 10 at 3

22  (describing "transloading agreement").  And BNSF and Union Pacific have multiple

23  intermodal hubs in California, can provide these services, and have indicated they

24  operate "intrastate locomotives" in California.  Exhs. 5, 21; *see also* Exh. 2 at 2.  In fact,

25  a company called DrayNow markets an app by which it claims trucking businesses can

26

27  _____

28      [4] Based on its website, Defendants understand California Western Railroad to be the same entity as Mendocino Railway.  *See* https://www.skunktrain.com/about/.

10

1     gain access to the California intermodal market, picking up freight from BNSF and Union

2     Pacific in eleven different California locations.  Exh. 11.

3         Finally, rail transportation moving goods to or from a ship at a California port is only

4     "part of the interstate rail network" if the rail transportation segment crosses California's

5     borders or the "water" segment "is under common control, management, or

6     arrangement" with the rail segment.  49 U.S.C. § 10501(a)(1)(B).

7       **E.**    **Procedural History**

8         Plaintiffs filed their First Amended Complaint (FAC) on October 13, 2023.  ECF No.

9     18.  The Regulation became final under California law on October 27, 2023.  ECF No.

10    21-1 at 27.  On February 6, 2024, this Court dismissed all claims against the Spending

11    Account and In-Use Operational Requirements, MTD Order at 11:24-28; all claims

12    against the "the locomotive equipment aspects" of the Idling Requirements (which

13    included dismissal of Plaintiffs' Locomotive Inspection Act claim in its entirety), *id.* at

14    14:6; and Plaintiffs' facial challenges under ICCTA and the dormant Commerce Clause,

15    *id.* at 17:21-22, 19:19-20.  The Court did not dismiss Plaintiffs' as-applied challenges

16    under ICCTA and the dormant Commerce Clause to certain Idling Requirements—those

17    that are "idling limits" and "impose new requirements on Plaintiffs' members," *id.* at

18    14:17-20—or to the Reporting and Recordkeeping or Administrative Payment

19    Requirements, *id.* at 19:3-4, 20:25-26, 22:4-5.

20        On February 27, 2024, EPA issued its notice inviting public comment on

21    California's Section 209(e)(2)(A) authorization request.  89 Fed. Reg. 14,484, 14,486

22    (Feb. 27, 2024).  Comments are due April 22, 2024.  *Id.*

23                   **STANDARD FOR SUMMARY JUDGMENT**

24        A party seeking summary judgment bears the initial burden of demonstrating the

25    absence of a genuine issue of material fact as to the basis for the motion.  *Celotex Corp.*

26    *v. Catrett*, 477 U.S. 317, 323 (1986).  "When the nonmoving party has the burden of

27    proof at trial, the moving party need only point out 'that there is an absence of evidence

28    to support the nonmoving party's case.'"  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th

Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).  The court must "view[ ] the evidence in

the light most favorable to the nonmoving party."  *Fontana v. Haskin*, 262 F.3d 871, 876

(9th Cir. 2001).  But "[c]onclusory, speculative testimony in affidavits and moving papers

is insufficient to raise genuine issues of fact and defeat summary judgment."  *Soremekun*

*v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## ARGUMENT

### I.   PLAINTIFFS HAVE NOT ESTABLISHED STANDING FOR ANY CLAIMS AGAINST THE IDLING REQUIREMENTS

"[P]laintiffs bear the burden to establish standing," *Phillips v. U.S. Customs &*

*Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023), and must "demonstrate standing for each

claim that they press," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  At the

summary judgment stage, Plaintiffs must "set forth by affidavit or other evidence" the

"*specific* facts" that establish their standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561

(1992) (emphasis added, cleaned up).  This Court has already rejected Plaintiffs'

declarations as insufficient to establish injury from any requirement that is not an "idling

limit."  MTD Order 14:3-14.  But Plaintiffs have also not met their burden as to claims

they press against "idling limits."  Defendants, not Plaintiffs are entitled to summary

judgment on these claims.

"Plaintiffs have alleged no [concrete] intent" to violate any of the Idling

Requirements.  MTD Order 13:8-9.  Instead, Plaintiffs have offered non-specific

assertions that their members will be "subject[ed] to new … idling limits," ECF No. 29-1

("Pl. MSJ") at 11:18-19, for which they "will incur supervision costs and personnel

training costs," *e.g.*, ECF No. 29-5 ¶ 11.  This injury claims rest on false premises:  that

federal law imposes no obligations on the locomotive operator; and thus Plaintiffs'

members do not currently train or supervise their employees to limit idling.  Pl. MSJ at

16:2-3; ECF No. 29-6 ¶ 13.  EPA's regulations do impose idling limits *on operators*.  *See*

*supra* 3:1-15; SUF ¶¶ 1-5.  Moreover, railroads have long voluntarily imposed idling

limits on their own locomotives.  *Id.*  "'When opposing parties tell different stories, one of

1    which is blatantly contradicted by the record, …  a court should not adopt that version of

2    the facts for purposes of ruling on a motion for summary judgment.'"  *Duhn Oil Tool, Inc.*

3    *v. Cooper Cameron Corp.*, 757 F. Supp. 2d 1006, 1009 (E.D. Cal. 2010) (quoting *Scott*

4    *v. Harris*, 550 U.S. 372 (2007)).  Plaintiffs have failed to establish that *any* of the Idling

5    Requirements would require a change to their members' training and supervision

6    practices.

7         Considering the Idling Requirements individually underscores the point.  Plaintiffs

8    identify only subprovision 2478.9(c) as allegedly injuring their members.  *E.g.*, ECF 29-6

9    ¶ 13; SUF ¶ 8.  Subprovision (c)(1) requires that operators "replace or repair a

10   malfunctioning or broken AESS no later than 30 days after discovering the initial

11   malfunction or break."  Cal. Code Regs., tit. 13, § 2478.9(c)(1).  This is not an idling limit,

12   and this Court correctly dismissed Plaintiffs' challenge to this requirement for lack of

13   standing.  MTD Order 14:6-9.[5]  Subprovision (c)(2) applies only when a locomotive's

14   AESS device is inoperative and requires operators to "manually shut off" such a

15   locomotive "no more than 30 minutes after" it becomes stationary unless one of four

16   conditions is present.  Cal. Code Regs., tit. 13, § 2478.9(c)(2).  As Plaintiff AAR told EPA

17   in 2007, "*railroads have had manual shut-down policies for decades*."  Exh. 3 at 3

18   (emphasis added).  Plaintiffs nonetheless opted to provide *no* information about their

19   members' current manual shut-down policies and *no* information about the training and

20   supervision of employees concerning those policies.  Moreover, given that excess idling

21   increases costs, SUF ¶ 7, Plaintiffs have not explained why their members' policies and

22   practices would allow idling that would otherwise not occur (and cannot therefore be

23   operationally necessary), simply because an AESS device is not working properly.

24        Plaintiffs claim no injury from the other subprovisions of the Idling Requirements.

25   ECF No. 29-6 ¶ 13.  On that ground alone, Defendants are entitled to summary

26   judgment as to any claims against those other subprovisions that survived the Motion to

27        [5] Plaintiffs also submitted no evidence that their members currently train and
     supervise employees to allow AESS devices to remain inoperable for longer periods.

28

13

1   Dismiss. *Devereaux*, 263 F.3d at 1076.[6]  In any event, Plaintiffs have not established

2   that any of those subprovisions will result in any *additional* training and supervision costs

3   to their members.

4        Section 2478.9(a) prohibits an AESS-equipped locomotive from idling longer than

5   30 minutes unless one of the identified conditions is present.  This requires operators to

6   use already-installed AESS devices in accord with their EPA-established specifications.

7   *Compare* Cal. Code Regs., tit. 13, § 2478.9(a) *with* 40 C.F.R. § 1033.115(g).  Operators

8   are already prohibited from "us[ing] the AESS system in a manner other than that for

9   which the system was designed."  73 Fed. Reg. at 37,123; 40 C.F.R. § 1033.115(g)

10  (prohibiting "circumvent[ion]"); SUF ¶ 5.  Plaintiffs have not established that subprovision

11  2478.9(a) "impose[s] new requirements on Plaintiffs' members," MTD Order 14:17, much

12  less that those members currently train and supervise their employees to do anything

13  other than what this subprovision requires.  SUF ¶¶ 11, 15.

14       Subprovision 2478.9(b) prohibits operators from "remov[ing], tamper[ing] with, or

15  disabl[ing]" the AESS devices already installed in their locomotives.  All challenges to

16  this subprovision were properly dismissed because "40 C.F.R. 1068.101(b) … already

17  prohibits 'everyone' from removing or rendering inoperative AESS equipment."  MTD

18  Order 14:9-11; SUF ¶ 2, 3.

19       Finally, subprovision 2478.9(d) requires "[l]ocomotives equipped to connect to

20  Wayside Power" to use that power and "turn off all engines" after 30 minutes where

21  "Wayside Power is available."  Cal. Code Regs., tit. 13, § 2478.9(d).[7]  In other words, if

22  the locomotive can plug into and use electricity, it must do so after 30 minutes rather

23  than continuing to idle the diesel engine.  Even if Plaintiffs consider this to be an "idling

24

25       [6] Defendants attempted to confer with Plaintiffs as to which claims remained after
    the order on the Motion to Dismiss.  Exh. 22.  In light of Plaintiffs' refusal to do so,
26  Defendants address each Idling Requirement herein.  Defendants do not concede,
    however, that challenges to "the locomotive equipment aspects of the" Idling
27  Requirements remain live.  MTD Order 14:6.
         [7] Subprovision 2478.9(e) exempts locomotives operating in zero-emission
28  configuration from the Idling Requirements.  Plaintiffs have not, and cannot, establish
    that this subprovision injures their members.

14

limit," they have not asserted, much less established, any injury from it.  In fact, this subprovision is only a "limit" on idling where the locomotive could otherwise idle for longer than 30 minutes—i.e., where one of the conditions specified in 40 C.F.R. § 1033.115(g) is present.  Plaintiffs have provided no evidence establishing which of their members has locomotives equipped to connect to Wayside Power or what their current policies are concerning the use of that power by those locomotives.  Plaintiffs have certainly not established that their members train and supervise employees to forego the cost savings of using Wayside Power where it is available.  *See* SUF ¶¶ 12, 13.

"[T]here is an absence of evidence to support" Plaintiffs' claims of injury—an issue on which they bear "the burden of proof."  *Devereaux*, 263 F.3d at 1076 (internal quotation marks omitted).  Defendants are entitled to summary judgment.  *Id.*  At a minimum, Plaintiffs' motion should be denied, or it should be deferred to permit Defendants to take discovery to examine Plaintiffs' claims of injury.  *See* Defendants' Rule 56(d) Motion ("56(d) Motion").

## II.    THIS COURT SHOULD APPLY THE PRIMARY JURISDICTION DOCTRINE AND STAY (OR DISMISS) ANY REMAINING CLAIMS

In its Order on Defendants' Motion to Dismiss, this Court rejected Defendants' request to apply the primary jurisdiction doctrine to what is left of this case, because the Court did not "see how resolution of claims related to [the Reporting and Recordkeeping Requirements, the Idling Requirements, or the Administrative Payment Requirement] falls within the special competence of the EPA, or would need to be harmonized with EPA approval."  MTD Order 9 n.6.  Defendants respectfully request that the Court reconsider that conclusion.  *See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001).  Defendants call the Court's attention to new facts, including EPA's recent solicitation of comments on CARB's authorization request.  Defendants also present facts and arguments they had neither reason nor opportunity to present on their Motion to Dismiss because they were not relevant to the dismissal Defendants sought of Plaintiffs' CAA claim.  Among those is Defendants'

15

1 position that, given the circumstances here, Defendants will not take enforcement action

2 until EPA acts on CARB's pending authorization request.[8]

3        On February 27, 2024, eleven days after this Court's Order on the Motion to

4 Dismiss, EPA published its solicitation of public comment on California's authorization

5 request.  89 Fed. Reg. at 14,484.  EPA seeks comment on whether it should authorize

6 enforcement of CARB's Regulation—*in all its parts*—under Section 209(e)(2)(A).  *E.g.*,

7 *id.* at 14,485 (specific references to Idling and Recordkeeping and Reporting

8 Requirements); *id.* (directing "interested parties" to CARB's authorization request for full

9 discussion of requirements).  This Court should not decide that EPA need not or will not

10 authorize the requirements still at issue in this case when EPA is actively considering

11 that very issue.  *San Francisco Herring Ass'n v. DOI*, 946 F.3d 564, 578 (9th Cir. 2019)

12 ("[C]ourts do not intrude on the agency's turf and thereby meddle in the agency's

13 ongoing deliberations.").  Rather, this Court should stay (or dismiss) what is left of this

14 case to allow EPA to complete its work.

15        Two aspects of EPA's special competence are implicated here—only one of which

16 was addressed on the Motion to Dismiss.  First, as the Court is aware, EPA has

17 indicated it will determine whether California is impermissibly regulating new locomotives

18 before acting on the pending Section 209(e)(2)(A) authorization request.  MTD Order

19 10:27-11:10.  Second, EPA may also have to decide whether the regulatory provisions

20 at issue even require EPA authorization—in other words, whether they are "standards

21 [or] other requirements" under Section 209(e)(2)(A); "accompanying enforcement

22 procedures" under Section 209(e)(2)(A)(iii); or "in-use requirements" (which require no

23 EPA authorization to be enforceable).  *See e.g.*, 88 Fed. Reg. 72,461, 72,475 (Oct. 20,

24 2023) ("[R]equirements [that] are not mobile source standards or not associated

25 compliance or enforcement mechanisms… would not require an authorization.").

26

27 _____
          [8] Defendants, however, reserve the right to enforce any provisions for any time
28 period ultimately authorized by EPA, as well as any provisions for which EPA concludes
   no authorization is necessary and for which the period for enforcement has not run.

16

1      Defendants did not previously address this second issue because Plaintiffs

2  challenged only the Spending Account and In-Use Operational Requirements under the

3  CAA.  FAC ¶ 105.  Defendants did not disagree with Plaintiffs that *those* requirements

4  are "standards [or] other requirements" under Section 209(e)(2)(A).  Pl. MSJ 18:16-17,

5  19:25-26; MTD Reply 2:21-23.  There was thus no reason to address these *other*

6  requirements in moving to dismiss that claim.  Defendants did not intend to suggest,

7  however, that the Idling, Reporting and Recordkeeping, and Administrative Payment

8  provisions do not require EPA authorization.  MTD Order 9 n.6.

9      Neither EPA nor the Courts have illuminated the distinctions between "standards"

10  and "other requirements."  Nor has a clear line been drawn between "standards and

11  other requirements" and "accompanying enforcement procedures" for non-new vehicles

12  that require EPA authorization and "in-use requirements" that do not require

13  authorization but apply to those same vehicles.  *See supra* 5:12-20.

14      However, EPA has previously authorized certain reporting and recordkeeping

15  requirements—treating them as "accompanying enforcement procedures"—where they

16  ensure other authorized requirements can be "effectively implemented and enforced."

17  82 Fed. Reg. 6,525, 6,531 (Jan. 19, 2017); *see also, e.g.*, 88 Fed. Reg. 24,411, 24,414

18  (Apr. 20, 2023).  EPA may well do the same here because these Reporting and

19  Recordkeeping (and Administrative Payment) Requirements similarly enable

20  implementation and enforcement of the Regulation's more substantive provisions.[9]

21      EPA may also conclude that some of the Idling Requirements are "standards [or]

22  other requirements" and the rest are "accompanying enforcement procedures."

23  Subprovision 2478.9(a), for example, proscribes how emission-control equipment

24  required by EPA's new-locomotive standards must be used in non-new locomotives

25  operating in California.  *Compare* Cal. Code Regs., tit. 13, § 2478.9(a) *with* 40 C.F.R. §

26  _____

27      [9] Defendants do not suggest that *all* emissions reporting and recordkeeping
   requirements are "accompanying enforcement procedures."  Based on EPA's past
   actions, however, *these* requirements may well be.

28

17

1033.115(g) (codified in Subpart titled "Emission Standards and Related Requirements").[10]  In the new vehicles context, "standards" include specifications of "emission-control technology with which [vehicles] must be equipped."  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004).  And phrases like "other requirements" can be "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Yates v. United States*, 574 U.S. 528, 545 (2015) (internal quotation marks omitted).  The other idling subprovisions likewise establish requirements for the use of emission-control technology or enable the implementation and enforcement of such requirements.  In other words, EPA may conclude these provisions do not simply regulate "the use, operation, or movement of [the] vehicles" themselves.  *See* 42 U.S.C. § 7543(d); *see also* 88 Fed. Reg. 72,461, 72,462 (Oct. 20, 2023) (authorizing requirement that stationary ships reduce emissions by, *inter alia*, plugging into shore power).

The entire Regulation is currently before EPA.  EPA's recent notice suggests that the agency may conclude authorization is required for all provisions.  *See supra* 16:3-9.  While there is uncertainty here because of the novelty of these issues, that only underscores the appropriateness of the primary jurisdiction doctrine.  At a minimum, there is no basis to conclude that EPA will *not* pass upon these requirements under the CAA.  And any line drawing should be done by EPA, not this Court, in the first instance.  42 U.S.C. § 7543(e)(2) (empowering EPA "to implement this subsection").

Moreover, EPA's action will have significant implications for what remains of this case.  If EPA affirmatively authorizes any of the requirements at issue under Section 209(e)(2)(A), that section will have to be harmonized with ICCTA and the dormant Commerce Clause.  And if EPA concludes some or all of the requirements at issue are "in-use requirements," then Congress's decision to allow enforcement of such state laws, without EPA approval, will require a distinct harmonization analysis.  *See Engine Mfrs.*,

---

[10] These Idling Requirements are therefore distinct from simpler idling limits that require only the manual shut-off of the vehicle.

18

1   88 F.3d at 1094 (upholding "EPA's interpretation [of] § 213(d)"); *see also* 40 C.F.R., Part

2   1074, Appendix A to Subpart A (codifying EPA's interpretation).  In other words, "[u]ntil

3   we know whether and, if so, to what degree" EPA grants Section 209(e)(2)(A)

4   authorization, the court cannot know *which* harmonization analysis applies to *which*

5   provisions of the Regulation.  *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075,

6   1090 (9th Cir. 2006).  This Court therefore, "cannot evaluate" Plaintiffs' claims, *Davel*,

7   460 F.3d. at 1090, and, at most, could issue a decision contingent upon EPA's decision,

8   *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1175-76 (E.D. Cal.

9   2007), *as corrected* (Mar. 26, 2008) (California standards authorized "under section 209"

10  not preempted under other statute).

11         In the meantime, Defendants do not believe it is sufficiently clear that the

12  requirements that remain at issue here are "in-use requirements" and can be enforced

13  without EPA authorization.  Accordingly, CARB does not plan to enforce these provisions

14  until EPA acts on the pending authorization request.

15  **III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' *PIKE*
             CLAIMS UNDER THE DORMANT COMMERCE CLAUSE**
16
           Plaintiffs claim the Regulation violates the dormant Commerce Clause's *Pike* test
17
    which asks whether "the burden imposed on [interstate] commerce is clearly excessive
18
    in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142,
19
    (1970); *see also* FAC ¶¶ 121, 123.  This Court dismissed Plaintiffs' facial claims under
20
    this theory, MTD Order 19:19-22, and all such claims against the Spending Account and
21
    In-Use Operational Requirements, *id.* at 11:24-27.  Defendants are entitled to summary
22
    judgment on the *Pike* claims that remain—namely any as-applied claims against the
23
    Idling, Reporting and Recordkeeping, and Administrative Payment Requirements.
24
    Plaintiffs bear the burden of proof.  *Rocky Mountain Farmers Union v. Corey*, 730 F.3d
25
    1070, 1097 (9th Cir. 2013).  But they cannot establish a cognizable burden under *Pike*.[11]
26
    At a minimum, Plaintiffs' motion should be denied.
27
_____
28         [11] Plaintiffs do not appear to have alleged, or moved for summary judgment on, a

19

1

**A.  Defendants Are Entitled to Summary Judgment**

2      To prevail on their as-applied *Pike* claim as to any provision of the Regulation,

3   Plaintiffs must first prove the "critical requirement":  that application to one or more of

4   their members' locomotives imposes a "substantial burden on interstate commerce."

5   *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012).

6   Only then would the Court consider whether that burden is clearly excessive in relation

7   to the putative benefits.  *Id.* at 1156 ("In the absence of [a] substantial burden on

8   interstate commerce, we need not determine if the benefits of a statute are illusory.");

9   *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127–28 (1978) (rejecting

10  *Pike* claim for failure to establish cognizable burden).  Plaintiffs have not shown, and

11  cannot show, a substantial burden on interstate commerce here.

12      "The mere fact that a firm engaged in interstate commerce"—including an interstate

13  transportation company like an airline—"will face increased costs as a result of

14  complying with state regulations does not, on its own, suffice to establish a substantial

15  burden on interstate commerce."  *Ward v. United Airlines, Inc.*, 986 F.3d 1234, 1241–42

16  (9th Cir. 2021).  Indeed, the Supreme Court recently affirmed dismissal of a *Pike* claim,

17  despite allegations that "certain processing firms" would be required "to make substantial

18  new capital investments."  *Nat'l Pork Producers Council v. Ross* (*NPPC*), 598 U.S. 356,

19  367 (2023).  In fact, cognizably significant burdens are found "only in rare cases."  *Nat'l

20  Pork Producers Council v. Ross* (*Ross*), 6 F.4th 1021, 1032 (9th Cir. 2021), *aff'd,* 598

21  U.S. 356 (2023).  Because *Pike*'s heartland is anti-protectionism, the most typical

22  cognizable burdens are discriminatory—found where the effects of the challenged law

23  "may … disclose the presence of a discriminatory purpose."  *NPPC*, 598 U.S. at 377.  In

24  the rarer case, a cognizable burden can arise "when a lack of national uniformity would

25  impede *the flow* of interstate goods."  *Id.* at 379 n.2; *see also Ross*, 6 F.4th at 1032.

26

27

28  *Pike* claim as to the Administrative Payment Requirement.  FAC ¶¶ 121-123; Pl. MSJ
    24:20-23.  Defendants address this requirement out of an abundance of caution.

Plaintiffs allege no discriminatory effects on interstate commerce, relying instead on the second type of burden. FAC ¶ 120; SUF ¶¶ 17-19. But Plaintiffs cannot establish that any of the Regulation's requirements will impede the flow of interstate goods; and they certainly cannot do so for the requirements to which challenges remain after the Motion to Dismiss. As Plaintiffs correctly observe, state laws have been found impede the flow of interstate goods when, for example, the laws require "'breaking up and reassembling long trains … before entering and after leaving that regulating state.'" Pl. MSJ 24:4-5 (quoting *S Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 775 (1945)). A law requiring a change in heavy-duty truck mudguards at the state border similarly imposed a substantial burden on interstate commerce by "causing a significant delay." *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 527 (1959) ("It was found that from two to four hours of labor are required to install or remove [the relevant] mudguard.").

The application of the Idling Requirements, Recordkeeping and Reporting Requirements, or the Administrative Payment Requirement to Plaintiffs' members would not cause any delay—much less a similarly significant one—for interstate commerce crossing the California border. First, as Plaintiffs themselves allege, many of their members' locomotives never even cross California's borders and, thus, could not experience delays when doing so. FAC ¶ 18; SUF ¶¶ 26, 27. Second, and perhaps more importantly, none of the requirements at issue requires an operator to make a change—much less a time-consuming one—at the border. SUF ¶¶ 20-25.

The Idling Requirements apply only when a locomotive is *stationary in California* and cannot delay border crossings. SUF ¶ 28. These requirements also only apply to locomotives equipped with devices that are designed to limit idling to the same amount allowed by the Regulation: 30 minutes (absent specified conditions). And, as shown above, Plaintiffs' members are already required, by federal regulations, to operate the idling devices in this manner. *See supra* 3:1-15. Even if some of Plaintiffs' members are injured because they have to train their employees to manually shut-down certain locomotives (with malfunctioning AESS devices) faster than they otherwise would (*but*

21

1    *see supra* at 3:16-4:3), those "increased costs" would not "on [their] own, suffice to

2    establish a substantial burden on interstate commerce."  *Ward*, 986 F.3d at 1241–42;

3    *see also Exxon*, 437 U.S. at 127 (rejecting "notion that the Commerce Clause protects

4    the particular … methods of operation" of interstate companies).  *See* SUF ¶ 29.

5           Plaintiffs likewise cannot establish that application of the Reporting and

6    Recordkeeping Requirements to any of their members will "impede *the flow* of interstate

7    goods."  *NPPC*, 598 U.S. at 380 n.2.  The need to collect and report data about their

8    locomotives' California operations will not affect border crossings, much less delay

9    interstate shipments as the reconfiguration requirements in *Southern Pacific Company*

10   and *Bibb* did.  Far from alleging any such effect, Plaintiffs claim only that their members

11   will have to "undertake investments" in "their systems" in order to comply.  FAC ¶ 91; *see*

12   *also*, *e.g.*, ECF No. 29-6 ¶ 14; SUF ¶ 30.  Compliance costs of that sort do *not* constitute

13   substantial burdens on interstate commerce—even when imposed on companies like

14   airlines.  *Ward*, 986 F.3d at 1242 (rejecting *Pike* claim against reporting requirement).

15   And the same is true of the Administrative Payment Requirement which does nothing

16   more than impose a $175 per-locomotive cost.

17   **B.    Plaintiffs' Motion Should Be Denied**

18          If the Court denies Defendants' motion, Plaintiffs' motion should also be denied.

19   As a threshold point, "any action taken … within the scope of the congressional

20   authorization is rendered invulnerable to Commerce Clause challenge."  *W. & S. Life Ins.*

21   *Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 653 (1981).  A California Court of

22   Appeal has concluded that the Congress's decision to provide waivers of preemption for

23   California's new motor vehicle emission regulations has this effect.  *People ex rel. State*

24   *Air Res. Bd. v. Wilmshurst*, 68 Cal. App. 4th 1332, 1345 (1999).  The same is true of the

25   analogous provision for non-road vehicle emission regulations:  Section 209(e)(2)(A).

26   "In-use requirements" are also congressionally authorized and "invulnerable" to dormant

27   Commerce Clause challenge.  This Court should not grant Plaintiffs' summary judgment

28

22

1    because of current uncertainty as to *which* part of the Clean Air Act authorizes which

2    relevant parts of this Regulation.  *See supra* Sec. II.

3          Plaintiffs' motion also fails on its merits.  Plaintiffs assert they did not move for

4    summary judgment on their *Pike* claim. Pl. MSJ 23:27-28.  Instead, Plaintiffs ask for

5    summary judgment "as a matter of law" simply because the Regulation applies to

6    "instrumentalities of interstate transportation"—*i.e.*, locomotives.  Pl. MSJ 23:18-19.

7    There is no such claim that can prevail "as a matter of law."  As Plaintiffs' own leading

8    case illustrates, state laws—including those regulating trains—"will not be invalidated

9    *without the support of relevant factual material*."  *S. Pac.*, 325 U.S. at 770 (emphasis

10   added); *see also id.* 771-72 (reviewing detailed factual findings); *Union Pac. R.R. Co. v.*

11   *Cal. Pub. Utilities Comm'n*, 346 F.3d 851, 870 (9th Cir. 2003) (requiring "the Railroads

12   [to] demonstrate" burdens); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 444

13   (1978) (considering "massive array of evidence").

14         In fact, courts apply the *Pike* test to state laws that regulate "instrumentalities of

15   interstate transportation."  Pl. MSJ 23:18-19.  Even before *Pike* was decided, the

16   Supreme Court considered an Illinois truck regulation and applied a test it later described

17   as "similar in principle to the subsequent formulation in *Pike*."  *Raymond Motor Transp.*,

18   434 U.S. at 443 (describing *Bibb*, 359 U.S. 520).  The Court also expressly rejected the

19   argument that "*Pike* is not applicable to a State's regulation of motor vehicles."  *Id.* at

20   442; *see also Union Pac. R.R.*, 346 F.3d at 870 (identifying *Pike* as the applicable legal

21   rule in challenge to state railroad regulation).  The Court's recent decision in *NPPC* did

22   not change these precedents, much less suggest that a plaintiff can establish an undue

23   burden on interstate commerce without any evidence.  The Court itself explained it was

24   "say[ing] nothing new," *NPPC*, 598 U.S. at 378, and went on to reference cases involving

25   non-discriminatory regulation of "trucks, trains, and the like" *in a discussion of the Pike*

26   *test*, *id.* at 380 n.2.  Far from establishing a new test allowing plaintiffs to establish undue

27   burdens as a matter of law, the *NPPC* Court rejected attempts to expand the doctrine

28   beyond its anti-protectionism heartland.  *Id.* at 373-74, 377.

23

Plaintiffs allege no economic protectionism here, so *Pike* applies, just as in *Raymond Motor Transportation* and *Union Pacific*. Plaintiffs' disavowal of their *Pike* claim, thus, leaves the Court with no law to apply, and their request for summary judgment must be denied.[12]  To the extent the Court disagrees, Defendants are entitled to discovery to probe Plaintiffs claim that "[t]he Regulation … imposes an unsustainable burden on the flow of interstate goods."  Pl. MSJ 24:26; *see also* Rule 56(d) motion.

## IV.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' *SCHEINER* CLAIM AGAINST THE ADMINISTRATIVE PAYMENT REQUIREMENT

Plaintiffs also allege that the Administrative Payment Requirement "independently violates the Dormant Commerce Clause" under *American Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266, 285 (1987).  FAC ¶ 124.  Here, too, the Court dismissed Plaintiffs' facial claims.  MTD Order 19:19-20.  Their as-applied claims also fail because this provision does not discriminate against interstate commerce.  There is no factual dispute about that, and Defendants are entitled to summary judgment.

In *Scheiner*, the Court invalidated Pennsylvania's flat taxes—levied to finance the maintenance and improvements of its highways and bridges—"because the methods by which [they were] assessed discriminate[d]" against interstate commerce.  *Scheiner*, 483 U.S. at 282.  Specifically, the "cost per mile on [out-of-state] trucks" was "approximately five times as heavy" as that "borne by local trucks."  *Id*. at 286.

Since then, the Supreme Court and multiple Circuit Courts have confirmed that discrimination against interstate commerce—not an excessive burden under the *Pike* test—was dispositive in *Scheiner*.  In *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 562-63 (2015), the Court cited *Scheiner* as an example of "tax schemes that inherently discriminate against interstate commerce."  *See also Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 197 (1995) (similar); *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 10 (1st Cir. 1992) (*Scheiner* determines "whether discrimination exists"); *Doran v. Mass. Tpk. Auth.*, 348 F.3d 315, 319–20 (1st Cir. 2003)

---

[12] Plaintiffs have also failed to identify an as-applied remedy to which they could be entitled if they prevailed on any Commerce Clause claim.  *See infra* Sec. V.C.

24

1  (*Scheiner*'s "premise" was tax that "did not treat interstate and intrastate interests

2  evenhandedly."); *Yerger v. Mass. Tpk. Auth.*, 395 F. App'x 878, 882–83 (3d Cir. 2010).

3      Plaintiffs have not alleged, much less established, that the Administrative Payment

4  discriminates by treating out-of-state companies unfavorably.  Plaintiffs allege only that

5  CARB requires "an annual flat fee of $175 per locomotive operated in California."  FAC ¶

6  124.  But the Supreme Court has already rejected the argument that a "$100 flat fee"

7  imposed on trucks should be invalidated "in the absence of … proof" of discriminatory

8  effects.  *Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 436

9  (2005).  Rather, to prevail a plaintiff has to "show that the flat assessment unfairly

10  discriminates against interstate truckers," *id.* at 435—*i.e.*, that the costs recovered

11  through the fee are "likely to vary significantly with truck-miles traveled" and interstate

12  trucks generally travel fewer miles, *id.* at 437; *see also Trailer Marine Transp.*, 977 F.2d

13  at 10 (invalidating flat-fee because transient trucks "presumptively … cause far fewer

14  accidents and impose far lower costs on the compensation fund").[13]

15      Plaintiffs cannot make such a showing here.  The Administrative Payment was

16  calculated to help defray:

17         the direct labor cost of staff that would be needed to implement and enforce
       the Proposed Regulation; the indirect labor cost of management,

18         administrative, and information technology resources; and operational costs
       that would be needed to support enforcement efforts (surveillance system

19         equipment, data storage, etc.). .

20  ECF 18-3 at 142; SUF ¶¶ 31-33.  Unlike the road maintenance costs in *Scheiner*, these

21  costs are far more likely to vary per locomotive than per mile.[14]  Indeed, many of the

22  Regulation's provisions expressly apply on a per-locomotive basis, creating

23  implementation and potential enforcement costs for each locomotive.  *E.g.*, Cal. Code

24  Regs., tit. 13, § 2478.4(f) ("Spending Account Calculation Per Locomotive"); § 2478.5

25  _____

26      [13] The fact that the fee at issue in *Michigan Public Service Commission* applied
only to intrastate trucks was not dispositive.  *See* MTD Order 21:12-13.  That fact was

27  relevant only because it made clear that the fee was not "an impermissible *discriminatory*
roadblock."  *Michigan Pub. Serv. Comm'n*, 545 U.S. at 437 (emphasis added).

28      [14] Plaintiffs have also not shown that *interstate* locomotives travel fewer miles in
California than *intrastate* locomotives.  *See Scheiner*, 483 U.S. at 276; SUF ¶ 36.

25

(In-Use Operational Requirements applicable to individual locomotive); § 2478.6 (exception available on individual locomotive basis); § 2478.11(b) (per-locomotive reporting); SUF ¶¶ 34, 35.  "[M]iles traveled within the State simply are not a relevant proxy" here.  *Okla. Tax Comm'n*, 514 U.S. at 199.  Defendants are entitled to summary judgment on this claim because "there is an absence of evidence to support" a conclusion that the Administrative Payment Requirement discriminates against interstate commerce as required to prevail under *Scheiner*.  *Devereaux*, 263 F.3d at 1076.

## V.   PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR REMAINING ICCTA CLAIMS

This Court dismissed Plaintiffs' facial ICCTA preemption claims, MTD Order 17:3-22, and all claims against the Spending Account and In-Use Operational Requirements, *id.* 11:24-27.  Plaintiffs are not entitled to summary judgment on the ICCTA claims that remain:  as-applied claims against the Idling, Reporting and Recordkeeping, and Administrative Payment Requirements.  Plaintiffs have not established that ICCTA preemption trumps the congressional authorizations provided in the CAA.  Nor have Plaintiffs established that categorical ICCTA preemption applies here because these requirements are part of a comprehensive regulatory program that applies to mobile sources in California, generally.  In other words, these regulatory requirements do not "target" railroads or otherwise "manag[e] or govern[] *rail transportation*."  Pl. MSJ 13:4-6 (internal quotation marks omitted, emphasis added).  Indeed, these provisions regulate locomotive *emissions*—a subject over with the STB does not have jurisdiction.  Finally, Plaintiffs' motion should be denied because Plaintiffs have not identified the specific relief to which they are entitled.

### A.   The CAA's Preservation of State Authority to Control Non-New Locomotive Emissions Protects the Regulation

Plaintiffs' ICCTA preemption claims cannot be sustained because the CAA preserves state authority to control harmful emissions from non-new locomotives in several ways, one or more of which apply here.  And this Court should decline Plaintiffs' invitation to ignore the comprehensive regulatory structure Congress created for

26

1  locomotive emissions.  Rather, Congress's choices must be, and can be, harmonized

2  with ICCTA.  *E.g.*, *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.,* 951 F.3d 1142, 1159

3  (9th Cir. 2020).  However, until EPA acts on the pending authorization request, neither

4  the parties nor the Court know for certain *which* Congressional authorization applies to

5  *which* of the Regulation's provisions at issue.  As shown above, a primary jurisdiction

6  stay would permit for orderly resolution of the outstanding claims in this case, after EPA

7  resolves the issues now before it; and may also permit the parties and the Court to

8  address particular issues that could arise in the meantime (e.g., through stipulated

9  agreements and orders).  If the Court declines to apply the primary jurisdiction doctrine,

10  it should still deny Plaintiffs' motion on their ICCTA claims because ICCTA did not

11  impliedly repeal any of the Congressional authorizations provided in the CAA.  Plaintiffs

12  bear the burden of establishing otherwise and have not even attempted to do so.

13      First, Section 209(e)(2)(A) "clearly envision[s] the potential for California to regulate

14  non-new locomotives."  88 Fed. Reg. 77,004, 77,005-06 (Nov. 8, 2023).  That provision

15  requires EPA to "authorize" California emission "standards and other requirements" and

16  "accompanying enforcement procedures" for non-new locomotives.  42 U.S.C. §

17  7543(e)(2)(A).  To the extent that provision creates "'an apparent conflict'" with ICCTA's

18  preemption provision, this Court "must strive to harmonize the two laws, giving effect to

19  both laws if possible."  *BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.* (*BNSF*),

20  904 F.3d 755, 762 (9th Cir. 2018) (internal quotation marks omitted).  And it can readily

21  do so, as *BNSF* illustrates.

22      That case involved an ICCTA preemption challenge to a California law that

23  required railroads to collect a fee from shippers of hazardous materials and to remit the

24  fees to the State.  *BNSF*, 904 F.3d at 759.  Section 5125(f)(1) of the Hazardous

25  Materials Transportation Act (HMTA) authorizes states to impose fees related to

26  transportation of hazardous material by rail.  *Id*. at 763, 766.  The court concluded that it

27  "should not read the preemption provision of the ICCTA to eliminate the protection from

28  preemption provided by § 5125(f)(1) of the HMTA."  *Id*. at 765.  Section 5125(f)(1) was

27

1   "easily harmonized [with the ICCTA] by reading § 5125(f)(1) of the HMTA to protect from

2   preemption the fees specifically authorized in that section." *Id.* at 762.[15]  Section

3   209(e)(2)(A) can similarly be harmonized with ICCTA by concluding that the CAA

4   protects California's EPA-authorized regulation of non-new locomotive emissions.  *See*

5   *also BNSF Ry. Co. v. Albany & E. R.R. Co.*, 741 F. Supp. 2d 1184, 1198 (D. Or. 2010)

6   (harmonizing ICCTA with antitrust law); *Cent. Valley Chrysler-Jeep*, 529 F. Supp. 2d

7   1175-76 (harmonizing analogous CAA provision with another statutes).

8           Section 5125(f)(1)'s "narrow and specific" protection of fair fees relating to

9   transportation of hazardous materials was neither controlled nor nullified by ICCTA's

10  "broad and general" preemption provision, *BNSF*, 904 F.3d at 766.  And Section

11  209(e)(2)(A) is equally narrow and specific—focusing exclusively on emissions from non-

12  road vehicles and engines (and, as to locomotives, only those that are not new).  Indeed,

13  the 1990 amendments to the CAA reflect Congress' highly specific determinations about

14  locomotive emissions-that EPA shall promulgate standards for new locomotives, that all

15  States are preempted from doing the same; that EPA shall authorize California

16  "standards and other requirements," and "accompanying enforcement procedures," and

17  that all State may impose "in-use requirements." *See supra* 4:22-5:28.  ICCTA

18  establishes no clear intention to undercut Congress's choices, as the STB has

19  repeatedly recognized:  "'[N]othing in section 10501(b) [of ICCTA] is intended to interfere

20  with the role of state and local agencies in implementing Federal environmental statutes,

21  such as the Clean Air Act . . . .'" *Swinomish Indian Tribal Cmty.*, 951 F.3d at 1157

22  (quoting *Bos. & Me. Corp. & Town of Ayer, Mass.*, 2001 WL 458685, at *6 n.28 ((S.T.B.

23  Apr. 30 2001)).  Finally, Section 209(e)(2)(A) was preexisting law when ICCTA was

24  enacted.  Pub. L. No. 104-88, 109 Stat. 803 (1995) (ICCTA); Pub. L. No. 101-549, 104

25  Stat. 2502 (Nov. 15, 1990) (Section 209(e)(2)(A)).  Thus, the "strong presum[ption] …

26  that Congress will specifically address preexisting law when it wishes to suspend its

27

28    [15] The court ultimately concluded the fee at issue was not within the scope of
      Section 5125(f)(1) of HMTA, but that does not alter the harmonization analysis.

28

1   normal operations in a later statute" applies.  *BNSF*, 904 F.3d at 766 (internal quotation

2   marks omitted).  Yet Congress gave no indication it intended ICCTA to upend its

3   carefully balanced cooperative federalism approach to locomotive emission control.

4          Second, Congress also authorized state "in-use requirements" to control emissions

5   from non-road vehicles and engines.  42 U.S.C. § 7547(d); *Engine Mfrs.*, 88 F.3d at

6   1090.  Thus, to the extent the requirements that remain at issue here are outside the

7   scope of Section 209(e)(2)(A) because they are "in-use requirements," those

8   requirements are still protected by congressional authorization.  And that authorization

9   can just as easily be harmonized with ICCTA as Section 209(e)(2)(A) can.  The "in-use

10  requirement" authorization is specific and narrow, in contrast to ICCTA's more general

11  preemption.  And there is no evidence that Congress intended ICCTA to override this

12  earlier-enacted authorization.

13         Third, California has already submitted, to EPA, a commitment to adopt this

14  Regulation in its State Strategy for the State Implementation Plan.  Exh. 16 at 1, 34; Exh.

15  17.  The text of the CAA allows for such submissions; and if and when EPA approves

16  them, such commitments become enforceable federal law.  *Comm. for a Better Arvin*,

17  786 F.3d at 1178-79 (citing 42 U.S.C. § 7410(a)(2)(A)).  This part of the CAA can also be

18  readily harmonized with ICCTA by preserving the central role Congress intended States

19  to play in protecting the public health of their residents from harmful pollution—a role the

20  STB does not, and cannot, play.[16]

21         To avoid the conclusion that the CAA protects these regulatory provisions, Plaintiffs

22  "bear[] the heavy burden of showing a clearly expressed congressional intention that"

23  ICCTA displaces the CAA.  *BNSF,* 904 F.3d at 761 (cleaned up).  Plaintiffs cannot meet

24  that burden.  They first miss the mark when they argue that Section 209(e)(2)(A)

25  authorization would not "displace ICCTA preemption" because "EPA has neither the

26         _____

           [16] Unlike in *AAR*, CARB *has* submitted a relevant measure for approval into the
    SIP.  CARB is also actively pursuing Section 209(e)(2)(A) authorization which can be a
27  prerequisite to SIP submission for regulations covered by Sections 209(b)(1) or
    209(e)(2)(A).  *See supra* at 5:25-6:2.  To the extent this Court nonetheless concludes
28  that *AAR* forecloses this argument, Defendants preserve it for further review.

1  expertise nor the authority to alter the STB's exclusive jurisdiction."  Pl. MSJ 17:4.

2  Congress itself already displaced ICCTA preemption as to locomotive emissions, giving

3  EPA (not the STB) jurisdiction over new locomotive emissions and preserving a role for

4  state regulation of non-new locomotive emissions.  Plaintiffs' reliance on *AAR* is equally

5  misplaced, Pl. MSJ 16:26-17:2, because CARB has initiated a SIP process, Exh. 17;

6  *AAR*, 622 F.3d at 1098 (discussing future SIP submittal).  Moreover, unlike in *AAR*, two

7  of the harmonization analyses here involve *extant* federal law:  provisions of the CAA—

8  Section 209(e)(2)(A) and Sections 213(d) and 209(d).  *See AAR*, 622 F.3d at 1098.

9  Finally, Plaintiffs assert that the potential for patchwork regulation precludes

10  harmonization here.  Pl. MSJ 17:7.  The Ninth Circuit has not considered that when

11  harmonizing ICCTA with other federal statutes.  *E.g.*, *BNSF*, 904 F.3d at 761-771.  And

12  Plaintiffs identify no reason to depart from those precedents here.  Nor is there one.

13  Congress ensured there would be no patchwork of "standards and other requirements"

14  and "accompanying enforcement procedures" here, 42 U.S.C. § 7543(e)(2)(B) (requiring

15  identicality), and Congress itself chose to allow each State to adopt its own "in-use

16  requirements."  Any "patchwork" that results reflects Congress's choice.

17  The CAA and the ICCTA are "capable of coexistence."  *BNSF Ry. Co.*, 904 F.3d at

18  762.  Plaintiffs are not entitled to summary judgment because ICCTA does not preempt

19  any part of the Regulation that is authorized by EPA under Section 209(e)(2)(A); any part

20  of the Regulation that is an "in-use requirement"; or any part of the Regulation—or the

21  commitment to adopt such a Regulation—that is part of California's SIP.

22  **B.  Plaintiffs Have Not Established that Categorical Preemption Applies Here**

23

24  Plaintiffs have sought summary judgment only on their "categorical preemption

theory."  Pl. MSJ 13:13-14.  But categorical preemption does not apply here.

25  First, categorical preemption only applies where the STB's "jurisdiction is

26  *exclusive*."  *Oregon Coast Scenic R.R., LLC v. Oregon Dep't of State Lands*, 841 F.3d

27  1069, 1073 (9th Cir. 2016).  The STB does not have exclusive jurisdiction over

28

30

1    locomotive emissions.  Rather, Congress gave that jurisdiction to EPA (and, to some

2    extent, to the States).  *See supra* 2:20-27, 4:23-5:28.  Thus, just as "ICCTA does not

3    preempt state rules relating to railroad safety because such rules" operate under the

4    "umbrella" of another federal statute (the Federal Rail Safety Act), ICCTA does not

5    preempt state emission controls that operate under the CAA's umbrella.  *Belt Ry. Co. of*

6    *Chicago v. Weglarz Hotel III, L.L.C.*, No. 18 C 7361, 2020 WL 6894664, at *4 (N.D. Ill.

7    Nov. 24, 2020) (citing *Tyrrell v. Norfolk S. Ry. Co.,* 248 F.3d 517, 523 (6th Cir. 2001)).  In

8    other words, these requirements do not "have the effect of managing or governing rail

9    transportation," within the meaning of ICCTA.  *Delaware v. Surface Transportation Bd.*,

10    859 F.3d 18, 19 (D.C. Cir. 2017).[17]

11         Second, categorical preemption does not apply because the regulatory provisions

12    at issue do not "target[] the railroad industry."  *Delaware*, 859 F.3d at 19 (internal

13    quotation marks omitted); *see also* Pl. MSJ 13:4-5.  Rather, these requirements are

14    "laws of general applicability."  *AAR*, 622 F.3d at 1097.[18]  They are part of a

15    comprehensive program regulating mobile source emissions—a program that imposes

16    idling limits, as well as recordkeeping and reporting obligations, on many other types of

17    vehicles:  from trucks and buses to ships, bulldozers, and graders.  The requirements

18    imposed on heavy-duty trucks are particularly germane here because Plaintiff AAR has

19    compared the emissions of those trucks with those of locomotives.  Exh. 3 at 1

20    ("[L]ocomotives are … cleaner than trucks on an emissions per ton-mile basis") (internal

21    quotation marks omitted).  Locomotives may not have been subject to such requirements

22    before now, but their *addition* to California's mobile source regulations does not make

23    that regulatory program *less* generally applicable.  *See Parents for Priv. v. Barr*, 949

24    F.3d 1210, 1236 (9th Cir. 2020) (rule was "generally applicable" under First Amendment

25    because it did not "selectively impose[] certain conditions or restrictions only on religious

26

27            [17] To the extent this argument is foreclosed by *AAR*, Defendants preserve it for
further review.

28            [18] Such laws are preempted under ICCTA only if they "unreasonably interfere with
interstate commerce."  *Id.*  Plaintiffs have not sought summary judgment on that issue.

31

1    conduct").  Put simply, the extension of California's broad mobile-source emissions

2    control program to include locomotives "does not discriminate against rail carriage."

3    *New York Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007).

4          Specifically, CARB regulations prohibit large diesel-fueled commercial motor

5    vehicles (including heavy-duty trucks) from idling "for more than 5 consecutive minutes

6    at any location" in California.  Cal. Code Regs., tit. 13, § 2485(c)(1)(B)(1).  Off-road

7    diesel-fueled vehicles and engines—e.g., backhoes and excavators—are likewise

8    generally prohibited from idling "for more than five consecutive minutes," with limited

9    exceptions similar those provided for locomotive operators.  *Id.* § 2449(d)(2)(A).  CARB

10   also restricts idling by school buses and other buses near schools, *id.* § 2480; and by

11   harbor craft, Cal. Code Regs., tit. 17, § 93118.5(h).  And CARB requires ocean-going

12   vessels to reduce emissions while "at-berth" in California, allowing them to do so by

13   plugging in to shore power.  *Id.* § 93130.7.

14         CARB also requires many mobile sources of harmful pollution to register, report

15   information, and keep records, as the Regulation does for locomotives.[19]  For example,

16   owners and operators of fleets of off-road diesel-fueled vehicles and engines must report

17   information about each vehicle and the fleet's operations annually.  Cal. Code Regs., tit.

18   13, § 2449(g).  Commercial harborcraft owners and operators must likewise comply with

19   detailed recordkeeping and reporting requirements.  Cal. Code Regs., tit. 17,

20   § 93118.5(m), (n), (o).  As must many others.[20]

21         CARB does not apply idling or reporting requirements "exclusively" to locomotives.

22   *AAR*, 622 F.3d at 1098.  Certainly, the specific requirements imposed on a category of

23         [19] Requiring railroads to report emissions and other data, to keep EPA-mandated
      idling devices in good repair, to operate those devices as intended, and to manually
24    shut-off stationary trains when those devices are inoperable does not have "the effect of
      managing or governing rail transportation" within the meaning of 49 U.S.C. § 10501(b).
25    To the extent *AAR* adopted a broader understanding that applies here, Pl. MSJ 3:13-16,
      Defendants preserve this issue for further review.
26         [20] The full set of mobile sources subject to reporting requirements is too
      voluminous to provide here.  *See also e.g.*, Cal. Code Regs., tit. 13 § 2479(i), (j) (cargo
27    handling equipment); *id.* § 2490.3 (large transportation network companies); *id.* §§
      2014(a), 2014.1(a)(6)(D) (drayage truck fleets); *id.* §§ 2015.4, 2015.5 (sizable heavy-
28    duty fleets); Cal. Code Regs., tit. 17, 93130.7(e), (f), (g) (ocean-going vessels).

1   vehicles or engines may differ based on its characteristics.  Thus, heavy-duty trucks may
2   idle for only 5 minutes while locomotives may idle for 30.  *Compare* Cal. Code Regs., tit.
3   13, § 2485(c)(1)(B)(1) *with id.* § 2478.9.  But similar variation exists in regulations
4   adopted under generally applicable statutes such as the Occupational Safety and Health
5   Act (OSHA).  *E.g.,* 29 C.F.R. § 1910.178-1910.184 ("Materials Handling and Storage"
6   requirements for, *inter alia*, "powered industrial trucks," "crawler locomotive and truck
7   cranes," and "helicopters"); *see also Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d
8   1113, 1115 (9th Cir. 1985) (OSHA is "is a statute of general applicability").  Recognizing
9   the different needs (and emission-reduction capabilities) of different types of vehicles
10  does not "discriminate against railroads" (or any other type of vehicle).  *Adrian &*
11  *Blissfield R. Co. v. Village of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008).  Categorical
12  ICCTA preemption does not apply.

13          **C.    Plaintiffs Have Not Identified a Remedy to Which They Would Be**
14                  **Entitled Even If They Could Prevail**

15          It is Plaintiffs' burden to identify "what *specific* relief" they would be entitled to in the
16  event they prevailed on their remaining, as-applied ICCTA claims.  *Physicians Surgery*
17  *Ctr. of Chandler v. Cigna Healthcare Inc.*, 550 F. Supp. 3d 799, 812 (D. Ariz. 2021)
18  (emphasis added); *see also Soriano v. Countrywide Home Loans, Inc.*, No. 09-CV-
19  02415-LHK, 2011 WL 13073307, at *2 (N.D. Cal. May 10, 2011) ("It is Plaintiff's burden
20  to identify to what restitution or injunctive relief he is entitled as a remedy for the alleged
21  violation.").  Plaintiffs have not met that burden here, and there is no reason to proceed
22  to summary judgment without an identified, available, and administrable remedy.

23          Plaintiffs seek a declaration that "the Regulation" is "unlawful," and an injunction
24  preventing enforcement "against Plaintiffs' members."  Pl. MSJ 25:22-23.  Plaintiffs are
25  not entitled to facial declaratory relief because not all locomotives operating in California
26  fall within ICCTA's preemptive scope.  MTD Order 17:19-22.  And because some of
27  Plaintiffs' members or their locomotives fall outside that scope, *see supra* 9:23-11:2;
28  Plaintiffs are not entitled to the injunctive remedy they seek.  *Oracle USA, Inc. v. Rimini*

33

1   *St., Inc.*, 81 F.4th 843, 857 (9th Cir. 2023) (rejecting injunction reaching conduct that was

2   not unlawful).[21]

3       Plaintiffs have thus far failed to identify the "subset of … applications" they claim

4   are preempted by ICCTA.  *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011).

5   In other words, "Plaintiffs have not made a good faith attempt to distinguish between

6   covered and uncovered [locomotives]."  *SocialCom, Inc. v. Arch Ins. Co.*, No. 2:20-CV-

7   04056-SB-AGR, 2021 WL 10417393, at *4 (C.D. Cal. Nov. 4, 2021).  And contrary to

8   Plaintiffs' suggestion, ICCTA preemption does not attach to a given railroad for all

9   purposes.  Rather, ICCTA preemption may apply to *some* of a railroad's activities or

10  locomotives, but not to others.  *See supra*  9:12-17.  And whether or not ICCTA

11  preemption applies is a fact-intensive inquiry.  *See also All Aboard Fla. F Operations*

12  *LLC & All Aboard Fla. F Stations,* No. FD 35680, 2012 WL 6659923, at *3 (Dec. 21,

13  2012).  And at least some of Plaintiffs' members with operations in California provide

14  some rail transportation that is outside that scope. *See supra* 9:23-11:2.

15      The information necessary to craft an appropriate and administrable remedy here –

16  should Plaintiffs prevail on any claims—is in the hands of Plaintiffs' members.  To the

17  extent Plaintiffs have not identified an available and administrable remedy because they

18  cannot access that information, they lack standing.  *Rocky Mountain Farmers Union v.*

19  *Corey*, 913 F.3d 940, 950 (9th Cir. 2019).[22]  In any event, this Court should not rush to

20  judgment—while interfering with EPA's ongoing proceeding—where Plaintiffs have not

21  identified a remedy to which they would be lawfully entitled.  To the extent the Court is

22  inclined to do so, Defendants respectfully request it defer and grant their Rule 56(d)

23  motion on this remedial issue.

24

25

26      [21] Underscoring the point, Plaintiffs have not identified which railroads operating in
California are "members."  SDF ¶ 20-23.

27      [22] For example, Plaintiffs' declarants claim that some of their locomotives provide
transport as part of the interstate rail network, *e.g.*, ECF No. 29-9 ¶ 2, but fail to establish

28  that they provide *no* transportation *outside* ICCTA's preemptive scope.

**VI.    SHOULD THE COURT CONCLUDE THAT ANY PART OF THE REGULATION IS INVALID, DEFENDANTS REQUEST THE OPPORTUNITY TO ADDRESS SEVERABILITY**

In the event the Court concludes that one or more parts of the Regulation are invalid, Defendants request the opportunity to submit supplemental briefing on the severability of that part or parts.  "[C]ourts … should avoid nullifying an entire statute [or regulation] when only a portion is . . . invalid."  *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 573-74 (9th Cir. 2014).  "The need for deference and restraint in severing a state or local enactment is all the more acute because of [the federal courts'] respect for federalism and local control."  *Id.* at 574.  In assessing severability, this Court is "bound by state statutes and state court opinions."  *Project Veritas v. Schmidt*, 72 F.4th 1043, 1063 (9th Cir. 2023).  "In California, courts 'look first to any severability clause,'" which creates "'a presumption in favor of severance.'"  *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir. 2015) (en banc) (quoting *Cal. Redev. Ass'n v. Matosantos*, 53 Cal. 4th 231, 270 (2011)).  The Regulation has such a severability clause.  Cal. Code Regs., tit. 13, § 2478.17(a).  Defendants would show the resulting presumption cannot be overcome for any of the challenged provisions.  However, Defendants cannot make a provision-by-provision showing here.  They therefore respectfully submit that issues of severability be briefed only if and when the Court has issued an opinion concluding that specific provisions are unlawful.

## CONCLUSION

Defendants respectfully request the Court grant Defendants summary judgment on all claims against the Idling Requirements and stay the remainder of this litigation under the primary jurisdiction doctrine.  In the alternative, Defendants respectfully request the Court grant Defendants summary judgment on all dormant Commerce Clause claims and deny Plaintiffs' motion on all claims.

| | |
|---|---|
| 1 | Dated:  March 5, 2024 |

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
NATALIE E. COLLINS
MICHAEL S. DORSI
KATHERINE GAUMOND
MICAELA M. HARMS
DYLAN K. JOHNSON
Deputy Attorneys General


*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Defendants*

OK2023401270
91741698.docx

Memo in Supp. of Defendants' Cross-MSJ, Mot. for Stay, and Opp. to Pl. MSJ (2:23-cv-01154-DJC-JDP)