UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS and AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION, | No. 2:23-cv-01154-DJC-JDP |
| Plaintiffs, | ORDER |
| v. | |
| LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board; STEVEN S. CLIFF, in his official capacity as Executive Officer of the California Air Resources Board; and ROB BONTA, in his official capacity as Attorney General of the State of California, | |
| Defendants, | |
| and | |
| EAST YARD COMMUNITIES FOR ENVIRONMENTAL JUSTICE, PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, and SIERRA CLUB, | |
| Defendant-Intervenors. | |

1

1    Plaintiffs, two associations of railroads, seek to enjoin a sweeping emissions

2 regulation California recently adopted for railroads operating within California.  This

3 regulation falls within overlapping federal preemptive schemes: the Interstate

4 Commerce Commission Termination Act ("ICCTA") and the Clean Air Act ("CAA").

5 Congress maintains primary authority to regulate the railroad industry under the

6 ICCTA, which broadly preempts state regulatory authority over railroad operations.

7 Congress also maintains authority to regulate railroad emissions under the CAA,

8 which establishes a comprehensive program for controlling and improving the

9 nation's air quality through both state and federal regulation.  As is relevant here,

10 Section 209 of the CAA[1] preempts state regulation of emissions for new locomotives.

11 However, Section 209 also preserves a role for California to regulate emissions for

12 non-new locomotives subject to authorization by the Environmental Protection

13 Agency ("EPA").  Emissions regulations for non-new locomotives are preempted until

14 California receives such authorization.

15    Plaintiffs have filed a Motion for Summary Judgment (ECF No. 29) seeking a

16 ruling that California's regulation is preempted by the ICCTA.  California has

17 submitted their regulation to the EPA for authorization under Section 209, but the EPA

18 has not yet ruled on that authorization request.  The question before the Court is

19 whether the Court should stay ruling on this Motion until the EPA has acted under the

20 primary jurisdiction doctrine.

21    Having considered the Parties' briefing and arguments, the Court finds that a

22 stay is warranted.  California has not previously sought authorization from the EPA to

23 regulate emissions for non-new locomotives.  Thus, this is the first time the EPA will

24 consider both which parts of the regulation require its authorization under Section

25 209,[2] and, if authorization is required, whether to grant such authorization.  This

26 _____

27 [1] 42 U.S.C. § 7543.
[2] As explained in further detail below, the EPA must authorize emissions standards, requirements, and accompanying enforcement procedures for non-new locomotives, but need not authorize in-use

28 requirements.

1   decision by the EPA will greatly inform the Court's ruling on Plaintiffs' Motion.  If the

2   EPA denies authorization as to any part of the regulation that requires approval, then

3   those parts will be preempted by the CAA, and the Court need not consider whether

4   they are also preempted by the ICCTA.  However, if the EPA grants authorization as to

5   any part of the regulation that requires approval, then the Court will need to

6   harmonize that authorization under the CAA with the ICCTA to determine if such

7   approval shields those parts of the regulation from ICCTA preemption.  Given the

8   uncertainty both as to the scope of EPA authorization required, as well as the

9   likelihood of authorization, the Court finds that a stay is required so the Court may

10  have the benefit of the EPA's decision before proceeding further.

11      While the Court is cognizant that imposing this stay may result in some

12  prejudice to Plaintiffs, the Court finds that ruling on Plaintiffs' Motion now would be

13  premature and would risk disrupting the regulatory scheme that Congress has put in

14  place for regulating locomotives and their emissions.  Accordingly, the Court will

15  STAY this matter pending a ruling on California's Section 209 authorization request.

16                          **BACKGROUND**

17  **I.      Regulation of Locomotive Emissions under the CAA**

18      Congress enacted the CAA, 42 U.S.C. § 7401, *et seq.*, in 1963 "to protect and

19  enhance the quality of the Nation's air resources so as to promote the public health

20  and welfare and the productive capacity of its population."  *Id.* § 7401(b)(1).

21  Recognizing that the law was "work[ing] poorly," S. Rep. No. 101-228, at 128 (1989),

22  Congress passed the Clean Air Act Amendments of 1990, creating an

23  "aggressive regime of new control requirements" to address air pollution problems.

24  *Blue Ridge Env't Def. League v. Pruitt*, 261 F. Supp. 3d 53, 56 (D.D.C. 2017) (quoting

25  *Cal. Cmtys. Against Toxics v. Pruitt*, 241 F. Supp. 3d 199, 200 (D.D.C. 2017)).

26      "[D]esigned to safeguard our precious air resources," *N.Y. Pub. Int. Rsch. Grp. v.*

27  *Whitman*, 321 F.3d 316, 319 (2d Cir. 2003) (quoting *Connecticut v. EPA*, 696 F.2d 147,

28  151 (2d Cir. 1982)), this statutory scheme "regulates pollution-generating emissions

1  from both stationary sources, such as factories and powerplants, and moving sources,

2  such as cars, trucks, and aircrafts," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308

3  (2014).  "It is an intricate regulatory regime intended to 'protect and enhance the

4  quality of the Nation's air resources . . . .'"  *N.Y. Pub. Int. Rsch. Grp.*, 321 F.3d at 319–20

5  (quoting 42 U.S.C. § 7401(b)(1)).  Consistent with that mandate, the EPA was

6  established in 1970 to implement programs to regulate pollution from both mobile

7  and stationary sources under the CAA and other related statutes.  *See Friends of the*

8  *Earth v. Carey*, 535 F.2d 165, 168-69 (2d Cir. 1976).

9        Under the CAA, Congress has expressly preempted the states from regulating

10  emissions standards for "new" non-road vehicles and engines, instead deciding such

11  regulation falls solely within the power of the EPA.  42 U.S.C. § 7543(e)(1).  However,

12  states, or more specifically, California,[3] may enact "standards [or] other requirements"

13  and "accompanying enforcement procedures" for non-new non-road vehicles such as

14  locomotives.[4]  *Id.* § 7543(e)(2)(A).  Such standards, requirements, and accompanying

15  enforcement procedures are preempted, and thus unenforceable, unless and until the

16  EPA reviews California's proposed regulation and grants authorization.  *Id.*; *see also*

17  *Engine Mfrs. Ass'n v. EPA ("EMA")*, 88 F.3d 1075, 1087–93 (D.C. Cir. 1996) (rejecting

18  interpretation limiting preemption to new non-road vehicles).  However, states may

19  regulate "in-use requirements"–e.g., limits on the mode or use of non-road vehicles–

20  without the EPA's approval.  *Id.* at 1094 (upholding "EPA's interpretation that § 213(d)

21  [(42 U.S.C. § 7547(d)] incorporates into the nonroad regime at least the reservation of

22  the states' right to impose in-use regulations found in § 209(d)"); *id.* at 1082

23  (describing these regulations).

---

24  [3] While all states may adopt emissions standards, requirements, and accompanying enforcement
procedures for non-new non-road vehicles under 42 U.S.C. § 7543(e)(2), any such regulation must be

25  proposed by California in the first instance and be authorized by the EPA.  *Id*.  Other states may adopt
such regulations only to the extent "such standards and implementation and enforcement are identical,

26  for the period concerned, to the California standards authorized by the Administrator under
subparagraph (A) . . . ."  *Id.* § 7543(e)(2)(B)(i).

27  [4] Locomotives cease to be "new" when the earlier of two events occurs: (1) the locomotive's equitable
or legal title is transferred to an ultimate purchaser, or (2) the locomotive is placed into service (or back

28  into service if the locomotive has been remanufactured).  40 C.F.R. § 1033.901.

1    Under section 209(e)(2)(A) of the CAA ("Section 209(e)(2)(A)"), the EPA must

2    waive CAA preemption as to non-new locomotives[5] absent at least one of three

3    findings.  42 U.S.C. § 7543(e)(2)(A).  A Section 209(e)(2)(A) authorization proceeding

4    begins with a request from California that includes California's determination that its

5    locomotive "standards will be, in the aggregate, at least as protective of public health

6    and welfare as applicable Federal standards."  *Id.*  The EPA then considers California's

7    request in a public proceeding.  *Id.*; 40 C.F.R. § 1074.101(b).  The CAA provides three

8    bases for denial: "(i) the determination of California is arbitrary and capricious,

9    (ii) California does not need such California standards to meet compelling and

10    extraordinary conditions, or (iii) California standards and accompanying enforcement

11    procedures are not consistent with this section."  42 U.S.C. § 7543(e)(2)(A).  When

12    considering the third prong, the EPA considers whether the regulation falls within the

13    scope of 42 U.S.C. § 7543(e)(1), and is thus ineligible for authorization, because it

14    regulates new locomotives.  *Id.* § 7543(e)(2)(A); 88 Fed. Reg. 77,004, 77,007–08 (Nov.

15    8, 2023).  If none of the three bases for denial are established, the EPA "shall" grant

16    authorization.  *See* 42 U.S.C. § 7543(e)(2)(A).

17    Frequently, state regulations concerning emissions are ultimately submitted to

18    the EPA in a State Implementation Plan ("SIP") to meet federal air quality standards.

19    SIP submittals must provide "necessary assurances that the State . . . is not prohibited

20    by any provision of Federal . . . law from carrying out" those regulations.  42 U.S.C.

21    § 7410(a)(2)(E).  Where EPA authorization is required under federal law before a state

22    may implement an element of its SIP, states typically submit the request for

23    authorization to the EPA first, and only include the element in its SIP *after* receiving the

24    authorization from the EPA.  *See, e.g.*, 81 Fed. Reg. 39,424, 39,430 (June 16, 2016)

25    (approving SIP submission because "EPA has issued waivers or authorization under

26

27    _____

    [5] Although Section 209(e)(2)(A) applies broadly to non-new non-road vehicles, the Court will primarily
    discuss this section in relation to regulation of locomotives, and so will use locomotives interchangeably

28    with non-road vehicles throughout.

5

1  section 209 for all of the subject regulations").  Once approved, a SIP becomes federal

2  law.  *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1174 (9th Cir. 2015).

3  **II.   California's Locomotive Regulation**

4  On April 27, 2023, the California Air Resources Board ("CARB") adopted the "In-

5  Use Locomotive Regulation" ("Regulation") to set emissions standards for locomotives

6  operating in California.  (Plaintiffs' Statement of Undisputed Facts ("Pls' SUF") (ECF No.

7  51-3) ¶ 1.)  CARB submitted the final version of the Regulation to the California Office

8  of Administrative Law on September 15, 2023.  (*Id.* ¶ 2.)  The Regulation has four

9  primary components: (1) the Spending Account; (2) the In-Use Operational

10  Requirements; (3) the Idling Requirements; and (4) the Reporting and Recordkeeping

11  Requirements.  There is also an Administrative Payment Provision.

12  Spending Account (§ 2478.4[6]): By July 1, 2026, railroads must "establish a

13  Spending Account" into which they must make annual deposits "solely dedicated to

14  compliance with the Spending Account requirements."  § 2478.4(a)–(b).  The amount

15  that a railroad must deposit is calculated based on its locomotive's emissions in

16  California the previous calendar year.  § 2478.4(f).  Spending Account funds are

17  subject to purchase restrictions: they may be spent only to purchase, lease, or rent

18  clean locomotives; to convert dirtier locomotives into clean ones; to purchase, lease

19  or rent zero-emission equipment or infrastructure; or for zero-emission pilot projects

20  and demonstrations.  § 2748.4(d).

21  In-Use Operational Requirements (§ 2478.5): Beginning in 2030, any

22  locomotive that is "23 years or older," as determined by its original engine build date,

23  is banned from operating in California, unless the locomotive has not exceeded a

24  specified quantity of energy usage over its lifetime or exclusively operates in a zero-

25  emission configuration ("ZE Configuration") within California.  § 2478.5(a).  The

26  Regulation also sets dates after which all locomotives with engines built after specified

27  _____

28  [6] The Regulation is codified at Cal. Code Regs. tit. 13, §§ 2478–2478.17.  Unless otherwise noted, all citations of regulatory provisions refer to that title.

6

1   years–2030 for many locomotives and 2035 for those that haul freight long distances–

2   must operate "in a ZE Configuration at all times while in California."  § 2478.5(b)-(c).

3       Idling Requirements (§ 2478.9): The Idling Requirements, which take effect

4   immediately, regulate several aspects of a locomotive's function and maintenance.

5   The EPA has long required locomotive manufacturers to install automatic engine

6   stop/start ("AESS") devices on new locomotives that shut down the engine "after no

7   more than 30 continuous minutes of idling."  73 Fed. Reg. 25,098, 25,125 (May 6,

8   2008).  The Regulation requires operators to keep these idling devices in working

9   condition.  Specifically, the Regulation prohibits railroads from disabling an AESS

10  device unless necessary for maintenance and requires railroads to ensure the AESS

11  device is functional during locomotive operation, with an obligation to replace or

12  repair an inoperative AESS device within 30 days.  § 2478.9(b)-(c).  In addition, the

13  Regulation requires that locomotive operators "ensure an AESS equipped Locomotive

14  Engine is shut off no more than 30 minutes after the Locomotive becomes stationary"

15  (subject to narrow exceptions), § 2478.9(a), and "manually shut off" the engine "no

16  more than 30 minutes after the Locomotive becomes stationary" when an AESS device

17  is inoperative, § 2478.9(c)(2).

18      Reporting and Recordkeeping Requirements (§ 2478.11): Beginning July 1,

19  2026, locomotive operators must annually report a host of emissions information for

20  non-zero emissions locomotives, § 2478.11(b)(2), which are used to calculate

21  Spending Account deposits, § 2478.4(f); the "time, date, location, and duration of

22  each instance" an AESS-equipped locomotive "idled for longer than 30 minutes in

23  California," § 2478.11(b)(3)(A); and an itemized list of the description and location of

24  each item purchased with the Spending Account, § 2478.11(c)(6).

25      Administrative Payment Provision (§ 2478.12): The Administrative Payment

26  Provision authorizes CARB to collect an annual payment of $175 per locomotive, with

27  certain limited exceptions.  § 2478.12.  The Administrative Payment provision is due

28  with the railroads' submission of their annual emissions report.  § 2478.12.

**III.   Procedural History**

The Regulation became final in October 2023.  (Pls' SUF ¶ 3.)  On November 7, 2023, CARB submitted a Section 209(e)(2)(A) authorization request to the EPA.  (*Id.* ¶ 4.)  On February 27, 2024, the EPA issued its notice inviting public comment on California's authorization request.  89 Fed. Reg. 14,484, 14,486 (Feb. 27, 2024).  Comments were due April 22, 2024.  *Id.*  Defendants state that, while CARB has not yet submitted the Regulation itself for approval into California's SIP in light of the pending EPA approval, a commitment to promulgate a regulation like the one at-issue here was included in CARB's 2022 State Strategy for the State Implementation Plan, which was submitted for the EPA's approval on February 22, 2023.  (Dorsi Decl., Ex. 16 (ECF No. 52-16), at 1, 34; Dorsi Decl., Ex. 17 (ECF No. 52-17).)

Plaintiffs, who are associations representing both freight and passenger railroads,[7] filed their Amended Complaint on October 13, 2023, alleging: (1) the ICCTA preempts the Regulation in its entirety; (2) the CAA preempts the Spending Account and In-Use Operational Requirements; (3) the Locomotive Inspection Act ("LIA") preempts the Idling Requirements; and (4) the Regulation violates the Dormant Commerce Clause.  (Am. Compl. (ECF No. 18).)

On February 16, 2024, this Court dismissed all claims against the Spending Account and In-Use Operational Requirements (which included dismissal of Plaintiffs' CAA claim in its entirety) (Mot. Dismiss Order ("MTD Order") (ECF No. 48) at 11); all claims against "the locomotive equipment aspects" of the Idling Requirements (which included dismissal of Plaintiffs' LIA claim in its entirety) (*id.* at 14); and Plaintiffs' facial challenges under the ICCTA and the Dormant Commerce Clause (*id.* at 17, 19).  The Court did not dismiss Plaintiffs' as-applied challenges under the ICCTA and the Dormant Commerce Clause as to certain Idling Requirements–those that are "idling

---

[7] Plaintiff AAR's members include some of the largest (Class I) and some of the smallest (Class III) railroads in the country.  (Pls' SUF ¶¶ 5–8.)  Plaintiff ASLRRA represents the interests of hundreds of Class II and Class III railroads.  (*Id.* ¶¶ 19–22.)  Both Plaintiffs have members who own or lease and operate locomotives within California.  (*Id.* ¶¶ 7, 20.)

1    limits" (*id.* at 14)–or as to the Reporting and Recordkeeping or Administrative

2    Payment Requirements (*id.* at 19–22).

3          Plaintiffs moved for summary judgment on November 24, 2023, seeking

4    judgment as to all four causes of action in their Amended Complaint.  (Mot. Summ. J.

5    ("MSJ") (ECF No. 29).)  Given the Court's subsequent dismissal of Plaintiffs' CAA and

6    LIA claims, Plaintiffs' motion is moot as to those claims.  In addition, Plaintiffs have

7    withdrawn their motion for summary judgment as to their Dormant Commerce Clause

8    claim.  (MSJ Reply and Opp'n Cross-MSJ (ECF No. 58) at 2 n.2.)  Accordingly, Plaintiffs

9    seek summary judgment on their ICCTA claim only.

10         Defendants Liane M. Randolph, in her official capacity as Chair of CARB, Steven

11   S. Cliff, in his official capacity as Executive Officer of CARB, and Rob Bonta, in his

12   official capacity as Attorney General of the State of California, opposed Plaintiffs'

13   Motion on March 5, 2024.  (Defs.' Opp'n and Cross-MSJ (ECF No. 51).)  Defendants

14   argued Plaintiffs lacked standing to challenge the Idling Requirements and sought

15   dismissal or stay of Plaintiffs' ICCTA and Dormant Commerce Clause claims under the

16   primary jurisdiction doctrine.  (*Id.*)  Defendants also cross-moved for summary

17   judgment as to Plaintiffs' Dormant Commerce Clause claim.  (*Id.*)  Finally, Defendants

18   moved to deny or defer summary judgment under Federal Rule of Civil Procedure

19   56(d), arguing they required discovery on (1) Plaintiffs' standing to challenge the

20   Idling Requirements, (2) Plaintiffs' basis for their Dormant Commerce Clause claim,

21   and (3) the scope of relief for Plaintiffs' ICCTA claim.  (Rule 56(d) Mot. (ECF No. 53).)

22         Defendant-Intervenors East Yard Communities for Environmental Justice,

23   People's Collective for Environmental Justice, and Sierra Club separately opposed

24   Plaintiffs' Motion on March 5, 2024.  (Def.-Intervenors' Opp'n (ECF No. 49).)

25         The Court held a hearing on April 25, 2024, with Brian Burgess and Hayes Hyde

26   appearing for Plaintiffs, M. Elaine Meckenstock and Michael Dorsi appearing for

27   Defendants, and Yasmine Agelidis appearing for Defendant-Intervenors.  The matter

28   was submitted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DISCUSSION**

**I.     Standing to Challenge the Idling Requirements**

The Idling Requirements regulate both maintenance of locomotive equipment and operation of locomotives.  (MTD Order at 12.)  This Court previously held Plaintiffs lacked standing to challenge portions of the Idling Requirements related to equipment maintenance because Plaintiffs failed to allege any pocketbook injury as to those portions of the Regulation–i.e., "what operational and training costs their members already incur to maintain AESS equipment, and what additional costs they will incur comply with the Regulation." (*Id.* at 14.)  However, the Court found Plaintiffs' allegations supported standing as to those portions of the Idling Requirements related to locomotive operation because Defendants did not challenge Plaintiffs' standing as to those requirements and Plaintiffs alleged the Regulation imposed new idling limits on their members that would require them to incur additional operational and training costs to comply with those limits.  (*Id.* at 14–15.)

Defendants now challenge Plaintiffs' standing as to the remainder of the Idling Requirements.  (Defs.' Opp'n and Cross-MSJ at 12.)  Plaintiffs allege their members will incur supervision costs and personnel training costs to comply with the new idling limits.  (*Id.*)  However, Defendants argue Plaintiffs' declarations alleging this pocketbook injury are vague and insufficient to establish standing at summary judgment as they imply injuries-in-fact via training and supervision costs without establishing those costs.  (*Id.*; Rule 56(d) Mot. at 2–3.)  Additionally, Defendants argue the EPA's regulations already impose idling limits on operators, and that railroads have voluntarily imposed idling limits on their own locomotives for some time.  (Defs.' Opp'n and Cross-MSJ at 12.)  Thus, Defendants conclude Plaintiffs have failed to establish the idling limits would require their members to change their training and supervision practices.  (*Id.* at 12–13.)  To the extent the Court credits Plaintiffs' declarations, Defendants ask that this Court stay any ruling on summary judgment so that they can conduct discovery to probe the declarations.  (Rule 56(d) Mot. at 3, 5–8.)

1    The Court finds that Plaintiffs have adequately established standing to

2    challenge sections 2478.9(c) and (c)(2) of the Idling Requirements, which require

3    locomotive operators to ensure AESS devices are functional at all times during the

4    locomotive's operation and manually shutdown locomotive engines after 30 minutes if

5    an AESS device is malfunctioning.  Courts routinely recognize economic injury

6    resulting from governmental action as sufficient to satisfy the Article III injury-in-fact-

7    requirement.  *See Clark v. City of Lakewood*, 259 F.3d 996, 1007 (9th Cir. 2001).  Here,

8    Plaintiffs submitted numerous declarations from their members which establish

9    (1) these members did not previously train their employees to monitor AESS devices

10   to ensure they were working correctly and would shut off engines after 30 minutes;

11   (2) the members did not previously train or instruct their employees to manually

12   shutdown engines after 30 minutes of idling; (3) if the Regulation was not passed, they

13   would not change these practices; and (4) now the Regulation has been passed, they

14   must expend funds to train employees to perform manual shutdowns after 30 minutes

15   of idling.  (*See* BNSF Railway Decl. (ECF No. 58-5) ¶¶ 3, 6–8; Arizona & California

16   Railroad Company Decl. (ECF No. 58-7) ¶¶ 3, 5–7; San Diego & Imperial Valley

17   Railroad Company, Inc. Decl. (ECF No. 58-8) ¶¶ 3, 5–7; San Joaquin Valley Railroad

18   Co. Decl. (ECF No. 58-9) ¶¶ 3, 5–7.)  At summary judgment, declarations from

19   members can be sufficient to establish an organization's Article III standing.  *See Cent.*

20   *Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*, 30 F.4th 929, 937 (9th Cir. 2022).  While

21   the EPA requires locomotives to be equipped with AESS devices that shut off engines

22   after 30 minutes and prohibits locomotive operators from tampering with or otherwise

23   circumventing use of the devices,[8] this does not impose an affirmative obligation on

24   operators to monitor and manually shut-off engines after 30 minutes.  Thus, the Court

25   [8] Specifically, the EPA's idling-control standard requires all new locomotives to be equipped with AESS
     devices that will "shut off the main locomotive engine(s) after 30 minutes of idling (or less)," unless one
26   of four conditions is present.  40 C.F.R. § 1033.115(g).  It is "a violation of 40 CFR § 1068.101(b)(1) to
     circumvent" this idling standard.  *Id.*  Locomotive operators may not tamper with the AESS devices.  40
27   C.F.R. § 1068.101(b)(1); *see also id.* § 1033.15(b).  Tampering includes "remov[ing] or render[ing]
     inoperative any device," as well as operating the locomotive in a way "that renders the emission control
28   system inoperative."  *Id.* § 1068.101(b)(1).

1  finds that Plaintiffs' evidence is sufficient to establish standing as to sections 2478.9(c)

2  and (c)(2).

3        As to the other portions of the Idling Requirements, the Court finds that

4  Plaintiffs have not established standing.  Section 2478.9(a) requires locomotive

5  operators to ensure an AESS-equipped engine is shut off no more than 30 minutes

6  after the locomotive becomes stationary subject to four exceptions: (1) to prevent

7  engine damage; (2) to maintain air pressure for brakes or starter system, or to

8  recharge the locomotive's battery; (3) to perform necessary maintenance; or (4) to

9  otherwise comply with federal or state regulations.  This is already a requirement

10  imposed under federal law.  Specifically, the EPA's idling-control standard requires all

11  "new" locomotives—whether brand new or remanufactured—to be equipped with AESS

12  devices that will "shut off the main locomotive engine(s) after 30 minutes of idling (or

13  less)," unless one of four conditions is present.  40 C.F.R. § 1033.115(g).  The four

14  conditions listed in 40 C.F.R. § 1033.115(g)(2) map those listed in section 2478.9(a).  It

15  is "a violation of 40 CFR § 1068.101(b)(1) to circumvent" the EPA's idling standard, *id*.

16  § 1033.115(g), and operators are already prohibited from "us[ing] the AESS system in

17  a manner other than that for which the system was designed," 73 Fed. Reg. 37,096,

18  37,123 (June 30, 2008).  Accordingly, Plaintiffs have not shown their members will

19  need to expend additional resources training their personnel to comply with

20  section 2478.9(a), or that they intend to violation this section, which would constitute a

21  violation of federal law.

22        The Parties agree that all claims against section 2478.9(b), which prohibits

23  tampering with AESS devices, were dismissed in the Court's previous order dismissing

24  Plaintiffs' LIA claim as Plaintiffs had not established standing to challenge the

25  locomotive equipment aspect of the Idling Requirements.  (*See* MSJ Reply and Opp'n

26  Cross-MSJ at 8 n.6; Reply Defs.' Cross-MSJ (ECF No. 64) at 3.)  Section 2478.9(c)(1),

27  which requires malfunctioning AESS devices to be repaired within 30 days, and which

28  Plaintiffs alleged was preempted by the LIA, was dismissed by the Court's previous

order for the same reason.[9]  (*See* MTD Order at 13–15.)  Further, Plaintiffs' declarations

provide insufficient information to establish injury stemming from section 2478.9(d),

which provides locomotive operators with an alternative to manually shutting off a

locomotive after 30 minutes by plugging into wayside power.[10]  Finally, Plaintiffs state

they "do not challenge, or claim injury from, Section 2478.9(e) . . . ."  (MSJ Reply and

Opp'n Cross-MSJ at 8 n.6.)

      Accordingly, the Court holds that Plaintiffs have standing to challenge

sections 2478.9(c) and (c)(2) of the Idling Requirements only.

## II.  Primary Jurisdiction Doctrine

      In their prior Motion to Dismiss, Defendants argued the primary jurisdiction

doctrine compelled the stay or dismissal of Plaintiffs' action in its entirety.  (Mot.

Dismiss (ECF No. 20) at 8.)  Defendants reasoned the EPA's determination as to

whether the Spending Account and In-Use Operational Requirements fell within the

scope of state regulation expressly anticipated by Section 209(e)(2)(A) was a question

of first impression that Congress had committed to the EPA, requiring dismissal of

Plaintiffs' CAA preemption claim.  (*Id.* at 8–9.)  Defendants also argued that dismissal

of Plaintiffs' CAA preemption claim under the primary jurisdiction doctrine

necessitated dismissal of Plaintiffs' LIA, ICCTA, and Dormant Commerce Clause claims

as well because any eventual approval by EPA under the CAA would need to be

harmonized with preemption under the LIA and ICCTA, as well as the Dormant

Commerce Clause.  (*Id.* at 9.)

---

[9] The Court concurs with Defendants that Plaintiffs' newly-alleged basis for injury as to section 2478.9(c)(1), costs from locomotives taken out-of-service prior to a periodic inspection and out-of-cycle repairs (*see, e.g.*, BNSF Railway Decl. ¶ 8), were not previously asserted in Plaintiffs' Amended Complaint, in Plaintiffs' opposition to Defendants' Motion to Dismiss, or Plaintiffs' initial summary judgment declarations, and will therefore not be considered by the Court.  *See City of Los Angeles v. Bank of Am. Corp.*, No. CV 13-9046, 2015 WL 4880511, at *5 (C.D. Cal. May 11, 2015); *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010).

[10] Only BNSF Railway addresses wayside power in their declaration, but they merely state they do not currently use wayside power as an alternative to idling.  (*See* BNSF Railway Decl. ¶ 4.)  They do not specify they will incur additional costs to change their policies or train their personnel to use wayside power.

1    This Court previously declined to apply the primary jurisdiction doctrine.  (MTD

2    Order at 9 n.6.)  While the Court agreed that this "would appear to be a paradigmatic

3    case for application of the primary jurisdiction doctrine over the CAA claims," the

4    Court had already dismissed Plaintiffs' CAA preemption claim for lack of ripeness

5    because Defendants admitted they could not enforce the Spending Account and In-

6    Use Operational Requirements absent EPA approval.  (*Id.*)  However, Defendants did

7    not argue the Idling Requirements, Reporting and Recordkeeping Requirements, or

8    Administrative Payment Provision required EPA authorization to be enforced.  (*Id.*)

9    Accordingly, the Court did not see how resolution of claims related to those

10   provisions fell within the special competence of EPA, or would need to be harmonized

11   with EPA approval, and declined to apply the primary jurisdiction doctrine as to the

12   LIA, ICCTA, and Dormant Commerce Clause claims.  (*Id.*)

13   Defendants urge the Court to reconsider its holding as to the Idling

14   Requirements, Reporting and Recordkeeping Requirements, and Administrative

15   Payment Provision.  Defendants explain that two aspects of the EPA's special

16   competence require a stay.  (Defs.' Opp'n and Cross-MSJ at 16.)  First, as this Court

17   has previously recognized, the EPA must determine whether California is

18   impermissibly regulating new locomotives before acting on the pending Section

19   209(e)(2)(A) authorization request.  (*See* MTD Order at 10–11.)  This is a question of

20   first impression, as California has never before sought authorization to regulate

21   emissions for locomotives.  The EPA's decision will determine which parts of the

22   Regulation remain preempted under the CAA, as the EPA may decline to authorize

23   some or all of the Regulation.  If any portion of the Regulation is preempted under the

24   CAA, the Court will not need to consider whether those portions of the Regulation are

25   also preempted under the ICCTA or violate the Dormant Commerce Clause.

26   Additionally, as Defendants now argue, the EPA must also decide which

27   portions of the Regulation require EPA authorization in the first place–in other words,

28   whether they are "standards [or] other requirements"; "accompanying enforcement

14

procedures"; or "in-use requirements."  (Defs.' Opp'n and Cross-MSJ at 16.)

Defendants argue that there is no clear line between "standards and other

requirements" and "accompanying enforcement procedures" for non-new

locomotives, which require EPA authorization, and "in-use requirements," which do

not. (*Id.* at 17;) *see, e.g.*, 88 Fed. Reg. 72,461, 72,475 (Oct. 20, 2023) ("[R]equirements

[that] are not mobile source standards or not associated compliance or enforcement

mechanisms . . . would not require an authorization.").  Thus, Defendants argue it is

not clear whether the Idling Requirements, Reporting and Recordkeeping

Requirements, and Administrative Payment Provision require EPA authorization and

are thus impliedly preempted under the CAA.  If those sections require EPA

authorization, and the EPA denies authorization, then those sections will remain

preempted under the CAA.  However, if the EPA authorizes any of those provisions

under the CAA, then Court will need to harmonize that authorization with the ICCTA

and the Dormant Commerce Clause.  (Defs.' Opp'n and Cross-MSJ at 18.)

      With all that in mind, Defendants urge the Court to stay or dismiss this action

until the EPA reviews the Regulation.  Defendants argue that, until the Court knows

whether and, if so, to what degree, the EPA grants Section 209(e)(2)(A) authorization,

the Court will not know what analysis it should apply to which provisions of the

Regulation. (*Id.* at 19.)  Defendants state they will not take enforcement action until

the EPA acts on CARB's pending authorization request, although they "reserve the

right to enforce any provisions for any time period ultimately authorized by EPA, as

well as any provisions for which EPA concludes no authorization is necessary and for

which the period for enforcement has not run." (*Id.* at 16 n.8.)

      Having considered Defendants' further briefing, the Court agrees that the

primary jurisdiction doctrine compels the Court to stay consideration of Plaintiffs'

ICCTA and Dormant Commerce Clause claims pending the EPA's review of the

Regulation.  The primary jurisdiction doctrine allows courts to stay proceedings or to

dismiss a complaint without prejudice pending the resolution of an issue within the

special competence of an administrative agency.  *Clark v. Time Warner Cable*, 523 F.

3d 1110, 1114 (9th Cir. 2008).  A court's invocation of the doctrine does not indicate

that it lacks jurisdiction.  *Id.*  Rather, the doctrine is a prudential one, under which a

court determines that an otherwise cognizable claim implicates technical and policy

questions that should be addressed in the first instance by the agency with regulatory

authority over the relevant industry rather than by the judicial branch.  *Id.*  However,

the doctrine is intended to be used only if a claim "requires resolution of an issue of

first impression, or of a particularly complicated issue that Congress has committed to

a regulatory agency," and if "protection of the integrity of a regulatory scheme dictates

preliminary resort to the agency which administers the scheme."  *Id.* (*quoting Brown v.

MCI Worldcom Network Servs.*, 277 F.3d 1166 (9th Cir. 2002).)  Although no fixed

formula exists for applying the doctrine, courts typically examine four factors: (1) a

need to resolve an issue that (2) has been placed by Congress within the jurisdiction

of an administrative body having regulatory authority (3) pursuant to a statute that

subjects an industry or activity to a comprehensive regulatory authority that

(4) requires expertise or uniformity in administration.  *Id.* at 1115.  Courts must also

consider whether invoking primary jurisdiction would needlessly delay the resolution

of claims, and under Ninth Circuit precedent, "efficiency is the deciding factor in

whether to invoke primary jurisdiction."  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d

753, 760 (9th Cir. 2015) (citations and quotation marks omitted).

      The Court finds that all four factors are sufficiently satisfied here.  Concerning

the first factor, there is a need to clarify which portions of the Regulation are currently

preempted by the CAA.  Section 209(e)(2)(A) of the CAA expressly permits California

to "adopt and enforce standards and other requirements relating to the control of

emissions" for non-new locomotives subject to the EPA's authorization.  It is

undisputed that the purpose of the Regulation is to reduce emissions from

locomotives operating in California.  Most, or all, provisions of the Regulation may

qualify as "standards and other requirements" or "accompanying enforcement

procedures" under Section 209(e)(2) which cannot be enforced absent EPA approval. (*See* Defs.' Opp'n and Cross-MSJ at 17–18.)  However, other provisions of the Regulation may qualify as "in-use requirements" that do not require EPA approval. (*Id.*)  For the portions of the Regulation that require EPA authorization, if authorization is denied, those portions are preempted by the CAA and unenforceable.  The Court will not need to consider whether those portions are also preempted by the ICCTA or violate the Dormant Commerce Clause.  For portions that are authorized by the EPA, the Court will need to harmonize that authorization with preemption under the ICCTA and the Dormant Commerce Clause.  In sum, the authorization decision by the EPA will greatly inform what decisions the Court must make moving forward.

California has not previously sought the EPA's authorization to regulate emissions for non-new locomotives under Section 209(e)(2)(A), so there is little guidance as to which portions of the Regulation may require EPA approval.  The EPA has previously considered numerous authorization requests in the motor vehicle context under 42 U.S.C. § 7543(b).  However, the CAA requires EPA authorization for more categories of non-road vehicle regulation than motor vehicle regulation. Specifically, for new non-road vehicles, such as locomotives, 42 U.S.C. § 7543 preempts "other requirements," in addition to the "standards" and "accompanying enforcement procedures" which are preempted for new motor vehicles.  *Compare id.* § 7543(e)(2)(A) *with id.* § 7543(b)(1).  And 42 U.S.C. § 7543 also impliedly preempts "standards," "other requirements," and "enforcement procedures" for non-new non-road vehicles, whereas preemption in the motor vehicle context extends only to new vehicles.  *Compare id.* § 7543(e) *with id.* § 7543(a).  Thus, the scope of preemption is far broader and more ambiguous in the non-road vehicle context than the motor vehicle context.

In addition, there is reason to believe the idling limits imposed as part of the Idling Requirements, Reporting and Recordkeeping Requirements, and Administrative Payment Provision may require EPA authorization as "standards [or] other

1    requirements" and "accompanying enforcement procedures."  As the Supreme Court

2    has previously explained, "standards" in the new vehicle context include specifications

3    of "emission-control technology with which [vehicles] must be equipped."  *Engine*

4    *Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004).  The EPA

5    requires all new locomotives to be equipped with AESS devices.  The idling limits set

6    forth in sections 2478.9(c) and (c)(2) require locomotive operators to ensure AESS

7    devices are functional at all times during the locomotive's operation and manually

8    shutdown locomotive engines after 30 minutes if an AESS device is malfunctioning.

9    The EPA could well find that these idling limits are therefore "other requirements" as

10   they establish requirements for the use of AESS devices.

11          Additionally, the EPA has previously authorized certain reporting and

12   recordkeeping requirements—treating them as "accompanying enforcement

13   procedures"—where they ensured other authorized requirements could be "effectively

14   implemented and enforced."  *See, e.g.*, 82 Fed. Reg. 6,525, 6,531 (Jan. 19, 2017)

15   (diesel-fueled transport refrigeration units); *see also, e.g.*, 88 Fed. Reg. 24,411, 24,414

16   (Apr. 20, 2023) (large-spark ignition engines).  The EPA might do the same here if they

17   find the Reporting and Recordkeeping Requirements and Administrative Payment

18   Provision similarly enable implementation and enforcement of the Regulation's more

19   substantive provisions.  However, these theories are untested in the railroad context.

20   Thus, which portions of the Regulation will require EPA authorization under Section

21   209(e)(2)(A) is a question of first impression.

22          The second and third factors are also met, as Congress has given the EPA the

23   jurisdiction to consider and grant authorizations under Section 209(e)(2)(A), as well as

24   issue regulations to implement that section.  *See* 42 U.S.C. § 7543(e).  Further, the

25   CAA subjects locomotive emissions to a comprehensive regulatory scheme by

26   delegating the authority to regulate emissions for new locomotives to the EPA, and

27   the authority to regulation emissions for non-new locomotives to California with the

28   EPA's authorization.  *See* 42 U.S.C. §§ 7547(a)(5), 7543(e)(2)(A).

Finally, the fourth factor is met because determining what aspects of the Regulation must be approved by the EPA requires both expertise and uniformity of administration.  Congress concluded that the EPA has the relevant expertise to regulate locomotive emissions when it delegated the authority to regulate new locomotive emissions, *id.* § 7547(a)(5), and delegated the authority to grant or deny California's authorization requests concerning non-new locomotives, *id.* § 7543(e)(2)(A).  Implicit in this delegation is the authority for the EPA to draw the line between regulations that require their approval, and those that do not.  Accordingly, Congress's structure allows for one uniform regulatory program applicable to locomotive emissions.

Plaintiffs argue that it is unnecessary for the Court to wait for the EPA's authorization decision because, even if the EPA grants approval of the Regulation under the CAA, that is not an authorization to displace other federal laws.  (MSJ Reply and Opp'n Cross-MSJ at 7.)  They argue that, even if the EPA authorizes the entire Regulation, the Court will still need to rule on whether the Regulation is also preempted by the ICCTA.  (*Id.*)  Thus, Plaintiffs argue the outcome is the same whether the Court acts now or later.

First, this argument ignores the possibility that the EPA may decide the Regulation in whole or in part requires its authorization but denies that authorization request.  Should this occur, the Court will not need to rule on ICCTA preemption as to those portions of the Regulation as they will be preempted by the CAA.

More importantly, however, the EPA's decision will inform the Court's analysis of whether any approved regulations are preempted by ICCTA.  The Court agrees that, if the EPA grants authorization, such authorization will not displace the ICCTA.  Rather, to the extent the CAA and the ICCTA conflict, the Court will need to harmonize them.  *See Swinomish Indian Tribal Cmty. v. BNSF Ry. Co. ("Swinomish")*, 951 F.3d 1142, 1157 (9th Cir. 2020).  The Ninth Circuit has instructed that, in order to harmonize two federal statutes, courts must first assess whether the later statute

19

displaces, or repeals, the earlier one.  *Id.* at 1153 ("When a 'case involves the interplay between two statutory schemes created by Congress for different reasons and at different times,' we typically ask whether the later statute repeals the prior one." (quoting *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1224 (11th Cir. 2014)).  Repeals by implication are disfavored; rather, Congress's intent to repeal must be clear.  *Id.* at 1156.  "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."  *Morton v. Mancari*, 417 U.S. 535, 550 (1974).  If the earlier statute is not repealed, then courts determine whether the two federal statutes conflict, i.e., whether both apply to the challenged action.  *See, e.g., BNSF Ry. Co. v. California Dep't of Tax & Fee Admin. ("BNSF")*, 904 F.3d 755, 767–68 (9th Cir. 2018) (holding there was no conflict between 49 U.S.C. § 5125(f)(1) of the Hazardous Materials Transportation Act ("HMTA") and the ICCTA because the fees at issue were not "fair" and thus did not fall within the scope of section 5125(f)(1)).  If two federal statutes conflict, then then courts must strive to give "effect to both laws if possible."  *Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist. ("AAR")*, 622 F.3d 1094, 1097 (2010); *see also Mancari*, 417 U.S. at 551 ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

It is clear that the ICCTA, although a more recent law, has not repealed the CAA.  "Despite the broad 'preemption' language of § 10501(b) of the ICCTA, and consistent with the jurisprudence on 'implicit repeals,' courts and the STB have routinely held that the ICCTA does not repeal particular federal statutes and the remedies provided thereunder."  *Swinomish*, 951 F.3d at 1157.  The principal example of federal laws that should be harmonized with the ICCTA are environmental laws.  *BNSF Ry. Co. v. Clark Cty.*, 11 F.4th 961, 966 (9th Cir. 2021).  Indeed, "nothing in section 10501(b) is intended to interfere with the role of state and local agencies in

20

1  implementing Federal environmental statutes, such as the Clean Air Act, the CWA,

2  and the SDWA." *Joint Petition for Declaratory Ord. – Boston & Maine Corp. & Town of*

3  *Ayer, MA ("Town of Ayer")*, 5 S.T.B. 500, 2001 WL 458685, at *5 (S.T.B. Apr. 30, 2001).

4  This system preserves a role for state and local agencies in the environmental

5  regulation of railroads.  *AAR*, 622 F.3d at 1098.

6        However, the CAA and the ICCTA may conflict here.  Section 209(e)(2)(A)

7  permits California, with the approval of the EPA, to regulate emissions for non-new

8  locomotives.  The Regulation, while aimed at regulating locomotive emissions,

9  touches on numerous other aspects of railroad operation and management such as

10  record-keeping, spending, and locomotive configuration.  The ICCTA, for its part,

11  broadly preempts laws affecting "transportation by rail carriers."  49 U.S.C. § 10501(b).

12  Under the ICCTA, the Surface Transportation Board ("STB") has jurisdiction over

13  transportation of rail carriers and track construction, and the remedies afforded by the

14  ICCTA are "exclusive and preempt the remedies provided under Federal or State

15  law."  *Id.*; *see AAR*, 622 F.3d at 1097 (section 10501(b) "preempt[s] a wide range of

16  state and local regulation of rail activity").  Thus, portions of the Regulation that are

17  authorized under Section 209(e)(2)(A) may also fall under the jurisdiction of the STB.

18  However, as explained above, it is unclear which portions of the Regulation require

19  EPA authorization, and whether such authorization will be granted or denied.  It is this

20  uncertainty that weighs in favor of staying this matter pending the EPA's review.

21        Plaintiffs argue that, even if the EPA authorizes the Regulation, no

22  harmonization is required because an authorization under Section 209(e)(2)(A) would

23  simply remove the preemption bar that otherwise applies under the CAA but would

24  not shield the challenged provisions from the ICCTA or Dormant Commerce Clause.

25  (MSJ Reply and Opp'n Cross-MSJ at 14.)  In support of this, Plaintiffs point to *Rocky*

26  *Mountain Farmers Union v. Corey ("Rocky Mountain")*, 730 F.3d 1070 (9th Cir. 2013), in

27  which the Ninth Circuit considered whether a fuel regulation passed by California

28  violated the Dormant Commerce Clause.  California argued that its regulation was

1   authorized under 42 U.S.C. § 7545(c)(4)(B) of the CAA, foreclosing a Dormant

2   Commerce Clause challenge. *Id.* at 1106. The Ninth Circuit rejected California's

3   argument, explaining that the "sole purpose" of section 7545(c)(4)(B) was to relieve

4   California from CAA preemption. *Id.* Thus, it did not grant California's fuel regulation

5   exemption from the Dormant Commerce Clause. *Id.*

6        The Court finds *Rocky Mountain* inapposite here. Notably, the court in *Rocky*

7   *Mountain* considered whether section 7545(c)(4)(B) exempted California's fuel

8   regulation from Dormant Commerce Clause scrutiny. "[F]or a state regulation to be

9   removed from the reach of the dormant Commerce Clause, congressional intent must

10  be unmistakably clear." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91

11  (1984). As a result, to authorize a Dormant Commerce Clause violation, Congress

12  must do more than simply authorize a state to regulate in an area; it must "affirmatively

13  contemplate otherwise invalid state legislation," *id.*, and clearly express its intent to

14  "remove federal Constitutional constraints." *Sporhase v. Nebraska ex rel. Douglas*,

15  458 U.S. 941, 960 (1982). Defendants bear the burden of "demonstrating [this] clear

16  and unambiguous intent." *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992). The

17  court in *Rocky Mountain* did not consider whether California's fuel regulation required

18  harmonization with other federal statutes, only whether it met the stringent standard

19  for exemption from Dormant Commerce Clause scrutiny. Thus, *Rocky Mountain* has

20  no bearing on the need to harmonize the CAA with the ICCTA. Further, the EPA's

21  authorization under Section 209(e)(2)(A) may well have a direct bearing on application

22  of the Dormant Commerce Clause in these proceedings.

23       Further, the Ninth Circuit has yet to address the harmonization analysis courts

24  must undertake for Section 209(e)(2)(A) of the CAA and the ICCTA. Defendants urge

25  the Court to adopt the harmonization analysis used in *BNSF*. That case involved an

26  ICCTA preemption challenge to a California law that required railroads to collect a fee

27  from shippers of hazardous materials and to remit the fees to the State under section

28  5125(f)(1) of the HMTA, which authorized states to impose fees related to

transportation of hazardous material by rail "only if the fee is fair and used for a purpose related to transporting hazardous material." 904 F.3d at 759, 763, 766. The court concluded that it "should not read the preemption provision of the ICCTA to eliminate the protection from preemption provided by § 5125(f)(1) of the HMTA," reasoning that that principles of federalism and canons of construction supported this conclusion. *Id.* at 765. First, federalism entails a presumption against the federal preemption of state rules in areas of traditional state regulation, which includes protection of residents from physical and environmental hazards. Second, where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one. And when approaching conflicting federal law, repeals by implication are disfavored, as Congress will address preexisting law when it wishes to suspect normal operations in a later statute. Third, Congress had said nothing indicating the ICCTA would repeal the ability of states to impose fees under the HMTA. Accordingly, the court concluded that "that the ICCTA and the HMTA are easily harmonized by reading § 5125(f)(1) of the HMTA to protect from preemption the fees specifically authorized in that section." *Id.* at 762.

Defendants urge that, under *BNSF*, "Section 209(e)(2)(A) can similarly be harmonized with ICCTA by concluding that the CAA protects California's EPA-authorized regulation of non-new locomotive emissions." (Defs.' Opp'n and Cross-MSJ at 28.) There is much to be said for Defendants' argument. First, in enacting the Regulation, California is acting within the scope of traditional state regulation, i.e., protecting citizens from environmental hazards. Second, in *BNSF*, the court found section 5125(f)(1)'s "narrow and specific" protection of fair fees relating to transportation of hazardous materials was neither controlled nor nullified by ICCTA's "broad and general" preemption provision. *BNSF*, 904 F.3d at 766. One could argue that Section 209(e)(2)(A) is similarly narrow and specific, focusing exclusively on emissions from non-road vehicles and engines. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one,

1    regardless of the priority of enactment." *Mancari*, 417 U.S. at 550–51.  Third, as the

2    STB and the Ninth Circuit have repeatedly recognized, "nothing in section 10501(b)

3    [of the ICCTA] is intended to interfere with the role of state and local agencies in

4    implementing Federal environmental statutes, such as the Clean Air Act . . . ."

5    *Swinomish*, 951 F.3d at 1157 (quoting *Town of Ayer*, 2001 WL 458685, at *6 n.28).

6    Section 209(e)(2)(A) was preexisting law when ICCTA was enacted.  Pub. L. No. 104-

7    88, 109 Stat. 803 (1995) (ICCTA); Pub. L. No. 101-549, 104 Stat. 2502 (Nov. 15, 1990)

8    (Section 209(e)(2)(A)).  Thus, the "strong presum[ption] . . . that Congress will

9    specifically address preexisting law when it wishes to suspend its normal operations in

10   a later statute" applies.  *BNSF*, 904 F.3d at 766 (internal quotation marks omitted).  Yet

11   Congress gave no indication it intended the ICCTA to upend its existing approach to

12   locomotive emission control.  Accordingly, as in *BNSF*, Defendants urge this Court to

13   conclude that state regulation authorized under a federal statute that conflicts with,

14   but is more specific than, the ICCTA is shielded from ICCTA preemption.[11]

15         Plaintiffs do not concede that *BNSF* provides the appropriate harmonization

16   approach.  Rather, they point to STB authority which engages in a situation-specific

17   harmonization analysis when considering conflicts between the ICCTA and other

18   federal statutes.  As the STB has explained:

19             [F]ederal environmental statutes such as the CAA, the Clean
20             Water Act, and the Safe Drinking Water Act are generally
               outside the scope of § 10501(b) preemption, unless the
21             federal environmental laws are being used to regulate rail

22   [11] Courts in other circuits have applied a similar line of reasoning when harmonizing federal statutes
     with the ICCTA.  In *Tyrrell v. Norfolk South Railway Company*, 248 F.3d 517 (6th Cir. 2001), for example,
23   the Sixth Circuit considered whether an Ohio track clearance regulation was preempted under the
     Federal Railway Safety Act ("FRSA") and the ICCTA.  The FRSA, which governs rail safety, explicitly
24   provides a role for states to supplement federal regulations with their own rules.  *See* 49 U.S.C. § 20106
     ("A State may adopt or continue in force a law, regulation, or order related to railroad safety until the
25   Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the
     state requirement.").  The Sixth Circuit, interpreting this language, found that the state rule, which
26   regulated rail safety, was part of the FRSA's regulatory regime.  *See Tyrrell*, 248 F.3d at 521.  However,
     the state's rule also triggered the ICCTA's preemption clause.  To avoid a conflict, the court found that
27   Congress intended the two statutes to be construed in *pari materia* and that the ICCTA did not preempt
     state rules relating to railroad safety because such rules fell under the FRSA's regulatory umbrella,
28   which had "primary authority" over rail safety matters.  *See id.* at 523.

                                                      24

> operations directly or being applied in a discriminatory manner against railroads . . . [h]owever, actions taken and regulations enacted under federal environmental statutes or other federal statutes may directly conflict with the purposes and regulatory scheme under the Interstate Commerce Act. When such a conflict occurs, the Board or a court must determine whether the two federal statutes and their applicable regulatory schemes can be harmonized.

*United States Envt'l Prot. Agency – Petition for Declaratory Ord.* ("*EPA Petition*"), No. FD 35803, 2014 WL 7392860, at *7 (S.T.B. Dec. 29, 2014) (citations omitted).  "[W]hether a particular Federal environmental statute, local land use restriction, or other local regulation is being applied so as to not unduly restrict the railroad from conducting its operations, or unreasonably burden interstate commerce, is a fact-bound question." *Town of Ayer*, 2001 WL 458685, at *6.  Accordingly,

> situations need to be reviewed individually to determine the impact of the contemplated action on interstate commerce and whether the statute or regulation is being applied in a discriminatory manner, or being used as a pretext for frustrating or preventing a particular activity, in which case the application of the statute or regulation would be preempted.

*Id.*

For example, in *EPA Petition*, the STB considered a request from the EPA that it issue a declaratory order ruling as to whether proposed locomotive idling record-keeping and idling limitation rules in the South Coast Air Basin of California would be preempted by the ICCTA if the EPA were to approve the rules as part of California's SIP under the CAA.  2014 WL 7392860, at *1.  The STB ultimately declined to issue a declaratory order but opined that the rules would likely be preempted even if the EPA were to incorporate the Rules into California's SIP "because of the potential patchwork of regulations that could result, contravening Congress's purpose in enacting [the ICCTA]."  *Id.* at *8.  While the STB noted that not "every existing federal regulation that may affect railroad operations is preempted by [the ICCTA]," the STB reasoned that

25

1  "the current record" indicated "that allowing states and localities to create a variety of

2  complex regulations governing how an instrument of interstate commerce is

3  operated, equipped, or kept track of (even if federalized under the CAA) would

4  directly conflict with the goal of uniform national regulation of rail transportation." *Id.*

5  at *9.

6      The Court need not rule on the proper harmonization analysis in this order.  No

7  matter the harmonization method the Court ultimately adopts, the scope of the

8  Court's review will turn primarily on the EPA's decision.  Thus, the Court will reserve

9  decision on this matter until the EPA has completed its review of the Regulation.[12]

10      Finally, Plaintiffs argue that, under binding Ninth Circuit precedent, a stay is not

11  necessary because hypothetical EPA actions are "irrelevant" to ICCTA preemption and

12  provide "no authority for the courts to harmonize" state or local "rules with ICCTA."

13  *AAR*, 622 F.3d at 1098.  *AAR*, however, is distinguishable from the case at hand.  In

14  *AAR*, the Ninth Circuit held that a local air quality district's rules directed to train idling

15  and reporting and recordkeeping were "plainly" preempted under the ICCTA.  *Id.* at

16  1096, 1098.  In so ruling, the court reasoned that "if an apparent conflict exists

17  between ICCTA and a federal law, then the courts must strive to harmonize both laws

18  . . . ." *Id.* at 1097.  However, if "an apparent conflict exists between ICCTA and a state

19  or local law" then "different rules apply." *Id.*  The law at issue in that case was a purely

20  local law, which had not yet been submitted to CARB, or to the EPA by CARB, for

21  approval.  *Id.* at 1098.  Thus, the court reasoned that the rules did not have the force

22  and effect of federal law, even if they might if incorporated into California's EPA-

23  approved SIP in future and found no harmonization between the CAA and ICCTA was

24  necessary.  *Id.*  Here, by contrast, the harmonization analysis involves a regulation

25

26  _____

27  [12] The Court will also reserve ruling on whether and what form of harmonization analysis must be
    performed for portions of the Regulation that are found to be "in-use requirements," and thus do not
    require EPA authorization, but fall within the powers reserved for the states under Section 209(d).  *See*

28  *EMA*, 88 F.3d at 1094.

1  currently pending before the EPA.  Thus, future EPA action is not hypothetical, and the

2  Court must account for the EPA's possible imminent approval of the Regulation.

3       The Court finds that a stay of Plaintiffs' ICCTA and Dormant Commerce Clause

4  claims will not needlessly delay resolution of those claims.  Rather, imposing a stay

5  now will allow the Court to comprehensively review and harmonize any portions of the

6  Regulation authorized under the CAA with the ICCTA and the Dormant Commerce

7  Clause once the EPA has completed its review.  Further, Defendants have represented

8  to the Court they will not enforce any aspect of the Regulation until the EPA has issued

9  its ruling, which effectively stays the Regulation pending EPA review.

10       Accordingly, until such time as the EPA issues their ruling, the primary

11  jurisdiction doctrine compels a stay of Plaintiffs' ICCTA and Dormant Commerce

12  Clause claims.

13  **CONCLUSION**

14  In accordance with the above, it is hereby ORDERED:

15  1.  Plaintiffs' Motion for Summary Judgment (ECF No. 29) is DENIED without

16      prejudice;

17  2.  Defendants' Cross-Motion for Summary Judgment (ECF No. 51) is

18      GRANTED in part as to Plaintiffs' lack of standing to challenge the Idling

19      Requirements specified in California Code of Regulations, title 13, sections

20      2478.9(a), (b), (c)(1), (d), and (e).  The remainder of Defendants' Cross-

21      Motion is DENIED without prejudice;

22  3.  Defendants' Federal Rule of Civil Procedure 56(d) Motion (ECF No. 53) is

23      DENIED;

24  4.  This matter is STAYED pending a decision from the EPA on California's

25      Section 209(e)(2)(A) authorization request; and

26  ////

27  ////

28  ////

27

5.  The Parties shall file a Joint Status Report within thirty (30) days of a decision
    from the EPA.

IT IS SO ORDERED.

Dated:   **September 30, 2024**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC4 – Ass'nAmRR23-cv-1154.MSJ